## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )
    v.                       )    No. 03 CR 11
                             )    Judge James T. Moody
MATTHEW HALE,                )
                             )
            Defendant.       )

### NOTICE OF FILING

**TO:    By Hand Delivery**
M. David Weisman
Victoria Peters
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604

**PLEASE TAKE NOTICE** that on the 3rd day of March, 2003, the undesigned filed or

caused to be filed with the Clerk of the District Court for the Northern District of Illinois, at

Chicago, Illinois, the foregoing Motion for Revocation of Detention Order and Request for an

Evidentiary Hearing, a copy of which is hereby served upon you.

Respectfully submitted,

JODI L. GARVEY, One of the Attorneys
for Defendant.

**DURKIN & ROBERTS**
53 West Jackson Boulevard, Suite 615
Chicago, Illinois 60604
(312) 922-8980

## CERTIFICATE OF SERVICE

**JODI L. GARVEY,** attorney at law, hereby certifies that on March 3, 2003, she served,

or caused to be served, the foregoing pleading on the following attorneys of record by hand

delivery:

M. David Weisman
Victoria Peters
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604

_____
**JODI L. GARVEY**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES OF AMERICA,   )
                        )
       Plaintiff,     )
                        )
   v.                )   No. 03 CR 11
                        )   Judge James T. Moody
MATTHEW HALE,        )
                        )
       Defendant.   )

U.S. DISTRICT COURT

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

FILED
MAR 03 2003

DOCKETED
MAR 04 2003

## DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER AND REQUEST FOR AN EVIDENTIARY HEARING

Defendant, **MATTHEW HALE**, by his attorneys, **THOMAS ANTHONY DURKIN** and **PATRICK W. BLEGEN**, pursuant to 18 U.S.C. §3145(b), the Due Process and Effective Assistance of Counsel clauses of the Fifth and Sixth Amendments, as well as the Freedom of Speech and of Religion provisions of the First Amendment to the Constitution of the United States, respectfully requests that this Court review and revoke the order of Magistrate Rodovich, dated February 12, 2003,[1] granting the government's motion for pretrial detention and ordering that Defendant be held without bond pursuant to 18 U.S.C. §3142(e). Defendant further requests that the Court conduct an evidentiary hearing.

### I.   Introduction

For all intents and purposes, Matt Hale has had no meaningful detention hearing. He was arrested on January 8, 2003, by a covey of federal agents in SWAT team garb as he entered the federal courthouse in Chicago as a private litigant. Jailed immediately, and notwithstanding his

---

[1] At the conclusion of the detention hearing on January 23, 2003, Magistrate Rodovich indicated that the government had demonstrated by clear and convincing evidence that defendant was a danger to the community and by a preponderance that he was a flight risk. (Tr. p. 33) The Magistrate then indicated that he would put his reasons in writing, and that the decision could be appealed to this Court if the defendant was dissatisfied. *Id.* The Magistrate's written order was issued on February 12, 2003.

willingness to submit to interrogation by federal agents disbelieving of his protests of innocence (*See,* Exhibits A & B, FBI 302's both dated January 9, 2003[2]), he was immediately stashed in solitary confinement on the eleventh floor of the Metropolitan Correctional Center in Chicago under remarkably restrictive conditions instituted by the Bureau of Prisons.[3] Kept incommunicado from his wife, family and friends, Mr. Hale was unable to hire criminal counsel; and was forced to proceed to a detention hearing with appointed counsel who, under the circumstances, were hardly prepared to advocate effectively on his behalf, meaningfully confront the evidence the government submitted by proffer, or present witnesses on Hale's behalf.[4]

---

[2]Although both 302's are dated January 9, 2003, Hale was arrested and interrogated on January 8, 2003.

[3]*See,* the attached correspondence from counsel to the government attorneys and legal counsel at the MCC dated February 4, 2003, February 18, 2003, and February 22, 2003, and marked Exhibits C, D & E, respectively. The postage matter addressed therein has finally been resolved, at least for the moment, within the last week. All other issues remain unresolved and, in counsel's opinion fly in the face of Magistrate Rodovich's order and the letter and spirit of 18 U.S.C. §3142(I)(3). In addition, and in case the Court needs more proof that pretrial detention is being used to punish, Hale has been detained at the MCC since January 8, 2003; yet, as of the date of the filing of this motion, he has not been permitted a social visit of any kind, including his mother and father. Even more outrageously, on today's date, March 3, 2003, counsel were served with a copy of a memorandum dated February 24, 2003, signed personally by Attorney General John Ashcroft, directing the Bureau of Prisons, pursuant to 28 C.F.R. § 501.3, to implement "Special Administrative Measures" (SAM) severely restricting Hale's access to mail, the media, telephone, recreation, religious services, and visitors — including even Hale's legal visits. The constitutionality of this draconian order, and its "chilling effect" on Hale's Sixth and First Amendment rights, will certainly be the subject of later pleadings; but it surely should be something of the highest concern to this Court. A copy of the government's transmittal letter to counsel, along with a copy of the aforesaid section of the Code of Federal Regulations, are also attached hereto as Exhibit F & G, respectively. Counsel were provided with a copy of the Attorney General's memorandum to the Director of the Bureau of Prisons setting forth the measures themselves. This copy, however, is restricted to "Limited Official Use" only. Counsel are told that they will receive an unrestricted copy of the measures, and will then so supplement this pleading upon receipt. Suffice it to say for now, the "measures" are truly frightening to anyone concerned about the current state of civil liberties in this country.

[4]Proffers, while allowable at detention hearings in the court's discretion, have been described as "sterile" and as merely, "the shadow of testimony." *United States v. Torres,* 929 F.2d 291 (7th Cir. 1991) (Holding that defendant should have been allowed to present evidence by testimony at detention hearing.); *United States v. Hammond,* 44 F.Supp. 743 (D.Md. 1999) ("it is the Court and not the government that determines whether proceeding by proffer is acceptable in a given detention hearing.) However, no objection was made to proceeding by proffer save one objection later in the proceeding to the introduction of a tape transcript. (*See,* Detention Tr., p. 15) This, counsel submit, should be quite significant insofar as this Court's *de novo* review of the Magistrate's findings with respect to the weight of the government's evidence is concerned. That is, without witnesses, there was little for the Magistrate to evaluate with respect to credibility, nor was the evidence confronted by the defense. This latter issue will become highly relevant for purposes of this motion as the Court can see from the analysis herein with respect to the contents of the tape recordings. *See,* pp. 10-14, *infra.*

2

In short, Due Process and the Sixth Amendment entitle Hale to a new hearing and release on conditions.

## II.    **Relevant Law**

As this Court is no doubt aware, the Bail Reform Act of 1984, 18 U.S.C. §3142, provides a court with four options with respect to release or detention pending trial: (1) release on personal recognizance; (2) release on conditions; (3) temporary detention to permit revocation of conditional release; and, (4) detention. *See*, 18 U.S.C. §3142(a)&(e). In cases that do not give rise to a rebutable presumption of flight risk or danger to the community,[5] the statute favors release because a defendant may only be ordered detained where there are no conditions, or combinations of conditions, that will reasonably assure the appearance of the defendant and the safety of the community. *See*, 18 U.S.C. §3142(e); *United States v. Chen*, 820 F.Supp. 1205 (N.D. Cal. 1992) ("Only in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in favor of release"). *See, also, United States v. Salerno*, 481 U.S. 739, 749, 107 S.Ct. 2095, 2102, 95 L.Ed.2d 697 (1987); *United States v. Torres*, 929 F.2d 291 (7th Cir. 1991) (Both cases indicating that pretrial detention remains an exceptional step); *United States v. Infelise*, 934 F.2d 103, 105 (7th Cir., 1991) (Pretrial detention may only be ordered if the Court finds that there is no adequate alternative to pretrial detention which is less restrictive).

In order to determine whether conditions exist that will reasonably assure the defendant's appearance and the safety of the community, courts are directed under the act to consider: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of

---

[5]As discussed *infra*, herein, there is no presumption of detention in this case.

3

violence or involves a narcotic drug; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant;[6] and, (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See*, 18 U.S.C. §3142(g). The statute also specifically directs that "[n]othing in this section shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. §3142(j).[7]

Where, as here, no presumption weighs in favor of detention, the government has the burden of proof. When the government asserts that a defendant is dangerous, the government must prove "by clear and convincing evidence that no condition or set of conditions will ensure the safety of the community." *See, e.g., Portes*, 786 F.2d at 764. Where the government claims that a defendant is a risk of flight, the government must prove by a preponderance of the evidence that no conditions, or combinations thereof, will reasonably assure the defendant's appearance in court. *Id.* at 765.

When a district court reviews the detention order of a Magistrate pursuant to 18 U.S.C.

---

[6]History and characteristics include: (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law.

[7]With all due respect to Magistrate Rodovich, it appears from his detention order that he has not only ignored this provision, but turned it on its head. Instead of presuming Hale innocent, as he must, or simply acknowledging the fact that a grand jury had found sufficient probable cause to return an indictment, Magistrate Rodovich, incredibly, makes the following conclusion, "(t)he defendant is a member of a White supremacist organization which advocates hatred and violence. After Judge Lefkow entered an order against the defendant's organization, he encouraged the confidential informant to 'exterminate' the judge and the attorneys involved in the case. Because the defendant felt that he was being watched and that his e-mails were being intercepted, he attempted to distance himself from any direct involvement in the attack. However, it is clear from the defendant's comments that he expected the confidential informant to 'take the law into our own hands' and to 'meet force with force and open warfare . . .'" (Magistrate's Order, p. 9) Leaving aside the fact that few defendants, if any, would ever be released on bond if not presumed innocent, Magistrate Rodovich's conclusion seems to have arisen from passion rather than the evidence. For example, not even the government has alleged that Defendant encouraged the confidential informant to exterminate "the attorneys involved in the case." Needless to say, Defendant disagrees with Magistrate Rodovich's conclusions regarding the weight of the evidence in other respects, and that position is set forth more fully herein.

4

§3145(a), the review is *de novo*. *See, e.g., United States v. Portes*, 786 F.2d 758 (7th Cir. 1985); *United States v. Jones*, 804 F.Supp. 1081 (S.D.Ind. 1992). And, the district court need not defer to the Magistrate's findings, nor give specific reasons for rejecting them. *United States v. Shaker*, 665 F.Supp. 698 (N.D.Ind. 1987), *citing, United States v. Leon*, 766 F.2d 77 (2nd Cir. 1985) *and, United States v. Delker*, 757 F.2d 1390 (3rd Cir. 1985). The district court may start from scratch and hold a new hearing, or may review the transcript of the hearing before the Magistrate. *United States v. Torres*, 929 F.2d 291 (7th Cir. 1991). The court may also hear additional evidence, and decisions regarding whether to accept additional evidence is left to the broad discretion of the district court. *Shaker*, 665 F.Supp. at 704, *citing, United States v. Dominguez*, 783 F.2d 702 (7th Cir. 1986); *Delker*, 757 F.2d at 1393-94; *United States v. Fortna*, 769 F.2d 243 (5th Cir. 1985); *United States v. Daniels*, 622 F.Supp. 178 (D.C.Ill. 1985); *United States v. Freitas*, 602 F.Supp. 1283 (N.D.Cal. 1985).

In *Shaker, supra*, this very Court considered whether a defendant moving under 18 U.S.C. §3145(b) was required to meet the standards of §3142(f) in order to be able to present new evidence; *i.e.*, that the evidence was not known at the time of the original hearing and that it has a material bearing on the issue of conditional release. *Shaker*, 665 F.Supp. at 705. In light of case law reflecting a district court's broad discretion to hear additional evidence, this Court indicated that it was reluctant to impose such a requirement. Likewise, counsel's research has uncovered no subsequent case law indicating that the §3142(f) standard applies to §3145(b). Defendant, therefore, is requesting leave to present additional evidence, some of which certainly meets the §3142(f) standard.

For example, Defendant will present evidence regarding the firearm that the government indicated it was not able to locate — an issue that was not raised until the time of the detention

5

hearing. Defendant also intends to present evidence regarding his conviction which was overturned by the Illinois Appellate Court. With regard to evidence that cannot be said to be newly discovered, Defendant submits that the Court ought to exercise its discretion in favor of permitting such evidence. Additional evidence is particularly necessary where, as here, Defendant's counsel at the time of the detention presented no evidence other than referring Magistrate Rodovich to a few lines of transcript from Defendant's conversation with the confidential informant, and arguing that Defendant had ties to the community. (Detention Tr. pp. 27-28) As such, counsel submit that in this instance, starting from scratch and holding a new hearing is the only realistic alternative for providing a semblance of respect to Due Process and the Sixth Amendment.

## III. Magistrate Rodovich's Order

Although the order encompasses ten pages, nearly eight full pages are devoted to reciting the evidence presented by the government by way of its proffer.[8] The remaining pages entail analysis, and while the Magistrate recites the required conclusions; *i.e.*, that "[t]he government has demonstrated by clear and convincing evidence that the defendant is a danger to the community," and "[t]he government has also demonstrated by a preponderance of the evidence that the defendant is a flight risk," little or no attempt is made at justifying those conclusions. For example, the order does not discuss a single condition of release and/or why such a condition would not reasonably assure the safety of the community or Defendant's appearance. Likewise, the order does not discuss the two pieces of property which Defendant's counsel indicated were available for posting, nor does it address the suggestion by Defendant's counsel that Defendant's

---

[8]One paragraph (labeled 14) deals with information apparently gleaned from the pretrial services report and states, "[t]he defendant lives with his father in East Peoria, Illinois, and operates the World Church of the Creator out of his father's residence. The defendant has no other source of income."

6

father, a police officer for 30 years, was willing to serve as a third-party custodian, or the suggestion by Defendant's counsel that he be released with a condition of home detention. (Detention Tr. pp. 31-32). Obviously, other conditions are available as well, including electronic monitoring, a limitation on individuals with whom Defendant is permitted contact, as well as limitations on Defendant's access to a telephone and to a computer.

### A.  Danger to the Community and Weight of the Evidence

In addressing danger to the community, the Magistrate's order indicates as follows:

> Under 18 U.S.C. §3142(e), a defendant may be detained as a danger to the community if he is charged with a crime of violence under Section 3124(f)(1)(A). Under Section 3156(a)(4), the defendant is charged with a crime of violence. (Magistrate's Order, p. 8)

While counsel are unsure of the meaning of this paragraph, it does not appear to be an accurate statement of the Bail Reform Act. Whether or not the charged crime is a crime of violence is one of four specific factors that courts are directed to consider in deciding whether any conditions will reasonably assure safety and the defendant's appearance. *See,* 18 U.S.C. §3142(g). A charge amounting to a crime of violence also permits the government to request a detention hearing. *See,* 18 U.S.C. §3142(f). However, a defendant may only be detained where "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *See,* 18 U.S.C. §3142(e). The Magistrate's over-emphasis of the nature of the charge is, therefore, troubling to say the least. Lest there be some mistake, despite the Magistrate's reference to §3142(e), *the charges in this case do not give rise to a presumption in favor of*

7

*detention.*[9]

In finding that no conditions or combinations thereof would reasonably assure the safety of the community, the Magistrate also placed great emphasis on the purported weight of the evidence. In fact, it appears that the Magistrate has found the evidence to be so overwhelming as to support the following conclusion:

> (t)he defendant is a member of a White supremacist organization which advocates hatred and violence. After Judge Lefkow entered an order against the defendant's organization, he encouraged the confidential informant to "exterminate" the judge and the attorneys involved in the case. Because the defendant felt that he was being watched and that his e-mails were being intercepted, he attempted to distance himself from any direct involvement in the attack. However, it is clear from the defendant's comments that he expected the confidential informant to "take the law into our own hands" and to "meet force with force and open warfare . . ."[10] (Magistrate's Order, p. 9)

Having reviewed the exhibits and proffer provided by the government at the detention

---

[9]"Section 3142(e) provides for two rebuttable presumptions in favor of detention. The first of these two presumptions (the previous-violator presumption) is designed to ensure the safety of the community and others by presuming that no conditions of release will reasonably assure the safety of the community where the defendant is accused of one of numerous specified crimes, such as a crime of violence, and has previously (within the last five years) been convicted of or released from imprisonment for committing one of the specified crimes while free on bail. The second presumption (the drug-and-firearm-offender presumption) is designed to ensure both the safety of the community and the appearance of the defendant at trial by presuming no conditions of release will reasonably assure the defendant's appearance and the safety of the community where a judicial officer finds probable cause to believe that the defendant has committed a federal drug offense carrying a maximum prison term of ten years or more or has used a firearm to commit a felony. 18 U.S.C. § 3142(e). Thus, in order to properly trigger a presumption that a defendant poses a danger to the community, the defendant must either be a previous violator of one of the specified crimes or be accused of a drug or firearm related offense. The only time the presumption that a defendant is likely to flee is properly triggered is when the defendant is accused of a drug or firearm related offense." *United States v. Shaker*, 665 F.Supp. 698, 701 (N.D.Ind. 1987).

[10]The last quotes, "take the law into our own hands," and "meet force with force and open warfare" are taken from a two page e-mail which indicated that it was a preview of an article to be published on the internet, and was sent not just to the confidential informant, but to other members of Defendant's church. More importantly, the quotes in question were direct quotations from "The White Man's Bible," a book written by an individual named Ben Klassen, and which purports to contain the beliefs of Defendant and his church. To say, therefore, that Defendant expected the confidential informant to do those things is a stretch of the highest order. It is particularly disturbing, however, that the quotes were not identified by the Magistrate as coming from "The White Man's Bible," and that the Magistrate did not explain the theory on which he was relying. The failure to explain might well be understandable, however. What the Magistrate is essentially saying is that Hale's alleged solicitation can be based not on his own words, but by his reference to passages from religious books — a novel theory, indeed, which if taken to its logical, albeit hyperbolic, conclusion might also support the detention of a Christian or Muslim based upon selective militant quotes from the Bible or Koran.

8

hearing, counsel are, quite frankly, shocked that a detached review of the evidence could lead to such an unequivocal conclusion, but it is perhaps explainable in light of the government's sterile and self-serving proffer. One need merely read the transcripts of the two recorded conversations between Defendant and the confidential informant on December 5, 2002, and December 17, 2002, to realize that the government's evidence in this case is far from overwhelming — a conclusion that is virtually self-evident from the tapes themselves.[11]

An examination of the entirety of the transcripts provided to the Magistrate makes clear, from undersigned counsel's perspective, that the evidence against Defendant is awfully weak, at best; and that rather than supporting detention, it instead weighs heavily in favor of Defendant's release on conditions. On both dates, December 5, 2002, and December 17, 2002, the confidential informant, who had been planted by the FBI into Hale's church as early as 1999, and who was paid approximately $50,000 for his work, goes to great lengths to cajole, coax, and prod Hale into providing some assistance, or into acknowledging on tape that he has ordered the informant to take some action.

Moreover, and on repeated occasions, the informant can be seen to intentionally interrupt Hale while he is in the process of disclaiming any involvement in the informant's plan or any intent for it to go ahead. Despite these interruptions, on what counsel have counted to be more

---

[11]The government's case, stripped to its core, can readily be seen to be based on passion, distaste for Defendant's beliefs and political views, as well as an inclination to believe the defendant is guilty of solicitation because, as the prosecutor stated in his proffer, "[h]e never instructs the source not to carry out the plans. He never instructs the source that his plans are not what the defendant wants to happen." (Detention Tr., p. 19) Hoping, wishing, or wanting something to happen, no matter how distasteful, is not a crime, however, and is certainly not a violation of 18 U.S.C. §373, which requires, under circumstances strongly corroborative of an intent that a crime of violence be committed by another, that the defendant solicit, command, induce, or otherwise endeavor to persuade that person to engage in such conduct. Defendant is also charged with a violation of 18 U.S.C. §1503(a) in Count Two of the indictment. Although it is not clear, this charge appears to be based on the same conduct alleged in Count One, as both counts indicate that the conduct occurred, "[f]rom on or about November 29, 2002, through at least on or about December 17, 2002, in the Northern District of Illinois, Eastern Division, and elsewhere."

9

than twenty occasions during the two recorded conversations, Hale specifically indicates to the informant that he is unwilling to be part of any plan to injure Judge Lefkow, that the actions of any person depends upon the dictates of his own conscience, and, even more to the point of the government's charges, that he has neither ordered nor encouraged the informant to do anything to Judge Lefkow. The following excerpts, which represent only but a few among many, are illustrative:[12]

| | |
|---|---|
| CW | Well I got your e-mail about the Jew judge. . . . |
| HALE | Right. |
| CW | . . .you wanting his address and all his rats. Ah. . . |
| HALE | That information. . .yes. . for educational purposes and for whatever reason you wish it to be. |
| CW | Are you gonna. . . .I'm workin on it. I, I got a way of getting it. Ah, when we get it, we gonna exterminate the rat? |
| HALE | Well whatever you wanna do basically. |
| CW | Jew rat. |
| HALE | . . .you know, ah. . .my position has always been that I you know, I'm gonna fight within the law and, but ah that informations been provided if you wish to do anything yourself you can. So that makes it clear. |
| CW | Consider it done. |
| HALE | Good. (Tr. 12/5/02, p. 3) |

Both the government and Magistrate Rodovich relied strongly on this excerpt as evidence of Hale's having solicited the confidential informant. Leaving aside the fact that Hale expressly says on the tape that he will fight within the law, and that others are free to do as they choose, the exchange of "consider it done," and "good," is miles away from evidence of proof beyond a reasonable doubt for either crime charged in the indictment. The only thing Hale has asked the

---

[12]At the moment, only the government's draft transcripts are available, and Defendant does not vouch for their accuracy.

10

informant to do by his previous e-mail and in this portion of the tape is obtain addresses, which Hale later indicates he will post on the internet. In the context of their conversation, therefore, "consider it done," loses its connection with "exterminate" and, along with that, the very value the government hopes to place on this exchange of words.

Nor, counsel would point out, is this is a fact which was lost on the government during its investigation. Notwithstanding their claims of dangerousness, the government chose not to arrest Hale after this conversation on December 5th; but instead, waited to send the informant back on December 17th in what can only be described as an obvious attempt to elicit "better" statements from Defendant.[13]

As is clear from excerpts of the December 17, 2002, conversation, however, even the attempt to elicit "better" statements falls well short:

| CW | ...ah, also regarding that that is in motion about exterminating the rat. But ah.. |
|---|---|
| HALE | (UI) ... (CHUCKLING) |
| HALE | Here's the thing brother. Here's the thing. I can't be a party to such a thing.... |
| CW | Right, right. |
| HALE | ..you know.... |
| CW | I ain't I ain't gonna let, ... see the guys I got on it is, they don't know you from adam and they don't know nothing about the church...so you... |
| HALE | ...I don't even want.... |

---

[13]With respect to the strength of the government's evidence regarding dangerousness, one might also pause to consider the fact that if the government truly believed that Hale's emails were veiled solicitations to his followers to kill Judge Lefkow, how it is that in good conscience the government could decide to delay arresting Hale, thereby exposing Judge Lefkow and her family to such risk for more than a month. One of two things might only be said to be true here. Either Hale directly solicited the informant himself to kill Judge Lefkow, or the informant was simply one among many at whom Hale's "soliciting" emails were directed. Since the tapes obviously negate the former theory, the government and the Magistrate have been forced to marry the latter. If this theory were the true state of affairs, however, one would have to assume that the government was legitimately concerned that there were others out there willing to accept Hale's "invitation." The government's tactical decision to attempt to ensnare Hale into tape recorded admissions, rather than arrest him, speaks to the government's true beliefs and intentions, and belies its present claim of calamitous danger to the community.

11

| CW | . . . .you ain't you ain't gonna be. . . . |
|---|---|
| HALE | . . .your putting me in an impossible situation. |
| CW | Well. . . . |
| HALE | I hope you realize this because I can't. . . . |
| CW | I wouldn't endanger you at all. . . .so. . . |
| HALE | . . .know about any of this stuff and, nor can I. . . you know, this, I feel there are eyes and ears everywhere. . . . (NOISES) I'm just, I'm not party to such a thing. |
| CW | . . .right. |
| HALE | . . .in fact I don't know of such a thing. I don't even know what your talking about. |

(NOISES). (Tr. 12/17/02, pp. 4-5)

The informant's attempts at interrupting aside, here Hale is clearly attempting to deny and disavow his participation in any plan. Not satisfied, however, and surely following the instructions of his FBI handlers, the informant moves on to the tactic of suggesting that he needs assistance with the plan in the hopes of eliciting an incriminating response. This tactic fails as well:

| CW | Well. . . Well, what we did discuss before is in motion and ah, you know its costing, costing me. . .costing me more than what I thought. Ah, I. . . I came to see if you, I have two trusted brothers they could help out with this, if not, ah. . . |
|---|---|
| HALE | I can't, I can't take any steps to further anything illegal, ever. (Tr. 12/17/02, pp. 6-7) |

The Magistrate, rather than finding such statements exculpatory, curiously concludes that Hale's statements such as these indicate that he was merely attempting to distance himself from any direct involvement because he felt he was being watched. (Magistrate's Order, p. 9) That conclusion, while of course necessary if Hale is to be detained, is unsupported by the evidence. Hale was certainly attempting to distance himself from the confidential informant, as revealed by his displeasure at seeing the informant on both occasions. (Tr. 12/5/02, p. 1; Tr. 12/17/02, pp. 1-

12

2) More importantly, however, Hale goes on to explain that he is not ordering or encouraging anything — statements which cannot be viewed as mere attempts at distancing himself from a plan. Such statements, represent direct evidence, from Hale's own mouth, that he did not, and had no intention of violating 18 U.S.C. §373. The statements in question, clearly evidencing Hale's lack of intent, are made in response to the informant's final gambit; *i.e.*, blindly throwing out statements that Hale has ordered him to take some action in the desperate hope that Hale will agree.

| | |
|---|---|
| CW | That's gonna happen you just gotta you know, this has got to be tooken care of that's what you an I discussed and that's what. . . .the order I got. |
| HALE | . . .well, I'm not, I'm not telling you to do anything you know. Either way, or whatever, I I've always said that you know that since this happened that whatever happens whatever a person does is according to the dictates of their own conscience. |
| CW | Right. |
| HALE | . . . .and that's the way I feel you know but I just can't know no matter what's on your mind, I'm still speaking in generalities because you know who knows who's listening. I just don't, I don't assume anything these days. I mean, these are dangerous times. |
| CW | Yeah, but we gotta make that point, this is what I got from the last conversation we had and I figured you know. . . . |
| HALE | Well, you gotta understand I could never, never order such a thing or instruct or encourage. . . . |

*******

| | |
|---|---|
| CW | . . .You'd rather just have it done and not know nothing, that's what your telling me. |
| HALE | Well, I'm not gonna have anything done I'm just, simply saying. . . . |
| CW | . . .no I'm just . . . |
| HALE | . . .Whatever a person wants to do. . . I I have to be, I just can't this is too serious. I just can't ah. . . (UI) I don't want anything. . you know I'm not a party of anything (UI) . . .not encouraging anything. (Tr. 12/17/02 p. 13) |

*******

| | |
|---|---|
| CW | . . . .and ah, in motion it's gonna be tooken care of. Ah, . . .its was orders I have followed but ah. . . |

13

HALE               I haven't given. . .

CW                We. . .we gonna win so. . .ah, is it okay for me to come down here and use you as my alibi?

HALE               Alright. . . (UI) . . . I'd be . . . arrested. (Tr. 12/17/02, p. 14)

*********

In addition to casting serious doubt on the weight of the evidence, Defendant submits that these excerpts, along with the nature of the charged crimes and the government's method of "investigating" those charges, ought instead to weigh strongly in favor of release. It can hardly be said that Hale is a danger to the community, or to any specific person for that matter, when the only individual to raise the possibility of harming anyone is a government informant who is sent to Hale with the specific purpose of pointing him in that direction. At the first, and every other instance, it is the informant who raises the topic of "exterminating the rat." (Tr. 12/5/02, p. 3) At most, it appears that Hale did not attempt to dissuade the informant from the informant's self-professed plans. If the possibility of someone else proposing a plan of violence to Hale while he is awaiting trial is sufficient to make Hale a danger, it can surely be remedied through conditions which limit his contact with certain individuals and his access to telephones and a computer.

Lastly, and with regard to danger, the Magistrate indicated that, "a search of the defendant's residence resulted in the seizure of eight weapons but not the gun described by the defendant's father." (Magistrate's Order, p. 9) This situation is easily explained, and can be presented to the Court by proffer or live testimony. Hale's father, Russell Hale, is a retired East Peoria police officer of thirty years, and a gun collector. Hale lived with his father at the time of his arrest, and when a search warrant was executed at their home, Russell Hale told the FBI agents that he had guns in the home, but mistakenly told FBI agents that the one gun in the house

14

that belonged to Matt, an antique bolt-action rifle, was upstairs.[14]  The gun in question, Matt's

rifle, was, in fact, downstairs in the home with the rest of the guns in Russell Hale's collection.

Matt's rifle was seized along with the other guns in the home, taken outside and inspected by the

FBI, and was returned to Russell shortly thereafter.  Russell did not realize this mistake until

after the FBI had left, and he is understandably upset that his confusion has had a detrimental

impact on his son's ability to be released.  He is, of course, more than willing to testify regarding

this incident, and is also willing to dispose of the guns in any way the Court sees fit.  Likewise,

he remains available to serve as a third-party custodian, is happy to have his son return to live

with him, and as discussed herein, is willing to post the home in which he lives in addition to the

home in which his ex-wife, Hale's mother, lives.[15]

Finally, it is clear to counsel that the Magistrate fell for the government's sleight-of- hand

argument that Hale is a danger because he must have done the same thing with the confidential

informant that the government suspects he did with Benjamin Smith.  (See, Magistrate's Order,

pp. 7-8; referring to the Smith shooting spree, the government's proffer of Hale meeting with

Smith prior to it, and Hale's statement to FBI agents that he did not tell authorities that he

suspected Smith because it was their job to solve crimes).  That is, the government's orchestrated

pantomime regarding Judge Lefkow and this informant "hit man" demonstrates that Hale must

have "solicited" Benjamin Smith in the same fashion to randomly kill racial minorities in

Chicago and Indiana.  Not surprisingly, the Magistrate makes no attempt to explain the relevance

---

[14]At the time of his arrest, Hale had a valid FOID card which his father indicates has subsequently been revoked.

[15]Although it is Russell Hale who owns the second home, Hale's mother lives in it.  She is also more than willing to support her son, and is amenable to the home being posted and any other role or responsibility the Court sees fit for her.  In addition, Hale's mother is in the process of adopting two of her grandchildren who will then live with her — a fact which provides further assurance that Hale would appear in court as required.

of such "evidence," its impact on his decision, or even the extent to which he relied on it. In such circumstances, therefore, it is difficult to respond. Suffice it to say, however, that outrage over the Smith incident, backed up only by the government's suspicions and years of investigation which have led nowhere, ought not to be used to deny Defendant release on conditions.

### B. Risk of Flight

Magistrate Rodovich's Order addresses the issue of Defendant's risk of flight in the following summary fashion:

> The government also has demonstrated by a preponderance of the evidence that the defendant is a flight risk. The defendant lives with his father and is not employed except for the World Church of the Creator. This organization has members throughout the country, and the defendant undoubtedly could enlist their assistance in hiding from federal authorities who he views as corrupt and illegitimate. (Magistrate's Order, p. 9)

Here, the Magistrate misconstrues the issue and utterly fails to follow the requirement of the detention statute. The question demanded by the statute is not whether there is some fact that might pose an issue with respect to flight risk, but whether the government can prove by a preponderance of the evidence that *no conditions will reasonably assure the appearance of the defendant as required*. *See*, 18 U.S.C. §3142(e); *Portes*, 780 F.2d at 765. The Magistrate inexplicably fails to address any conditions whatsoever.

Moreover, the Magistrate ignores the fact that Hale voluntarily appeared at the courthouse in Chicago for a rule to show cause issued by Judge Lefkow; and, according to some of the very statements of the defendant used by the government to support its position, told his followers that he believed there was a likelihood that he would be jailed for contempt of court. (Tr. 12/5/02, p. 5) Hale's conduct in this regard is strong evidence that he will not flee. *See, United States v.*

16

*Hammond*, 204 F.Supp. 1157 (E.D.Wis. 2002) (district court denies government's appeal of Magistrate's release order of an Outlaws Motorcycle Club member despite allegations that Outlaws had previously absconded in similar cases); *citing, United States v. Patriarca*, 948 F.2d 789 (1st Cir. 1991) (finding that the defendant, a Mafia boss, was not a flight risk, despite ability of Mafia to facilitate flight, when he did not flee despite knowledge that he was under FBI surveillance and could be indicted).

With regard to enlisting others to assist Hale in hiding from federal authorities, this conclusion is drawn from the prosecutor's argument that "he is a leader of a White Supremacy organization with ties around the world. We believe he is also a flight risk because he could easily leave the area undetected and have places to stay worldwide." (Detention Tr., p. 29) This argument is unsupported by any evidence whatsoever and is, frankly, absurd. Hale has no passport and has never left the country. Moreover, he is without the financial means to engage in any such globetrotting game of hide-and-seek with the federal government. *See, United States v. O'Brien* 895 F.2d 810 (1st Cir. 1990) (defendant's indigence inhibited ability to travel far). Likewise, Hale could not simply "easily leave the area," as he is by now eminently recognizable, and has been under government surveillance for quite some time.[16] Lastly, any risk of flight could certainly be cured by a combination of any of the usual and customary conditions less restrictive than detention such as electronic monitoring, third party custodian, and/or the posting

---

[16]Moreover, Hale has been engaged in a four year legal battle in two states to obtain a law license. He is a graduate of Bradley University with a Bachelor's degree in political science, and also graduated from Southern Illinois University School of Law with a Juris Doctor. Trying to suggest that someone who would go to such lengths to pursue that goal despite the virtual insurmountability of the obstacles in front of him, would throw it all away by fleeing only emphasizes the shallowness of the government's claim that Hale is a flight risk. While he may well be utterly dislikeable and despicable to most people, lack of persistence is one thing that cannot be said of Hale. If, therefore, as it is often said that "actions speak louder than words," it might also be suggested that Hale's constant attempts to work within the legal system undermine the inflammatory rhetoric he has adopted, which as previously mentioned, is attributable, in any case, to the Church's founder Ben Klassen, not Hale himself.

17

of real estate. As the district court in *Hammond, supra,* noted under strikingly similar

circumstances:

> The mere opportunity to flee is not enough to justify detention. *Chen,* 820
> F.Supp. at 1208. "Section 3142 does not seek ironclad guarantees, and the
> requirement that the conditions of release 'reasonably assure' a defendant's
> appearance cannot be read to require guarantees against flight." *Id.* (citing *Portes,*
> 786 F.2d at 764 n. 7). The government has not established that the Outlaws have
> provided money to fund defendant's flight. Further, membership in an
> organization that has in the past helped members to flee is insufficient absent
> evidence that *this* member is inclined to flee. *Patriarca,* 948 F.2d at 793. Given
> the strict conditions of release imposed, defendant's appearance is reasonably
> assured. *Hammond,* 204 F.Supp. at 1166.

Defendant submits, therefore, that the government has not established by anything close

to a preponderance of the evidence that no condition or combination of conditions will

reasonably assure Hale's appearance in court. Although never addressed by the Magistrate, a

variety of conditions are available, not the least of which is Defendant's father posting the two

homes he owns in Peoria, one of which he estimates is valued at $80,000, and the other at

$117,000. As noted herein, Hale's father lives in the first home, while his mother and potentially

two grandchildren, live in the second. Not only is the monetary value of these homes significant,

but there can be no serious suggestion that Hale would flee the country and leave his family

homeless. Defendant is, of course, amenable to electronic monitoring, and any other conditions

the Court deems appropriate.

The Magistrate also noted that Defendant's sole prior conviction was reversed on appeal,

but that Hale did not comply with the terms of his probation, and his probation was revoked.

(Magistrate's Order, p. 9) As far as counsel can discover, no evidence whatsoever was presented

regarding the overturned conviction and the reason the probation was revoked. The pretrial

services report simply indicates that the probation was revoked, but does not provide a basis.

18

Any suggestion, however that Hale simply refused to comply with the conditions of his probation is incorrect. Hale complied with all of the conditions save that he was arrested while on bond over an incident related to distribution of pamphlets at a shopping mall and a confrontation which ensued with a security guard. It is counsel's understanding that no criminal charges were brought for this shopping mall incident, but that after a hearing sufficient evidence was found by a preponderance standard to violate his probation. Of course, the original conviction which placed Hale on probation in the first place was overturned by the Illinois Appellate Court. What this past case does reveal about Hale that is relevant for detention purposes is that he goes to court when required (no history of bond violations), and he is willing to comply with conditions of bond, remain in the jurisdiction, and contest charges against him — even charges he believes are unjust.

## IV.  Conclusion

In light of all of the above, Defendant respectfully requests that this Court permit him to present witnesses at a new detention hearing and find that Defendant can be released pending trial on conditions.

Respectfully submitted,

**THOMAS ANTHONY DURKIN,**

**PATRICK W. BLEGEN,** Attorneys for Defendant.

**DURKIN & ROBERTS**
53 West Jackson Boulevard, Suite 615
Chicago, Illinois 60604
(312) 922-8980

19

# SEE CASE

# FILE FOR

# EXHIBITS