# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 03 CR 11 |
| | ) | Judge James T. Moody, By Special |
| | ) | Designation of The Executive Committee |
| MATTHEW HALE, | ) | |
| Defendant. | ) | |

## NOTICE OF FILING

**TO:** **By Hand Delivery**
M. David Weisman
Victoria Peters
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604

**PLEASE TAKE NOTICE** that on the 2nd day of April, 2003, the undersigned filed or caused to be filed with the Clerk of the District Court for the Northern District of Illinois, at Chicago, Illinois, the foregoing Defendant's Motion to Enforce Magistrate Judge Rodovich's Detention Order of February 12, 2003, Regarding Attorney Consultation; and to Enjoin the Government from Requiring Attorney Affirmations as a Precondition of Private Consultation with Defendant, a copy of which is hereby served upon you.

Respectfully submitted,

**PATRICK W. BLEGEN**, One of the
Attorneys for Defendant.

**DURKIN & ROBERTS**
53 West Jackson Boulevard, Suite 615
Chicago, Illinois 60604
(312) 922-8980



## CERTIFICATE OF SERVICE

**JODI L. GARVEY**, attorney at law, hereby certifies that on April 2, 2003, he served, or caused to be served, the foregoing pleading on the following attorneys of record by hand delivery:

M. David Weisman
Victoria Peters
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604

PATRICK W. BLEGEN

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 03 CR 11 |
| | ) | Judge James T. Moody, By Special |
| | ) | Designation of The Executive Committee |
| MATTHEW HALE, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO ENFORCE MAGISTRATE
JUDGE RODOVICH'S DETENTION ORDER OF
FEBRUARY 12, 2003, REGARDING ATTORNEY CONSULTATION;
AND TO ENJOIN THE GOVERNMENT FROM REQUIRING
ATTORNEY AFFIRMATIONS AS A PRECONDITION OF
PRIVATE CONSULTATION WITH DEFENDANT**

Defendant, **MATTHEW HALE**, by his attorneys, **THOMAS ANTHONY DURKIN** and **PATRICK W. BLEGEN**, pursuant to 18 U.S.C. §3142(i), the Separation of Powers established by Articles I, II and III of the Constitution of the United States, as well as the Due Process, Effective Assistance of Counsel, and Excessive Bail clauses of the Fifth, Sixth and Eighth Amendments to the Constitution of the United States, respectfully moves this Court to enforce the detention order entered in the above proceedings by Magistrate Judge Andrew P. Rodovich in a written order dated February 12, 2003, by requiring John Ashcroft, the Attorney General of the United States, Patrick Fitzgerald, United States Attorney for the Northern District of Illinois, Dr. Kathleen Hawk Sawyer, Director of the United States Bureau of Prisons, J. F. Graber, Warden of the Metropolitan Correctional Center Chicago, and any and all of their duly authorized representatives, to comply with the order's express terms, which provide that the Defendant shall be afforded reasonable opportunities for private consultation with his attorney;

and, as such, to specifically enjoin the government, or its aforesaid representatives, from requiring any Attorney Affirmations as a precondition of private consultation with the Defendant.

In support of this motion, Defendant, through counsel, shows to the Court the following:

### I. INTRODUCTION

1. On March 11, 2003, while this Court was not sitting, and therefore unavailable, Defendant filed a pleading entitled Emergency Motion to Enforce Magistrate Judge Rodovich's Detention Order Of February 12, 2003, Regarding Attorney Consultation. Counsel would incorporate the facts and allegations of this pleading as though fully set forth herein. A copy of said emergency motion is attached hereto as Exhibit A. Emergency Judge James B. Zagel denied the motion on the basis that he did not believe the issue was ripe for adjudication and that counsel should revisit the issue upon this Court's return. (Tr., p. 28) A transcript of the proceedings before Judge Zagel is attached hereto as Exhibit B.

2. As can be seen from the Emergency Motion and the exhibits attached thereto and filed separately under seal, at issue is the Attorney General's implementation of Special Administrative Measures (SAMs) upon Defendant. As is made clear in the emergency motion, as well as the proceedings before Judge Zagel, Defendant and counsel, at this point, have only challenged the authority of the Attorney General to circumvent Magistrate Rodovich's detention order by imposing the requirement that undersigned counsel execute Attorney Affirmations as part of the SAMs placed upon Hale.[1] Because they can determine no statutory or regulatory

---

[1] By focusing solely upon the Attorney Affirmations and the absence of any authority for them in the Code of Federal Regulations, or any other statute or regulation, counsel do not implicitly endorse or acknowledge the propriety of the SAMs on pre-trial detainees in general, and Hale in particular; and reserve the right to challenge the SAMs as applied to Hale as part of the pre-trial motions. The SAMs in this case create a multitude of restrictions in addition to the attorney affirmations many of which similarly seek to regulate the conduct of counsel, and even the conduct of individuals in counsel's office. For example, the SAMs seek prohibit counsel from providing

2

authority for the Attorney General to require the Attorney Affirmations as a precondition of their private consultation with Mr. Hale, a person detained under 18 U.S.C. §3142, undersigned counsel have refused to execute the affirmations requiring them to affirm and abide by the terms of the SAMs imposed upon Hale. To the extent these affirmations are found to be implicit or otherwise permissible under a federal statute or regulation, counsel are also of the opinion that the affirmations are constitutionally infirm because of the affirmations' direct interference with the detention order and the attorney client relationship as protected by the Sixth Amendment.

3. In light of the above, Defendant has not been permitted to have any privileged communications with his attorneys, and aside from a brief conversation in court which was permitted by Judge Zagel on March 12, 2003, counsel have had no communication with Defendant since they were notified of the issuance of the SAMs on March 7, 2003. The government has indicated that it will not negotiate the issue of attorney affirmations, and counsel are, therefore, unable to assist Defendant as required by the Sixth and Fifth Amendments, notwithstanding the upcoming trial date of July 14, 2003, and the more pressing pre trial motions deadline of April 15, 2003.

## II. NO STATUTORY OR REGULATORY AUTHORITY EXISTS FOR THE REQUIREMENT OF ATTORNEY AFFIRMATIONS AS A PRECONDITION OF PRIVATE CONSULTATION

4. While the government has suggested that this loggerhead is counsel's own doing and is easily resolved if counsel merely sign the affirmations (Ex. B, p. 4), counsel respectfully

---

"inflammatory materials or materials inciting to violence or military training materials," and seek to require that counsel "will not allow any non-pre-cleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate." Whatever authority the Attorney General believes he has to regulate conduct outside of the MCC is as mysterious as his purported authority to require attorneys to sign the affirmations at issue here.

submit that the issue is not nearly so clear cut, particularly as the federal regulation upon which the SAMs are based simply does not provide authority for attorney affirmations; and, in fact, makes no mention of them whatsoever.[2] *See*, 28 C.F.R. §501.3 (hereinafter the "CFR").

5. On its face, the CFR permits only the imposition of administrative measures upon *inmates*, and not upon attorneys, or anyone else for that matter. Counsel submit that such a conclusion should be obvious, because while the Attorney General has been empowered by Congress to regulate the Bureau of Prisons and its inmates, no one has given the him the authority to regulate the conduct of attorneys. *See*, 28 CFR §0.5 (Attorney General has the authority to "[s]upervise and direct the administration and operation of the Department of Justice, including . . . U.S. Marshals, which are within the Department of Justice."); 28 CFR §1 (making clear that the Bureau of Prisons is a unit of the Department of Justice and that it falls under the authority of the Attorney General); 28 CFR §0.96 (authorizing the Attorney General to establish rules governing the discipline, treatment, and care of inmates in Bureau of Prisons custody); *and* 28 CFR 500.1(c) (defining inmate to mean, among other things, persons charged with offenses against the United States who are in the custody of the Bureau of Prisons)

6. Consistent wit that authority, the CFR creating the SAMs refers only to the "affected inmate," when, for example, providing for a notice requirement. *See*, 28 CFR 501.3. Moreover, the Federal Register notice announcing the final rule of the original form of the SAMs in 1997, lists only "[p]risoners" under the section entitled "[l]ist of subjects in 28 CFR part 501."

---

[2] Counsel might very well challenge the requirement of attorney affirmations on Sixth Amendment grounds even if the CFR specifically provided for them. Because it does not, however, counsel are amazed that the Attorney General and government would seek to infringe on the Sixth Amendment and attorney client relationship without even the limited discussion and public comment provided for when ordinarily enacting such a regulation.

4

62 FR 33730. Likewise, the Federal Register announcing changes to the CFR on October 31, 2001, states that "[t]he existing §§501.2 and 501.3 cover only inmates in the custody of the Bureau of Prisons." 66 FR 55062. That even the CFR as amended is limited only to inmates, or individuals in custody, is made clear by the fact that the amendment seeks only to encompass "instances when a person is held in the custody of other officials under the authority of the Attorney General (for example, the Director of the United States Marshals Service or the Commissioner of the Immigration and Naturalization Service)." *Id.*

7. It should be equally obvious, as well, that having enacted regulations the Attorney General must abide them, and he cannot simply impose additional requirements at his whim. Because the Attorney General has chosen to exercise his authority over the Bureau of Prisons through administrative regulations, he is therefore required to abide by the dictates of the Administrative Procedure Act, 5 U.S.C. §551 *et seq. See, e.g., Vitarelli v. Seaton*, 359 U.S. 535, 540 (1959) ("[T]he Secretary here . . . was bound by the regulations which he himself had promulgated for dealing with such cases, even though without such regulations he could have discharged petitioner summarily."); *Service v. Dulles*, 354 U.S. 363, 388 (1957) ("While it is of course true that . . . the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards . . . having done so he could not . . . proceed without regard to them."); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954) ("as long as the regulations remain operative, the Attorney General denies himself the right to sidestep [their requirements]"); *Nader v. Bork*, 366 F.Supp. 104, 108 (D.C. Cir. 1973) (the Attorney General "chose to limit his own authority in this regard by promulgating . . . the regulation" . . . "it is settled beyond dispute that under such circumstances an agency regulation had the force and

5

effect of law and is binding upon the body that issues it."

8. In attempting to require attorney affirmations, the Attorney General has not abided by his own regulatory and administrative framework, and the failure to do so, counsel would therefore submit, amounts to a violation of due process. *See, Holmes v. New York City Housing Auth.*, 398 F.2d 262, 265 (2nd Cir. 1968) ("It hardly need be said that the existence of an absolute and uncontrolled discretion in an agency of government vested with the administration of a vast program . . . would be an intolerable invitation for abuse. For this reason alone, due process requires [that decisions be made] with 'ascertainable standard.'")

9. Even more to the point that attorney affirmations are a mere afterthought, the CFR specifically addresses attorney communications and the concern expressed by the Attorney General and government in this case; *i.e.*, that Defendant might somehow use communications with his attorneys to further illegal objectives. At no point, however, is any reference made to attorney affirmations, either explicitly or implicitly. Instead, in a situation where a sufficient showing can be made that reasonable suspicion exists that "a particular inmate may use communications with attorneys or their agents to further or facilitate *acts of terrorism,"* the CFR expressly authorizes the Bureau of Prisons to monitor what would ordinarily be attorney privileged communications. 28 C.F.R. §501.3(d) (emphasis added) The relevant portion of the CFR, in its entirety, is instructive:

> (d) In any case where the Attorney General specifically so orders, based on information from the head of a federal law enforcement or intelligence agency that reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism, the Director, Bureau of Prisons, shall, in addition to the special administrative measures imposed under paragraph (a) of this section, provide appropriate procedures for the monitoring or review of communications between

6

that inmate and attorneys or attorneys' agents who are traditionally covered by the attorney-client privilege, for the purpose of deterring future acts that could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. 28 C.F.R. §501.3.

10. Even in such extreme cases as contemplated by subsection (d), the CFR still does not authorize attorney affirmations. Thus, it appears that in this case the Attorney General has simply ignored subsection (d), and has attempted to craft a *de facto* amendment to the regulation by imposing the requirement of an attorney affirmation. Seemingly out of thin air, he has also created a new and ingenious device for dealing with government concerns about the conduct of defense counsel in cases they deem to involve terrorism, but in which they can apparently not meet the burden established by subsection (d).[3] This blatant attempt to legislate through executive order, and circumvent the express requirements of the Bail Reform Act of 1984, must necessarily fail.

---

[3] The specter of "terrorism" in this case should not go unnoticed, and may well expose the government's true motivations in attempting to obtain attorney affirmations. As is noted in the emergency motion, the government has notified counsel that despite ambiguity in the Hale SAMs, it does not intend to monitor their attorney client communications with Hale at this time. While this decision appears magnanimous, it is more likely the result of a tacit admission that the government does not have sufficient evidence to trigger the requirements of §501.3(d), and therefore monitor attorney/client communications. This is necessarily so, of course, because as is obvious from the indictment this case does not involve "terrorism" - unless one wishes to engage in the FBI's euphemism of "domestic terrorism." It is this latter twist of the post September 11th emotions of fear and paranoia that may well be at the heart of this novel expansion of the SAMs to a pre trial detainee in a non terrorist indictment. Such a radical expansion, however, is exactly why this Court, or anyone else concerned with civil liberties, should be quite concerned by the government's actions here and why the government might have been so quick to claim that defense counsel is "really the one that overstates the issue." (Ex. B, p. 4) Whether it is an overstatement or not, the plain fact of the matter is that should the government be permitted to require the attorney affirmations in this instance, the government will be able to require them in any future case involving a pre trial detainee charged with a crime of "violence" rather than "terrorism" — an expansion of an already unwise proposition by exponential proportions. Anyone old enough to remember the government's promises that it would use the pre trial detention statutes sparingly in the early days of arguing over the constitutionality of the Bail Reform Act of 1984 might especially pay heed. In those days, too, the government was quick to claim that defense counsel, and virtually every civil liberties organization in the country, were overstating the issue and that the government should be trusted not to overuse the extraordinary pretrial detention powers that were being handed them. The fact that the multi-story Metropolitan Correctional Center in Chicago is now no longer sufficient to house the number of pre trial detainees in this District, and that pre trial detainees are being forced to be housed in county jails as far away as Wisconsin, ought to provide a sufficient answer to whether the government has earned the right to be trusted today.

7

### III. A STATUTORY CONSTRUCTION ANALYSIS, AS WELL AS THE SEPARATION OF POWERS PROHIBITS THE ATTORNEY GENERAL FROM REQUIRING ATTORNEY AFFIRMATIONS

11. Under basic statutory construction analysis, the requirement of attorney affirmations violates the time honored principle of *expressio unius est exclusio alterius*; that is, that the expression of certain powers implies the exclusion of others. *See, e.g., Barnhardt v. Peabody Coal*, 123 S.Ct. 748 (2003); *Lloyd C. Lockrem, Inc. v. United States*, 609 F.2d 940 (9th Cir. 1979). The Attorney General has already delineated his authority when there is cause to believe an inmate will use communications with his attorney to further illegal objectives, and that authority is set forth in subsection (d). If the Attorney General cannot meet the requirements of subsection (d), or simply does not want to for his own reasons, he cannot simply make up new requirements as he goes along. While the principle of *expressio unius est exclusio alterius* is certainly not absolute, and does not apply universally, in this case it ought to serve to prevent the Attorney General's end-run around its own regulation and the express terms of the detention statute.

12. Likewise, the separation of powers established by Articles I, II, and III prevents the Attorney General from imposing attorney affirmations. "The Constitution enumerates and separates the powers of the three branches of Government in Articles I, II, and III, and it is this 'very structure' of the Constitution that exemplifies the concept of separation of powers." *Miller v. French*, 530 U.S. 327, 341 (2000), *quoting, INS v. Chadha*, 462 U.S. 919 (1983). While the boundaries between the three branches are not "hermetically sealed," the Constitution prohibits one branch from encroaching on the central prerogatives of another. *Miller*, 530 U.S. at 314. As the Supreme Court noted long ago, "it is a breach of the National fundamental law if Congress

8

gives up its legislative power and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power." *J.W. Hampton, Jr. & Co. V. United States*, 276 U.S. 394, 406 (1928). Similarly, while the executive branch has the discretion to execute the laws that the legislature enacts, there is a significant distinction, long protected by the courts, between the execution of laws and the power to determine what the law shall be. The latter is reserved for the legislative branch, and it cannot be given to the executive, even by way of delegation from the legislature. *See, Field v. Clark*, 143 U.S. 649, 693-94 (1892); *and United States v. Grimaud*, 220 U.S. 506, 517 (1911) ("From the beginning of the Government various acts have been passed conferring upon executive officers power to make rules and regulations — not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power.")

13.   Here, the executive branch, by way of the Attorney General, has more than simply encroached upon the legislative prerogative; but has, in fact, usurped legislative power by imposing the requirement of attorney affirmations. Unlike the executive's authority over inmates, Congress has not conferred any power on the Attorney General to regulate the conduct of defense attorneys. The Attorney General's attempt to do so through the back door of SAMs and attorney affirmations ought to fail on this basic level. The Attorney General's attempt at legislation through attorney affirmations has also revealed a fundamental failure to execute the laws as enacted by Congress. When it enacted the Bail Reform Act of 1984, Congress specifically directed that any detention order must "direct that the person *be afforded reasonable*

9

*opportunity for private consultation with counsel.*"[4] 18 U.S.C. §3142 (emphasis added). Not only has the Attorney General utterly fail to execute this portion of the detention statute with regard to Hale, but the Attorney General has effectively amended the Bail Reform Act by requiring attorney affirmations as a prerequisite to private consultation with counsel. The Attorney General may execute laws, but he may not make them.

14. The Attorney General's conduct in this regard can also be seen as an encroachment on the power of the judiciary "not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the article III hierarchy. *Miller*, 530 U.S. at 342, *citing*, *Plaut v. Spendthrift Farm*, Inc., 514 U.S. 211. Magistrate Rodovich entered a detention order directing that Defendant be provided "reasonable opportunity for private consultation with counsel." The government neither objected to this order, nor appealed it to this Court or the Seventh Circuit. Attempting to avoid the order by executive fiat is not permissible under our government's system of separation of powers, as it impermissibly encroaches on Magistrate Rodovich's power as an Article III judge to rule on cases and decide them.

### IV. THE UNILATERAL IMPOSITION OF ATTORNEY AFFIRMATIONS VIOLATES THE SIXTH AMENDMENT

15. In addition to a violation of the separation of powers, the requirement of attorney affirmations most certainly represents an end-run around Defendant's Sixth Amendment right to

---

[4] This language is significant, particularly in light of the fact that when the emergency motion was heard the parties and Judge Zagel each seemed to have mistakenly been diverted into considering whether the SAMs constituted "reasonable access" to the Defendant. For this mistake, counsel on both sides regrettably seem to have been at fault. (Ex. B. pp. 19, 27) The significance of the statute's language is that reasonableness is attached only to the "opportunity" for private consultation, not to "private consultation" itself. As to "private consultation" there is no ambiguity or modifier. Put most simply, only the opportunities to consult with counsel are left to the jailor, and the opportunities must be reasonable; *i.e.*, not at midnight or whenever the Defendant so desires. As to private consultation, however, that requirement is not left to the jailor's discretion. Reasonable or not, the statute says the Defendant must get it. Counsel submit hat this language cannot be modified or circumvented by executive order.

counsel of his choosing and to the effective assistance of counsel.[5] Most significantly, the Attorney General and government have, by way of requiring attorney affirmations, effectively precluded all privileged communication between counsel and Defendant. The Sixth Amendment implications ought to be obvious in such a case, as blanket prohibitions on a defendant's ability to communicate with counsel have been found to violate the Sixth Amendment even when of short duration. *See, e.g., Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (denial of Sixth Amendment rights where defendant was forbidden from communicating with counsel during overnight recess); *Jones v. Vacco*, 126 F.3d 408 (2d Cir. 1977) (Sixth Amendment violation based upon weekend ban on communication between counsel and defendant)

16. The attorney affirmations also profoundly impact the attorney client relationship and the Sixth Amendment by creating a chilling effect on counsel which cannot be overstated. While courts continue to recognize that, "utmost candor between an attorney and client is essential to effective assistance of counsel," the Attorney General apparently does not agree, and his unilateral decision to impose upon that candor by requiring attorney affirmations ought to give this Court, and any other, significant pause. *Greater Newburyport Clamshell Alliance v. Public Service Commission of New Hampshire*, 838 F.2d 13, 21 (1st Cir.1988). *See, also, Mudd v. United States*, 798 F.2d 1509 (D.C. Cir. 1986) ("[A]n order [limited to certain subjects] can

---

[5] Even without the attorney affirmations, the SAMs dramatically impact the attorney client relationship and the Sixth Amendment. The SAMs limit defendants contact with counsel, experts, investigators, and other members of counsel's staff, and further limit what parts of Defendant's communications can be passed on to third parties. (SAMs, par. 2a-e) The SAMs limit phone calls to counsel's office, prohibit non-pre-cleared people from overhearing Defendant's phone calls, and provide that Defendant may not communicate with counsel's office by telephone unless a prison "staff member confirms that the person on the other end of the line is the inmate's attorney." (SAMs, par. 2f) The SAMs also limit the types of materials and information that counsel can provide to the defendant. (SAMs par. 2g).

11

have a chilling effect on cautious attorneys, who might avoid [discussion on non-restricted] matters for fear of violating the court's directive."); *United States v. Eniola*, 893 F.2d 383 (D.C. Cir. 1990) (finding a Sixth Amendment violation where court did not permit counsel to discuss with Defendant a potential witness' status as a government informant).

17. *United States v. Reid*, 214 F.Supp.2d 84 (D. Mass. 2002), an opinion by Chief Judge William G. Young of the United States District Court for the District of Massachusetts, appears to be the only judicial opinion discussing the Sixth Amendment ramifications of imposing attorney affirmations upon a pretrial detainee. The issue was ultimately avoided because the government modified the SAMs to require attorney affirmations only where they were not "excused, precluded, or barred by judicial determination." *Id.* at 92. Judge Young had previously indicated that he would not require the affirmations, and that apparently prompted the government to "back off." *Id.* Nevertheless, Judge Young believed he "had been presented with a significant constitutional question under the Sixth Amendment." *Id.* And, Judge Young's opinion provides a thorough and thoughtful analysis on the Sixth Amendment, the role of defense counsel and an independent bar in our adversarial system, as well as the conclusion that he would not permit the government to require attorney affirmations.

Respectfully submitted,

THOMAS ANTHONY DURKIN,

PATRICK W. BLEGEN, Attorneys for Defendant.

**DURKIN & ROBERTS**
53 West Jackson Boulevard, Suite 615
Chicago, Illinois 60604
(312) 922-8980

12

*See Case File for Exhibits*