IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

F I L E D
APR 14 2003
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 03 CR 11 |
| ) | Judge James T. Moody, By Special |
| ) | Designation of The Executive Committee |
| MATTHEW HALE, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE
TO DEFENDANT'S MOTION TO ENFORCE MAGISTRATE
JUDGE RODOVICH'S DETENTION ORDER OF
FEBRUARY 12, 2003, REGARDING ATTORNEY CONSULTATION;
AND TO ENJOIN THE GOVERNMENT FROM REQUIRING
ATTORNEY AFFIRMATIONS AS A PRECONDITION OF
<u>PRIVATE CONSULTATION WITH DEFENDANT</u>**

Defendant, **MATTHEW HALE**, by his attorneys, **THOMAS ANTHONY DURKIN** and **PATRICK W. BLEGEN**, respectfully submits the following reply to the government's response to Defendant's motion to enforce Magistrate Rodovich's detention order of February 12, 2003, regarding attorney consultation; and to enjoin the government from requiring attorney affirmations as a precondition of private consultation with counsel.

**I.** *United States v. El-Hage* **does not provide the support for which the government cites it.**

The government calls *United States v. El-Hage*, 213 F.3d 74 (2d Cir. 2000) the leading case on the propriety of SAMs, and later cites it for the proposition that "[t]he request of the affirmation is a 'valid, rational connection' to the government's interest of public safety." (Govt's Response, pp. 7, 8, *citing El-Hage* at 81) Defendant disputes both propositions. While the *El-Hage* opinion encompasses eight pages, less than one full page is devoted the issue of

whether "the conditions of [El-Hage's] confinement violates his due process rights because they restrict his ability to prepare his own defense." *El-Hage*, 213 F.3d at 81. Moreover, *El-Hage* does not address the issue of attorney affirmations; and, aside from mentioning that SAMs were imposed on *El-Hage* in the background portion of the opinion, *El-Hage* does not specifically discuss SAMs or the CFR creating them. Most importantly, *El-Hage* does not discuss the Sixth Amendment and the impact of SAMs in general or attorney affirmations specifically on the Sixth Amendment.

Because the attorney affirmations were not even raised in or discussed by the Second Circuit, *El-Hage* certainly cannot support for the government's proposition that the attorney affirmations have a "'valid rational connection' to the government's interest of public safety." (Govt's Response, p. 8) In fact, in *El-Hage* the government did not even raise "public safety" as an objective of the SAMs. Rather, due to the fact that *El-Hage* dealt with a defendant who has "extensive terrorist connections," the government's basis for the SAMs was "protecting national security interests." *Id.* at 81. Attempting to convert a national security case like *El-Hage* into the leading case on SAMs *and the attorney affirmations* is a stretch to say the least. Therefore, *El-Hage* cannot bail out the government in this instance. The fact remains that this case is, indeed, a case of first impression and of significant constitutional concern, with little to no precedent for the dramatic expansion of executive power sought by the Department of Justice.

**II.   The Government's Analogy to MCC Visitor Sign-In Sheets is Untenable.**

In arguing that the SAMs and the requirements of affirmations do not impact the Sixth Amendment, the government attempts to blame counsel for their inability to communicate with Defendant since the imposition of the SAMs. The government asks, "[h]ow is the attorney

2

affirmation requirement qualitatively different from other regulations the Bureau of Prisons enforces? For example, all visitors at the MCC - Chicago must sign a document declaring that the visitor does not possess certain listed contraband and other controlled items (e.g. drugs, weapons, cell phones, etc.). If a defense attorney chose not to sign that document and was thus denied access to his or her client, the attorney could not legitimately argue that the government has 'effectively precluded all privileged communications' by requiring a signature to a document that he or she would prefer not to sign." (Govt's Response, p. 12)

The qualitative differences are numerous and obvious, as is the impact of the affirmations on the Sixth Amendment. First, the sign-in sheets apply equally to all visitors to the MCC and to every inmate locked up there. They are not designed specifically for attorneys, nor are they reserved only for inmates specifically chosen by the Attorney General. Second, even if an attorney decided not to sign the visitor sign-in sheet, he could still have privileged communications with his client by telephone, by mail, in the Marshall's lock-up, and in court. Unless the SAMs affirmations are signed, on the other hand, all privileged communications between attorney and client is prohibited. Third, the sign-in sheets do not attempt to regulate conduct outside of the MCC. The attorney affirmations clearly do, as they require attorneys to affirm that they will abide by the SAMs which seek to regulate all sorts of conduct outside of the MCC, including in counsel's office. *See*, SAM, pp. 3-7 (regulating who may participate in Defendant's phone calls to counsel's office, that third parties may not overhear calls, and requiring that counsel's staff must be "pre-cleared.") Fourth, unlike the affirmations, the sign-in sheets, or other similar facility wide prison regulations, do not regulate speech in any way, shape or form. The SAMs affirmations are specifically designed to regulate speech, however, as they

3

regulate not only what counsel may say to third parties, but what counsel may say to Defendant and what documents may be provided to Defendant. *See*, SAM, pp. 3-4 ("In signing the SAM acknowledgment document, the inmates attorneys, and pre-cleared staff, will acknowledge the restriction that they will not forward third party messages to or from the inmate." "The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's defense, and not for any other reason.") Fifth, and most importantly, the MCC sign-in sheets have no impact on a defendant's Sixth Amendment right to counsel. An acknowledgment by an attorney that he has not brought a cell phone or other contraband into the MCC has nothing to do with the attorney/client relationship. Restrictions on whether an attorney can speak with his client, and in the event he does, what he is permitted to say, have obvious Sixth Amendment implications.

### III.    The Government has Confused Attorney/Client Candor with Confidentiality.

In its Response, the government argues that, "defendant's position that the attorney affirmation impinges on the *confidentiality* of attorney-client communications is simply not true." (Govt's Response, p. 12) (emphasis added) Defendant's position is not that the affirmations affect attorney/client confidentiality, but rather that they impact attorney/client *candor*. (Defendant's Motion, p. 11) Candor and confidentiality are not synonymous, and the government's confusion of the two reveals a fundamental lack of understanding of the attorney/client relationship. The Sixth Amendment is not satisfied simply because the government agrees not to listen in on communications between an attorney and client, as the attorney client relationship is hardly a mere privacy agreement. Attorneys and clients must be able to communicate not just privately, but freely and candidly. *See, e.g., United States v.*

4

*Eniola*, 893 F.2d 383 (D.C. Cir. 1990) ("[T]he sixth amendment protects the defendant against intrusions that could inhibit the free exchange of information between attorney and client.") Defendant submits that the attorney affirmations obviously impact the free exchange of information between attorney and client, as the affirmations require counsel and Defendant to continually "think twice" before communicating with each other.[1]

### IV. Attorney Affirmations are not Inherent to SAMs, and Defendant has requested relief pursuant to 18 U.S.C. §3142(i).

In a single paragraph, the government has asserted that attorney affirmations are inherent in 28 CFR 501.3. The government has not responded to Defendant's myriad arguments to the contrary in his original motion; and, in particular, has not responded to Defendant's argument that 28 CFR §501.3(d) specifically deals with concerns that a defendant may pass messages through his attorney. In light of subsection (d), the government's suggestion that attorney affirmations are "inherent" is dubious at best. The government can not seriously argue that the CFR provides authority for both "explicit" and "implicit" means for dealing with the risk of an attorney being used as a mouthpiece.

---

[1] In a footnote in its Response, the government cites to a portion of the transcript before Judge Zagel in which undersigned counsel indicated that the "abide by" language of the attorney affirmation troubled him more than the "acknowledge" language. (Tr. p. 9) This statement was in response to Judge Zagel's suggestion that the affirmations merely ask attorneys to "acknowledge" the purpose of the SAMs. *Id.* Apparently, and even after having read the transcript, the government continues to believe that undersigned counsel indicated that he would not abide by the SAMs. (Govt's Response, p. 8 "Mr. Durkin then corrected himself . . .") The government goes on to state that "[t]he ambiguity of the spoken word is exactly why the government seeks a written affirmation by defense counsel that they understand the terms of the SAMs and agree to abide by those terms." (Govt's Response, p. 8) In response, counsel would state that the government's penchant for misinterpreting the spoken word to fit its own purposes, even in the face of evidence to the contrary, is precisely why counsel have refused to execute the attorney affirmations. Other than by refusing to sign the affirmations in the first place, counsel are at a loss to understand how they can otherwise avoid leaving themselves, their partners, associates, and staff at the mercy of the government's choice of interpretations of language as innocuous as even this. Such subtle authority over the attorney client relationship is exactly at the root of the Sixth Amendment "chilling effect" the government seems to insist it cannot understand.

5

Lastly, and much to the heart of Defendant's point regarding the relationship between the magistrate's detention order and the impropriety of the attorney affirmations, the government argues that Defendant can only seek relief under 18 U.S.C. §3142(i). Defendant would note, however, that his motion was made with specific reference to §3142(i), and that this Court has the authority under that provision, as well as the Separation of Powers established by Articles I, II and III of the Constitution of the United States, and the Due Process, Effective Assistance of Counsel, and Excessive Bail clauses of the Fifth, Sixth and Eighth Amendments to the Constitution of the United States to grant Defendant's request to prohibit the requirement of attorney affirmations. Alternatively, and as suggested in *Falcone v. United States Bureau of Prisons*, 52 F.3d 137 (7th Cir. 1995), this Court has the authority to order Defendant into the custody of a United States Marshal to protect Defendant's Sixth Amendment Right to counsel; or for that matter, to order Defendant's release on conditions consistent with the Sixth Amendment and the presumption of innocence. *See*, 18 U.S.C. § 3142(j).

Respectfully submitted,

/s/ Thomas A. Durkin

THOMAS ANTHONY DURKIN,

/s/ Patrick W. Blegen /by JLG

PATRICK W. BLEGEN, Attorneys for Defendant.

**DURKIN & ROBERTS**
53 West Jackson Boulevard, Suite 615
Chicago, Illinois 60604
(312) 922-8980

## CERTIFICATE OF SERVICE

**THOMAS ANTHONY DURKIN**, attorney at law, hereby certifies that on April 14, 2003, he served, or caused to be served, the foregoing pleading on the following attorneys of record by hand delivery:

M. David Weisman
Victoria Peters
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604

**THOMAS ANTHONY DURKIN**