**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**FILED**

MAY 2 3 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 CR 11 |
| | ) | Judge James T. Moody |
| MATTHEW HALE, | ) | |
| | ) | |
| Defendant. | ) | |

### MOTION FOR A CHANGE OF VENUE BASED ON PRETRIAL PUBLICITY

Defendant, **MATTHEW HALE**, by his attorneys, **THOMAS ANTHONY DURKIN** and **PATRICK W. BLEGEN**, pursuant to Rule 21 of the Federal Rules of Criminal Procedure as well as Article III, Section 2 of the Constitution of the United States and the Sixth Amendment to the Constitution of the United States, respectfully moves this Court to transfer this case to the Central District of Illinois.[1]

In support of this motion, Defendant, through counsel, shows to the Court the following:

1.     Defendant is charged in Count One of the Indictment with soliciting a crime of violence in violation of 18 U.S.C. §373. Defendant is charged in Count Two with endeavoring to impede a judicial officer in the course of her duties in violation of 18 U.S.C. §1503.

2.     As the Court is by now well aware from various pleadings by both the defense and the government, the charges in the indictment involve an alleged plot to kill the Honorable Judge Joan Humphrey Lefkow, a United States District Court Judge who sits in this District. The alleged plot purportedly was concocted by Defendant, the Pontifex Maximus of the World

---

[1] Contemporaneously herewith, Defendant has Filed a Motion to Dismiss Count One of the Indictment or for a Change of Venue to the Central District of Illinois. The instant motion is submitted as a basis to transfer the entirety of the indictment to the Central District.

Church of the Creator, and a confidential informant who had several years ago been implanted into Defendant's church by the FBI. The purported motive for the plot was to retaliate against Judge Lefkow for her rulings in a trademark infringement case involving Defendant and his church.

3.      On January 8, 2003, and in what can only be described as a dramatic scene, Defendant was arrested in the Lobby of the Dirksen Federal Building by a covey of armed federal agents. Defendant was appearing in the Dirksen Building to respond to a rule to show cause issued by Judge Lefkow in the trademark case; and, as a result, there was a significant media presence in the Dirksen Building lobby, and several members of the media personally witnessed Defendant's arrest and subsequently reported their observations.

4.      Defendant's indictment was originally assigned to the calendar of the Honorable Elaine E. Bucklo. However, on January 22, 2003, the Executive Committee of the Northern District entered an order specially designating this Court, to preside over this case due to the nature of the charges.

5.      In addition to the charges involving Judge Lefkow, the government has suggested, as part of its presentation to Judge Rodovich at the detention hearing, that Defendant is connected with or encouraged the criminal activities of Benjamin Smith, a former member of the World Church of the Creator.[2] As the Court is no doubt aware, Smith conducted a shooting spree between July 2, 1999, and July 4, 1999, apparently targeting racial minorities. The government has concluded that Smith shot at a total of 32 people, wounding ten and killing two, including

---

[2]The government has also made use of Defendant's connection with Smith in Title III applications and applications for search warrants. It is likely, as well, that the government will seek to admit evidence of the Benjamin Smith incident at Defendant's trial as 404(b) evidence.

former Northwestern University basketball coach, Ricky Byrdsong.

6. The local press coverage of Defendant's arrest, the charges relating to Judge Lefkow, and the Benjamin Smith shooting spree has been nothing short of overwhelming. To obtain just a limited view of the nature and amount of pretrial publicity in this case, a law clerk in counsel's office performed a Lexis search for articles relating to Defendant in the Chicago Tribune and the Chicago Sun Times. This search revealed that these two newspapers alone mentioned Defendant in 266 articles since the date of Smith's shooting spree. Moreover, both newspapers repeatedly connected Defendant with the Smith shootings, and such articles either implied or explicitly stated that Defendant encouraged Benjamin Smith to go on a shooting spree. Such articles also often seek to support the connections between Defendant and the Smith shootings with statements from prosecutors. *See, e.g.*, Adam Kovac, *Senate Approves Legislation that Targets Hatemongers*, CHI. TRIB., May 8, 2002, at Pg. 3 (noting that "prosecutors said [Smith] was motivated to kill blacks, Asians, and Jews by self-styled white supremacist leader Matthew Hale"). Over the last four years, these papers have mentioned the Smith shootings in 62% of articles that discuss Defendant.[3]

7. Research also revealed that much of the media reporting regarding Defendant inflammatory, derogatory, and otherwise cast Defendant in a negative light. For example, in one

---

[3] The numerical results of the search are as follows. The Chicago Sun-Times contained 103 total articles referring to Matthew Hale since July 5, 1999 (the time of the Smith shootings), and 61, or 59%, of those articles also mentioned the Smith shooting spree. The Chicago Tribune contained 163 total articles that mentioned Matthew Hale, and 106, or 65% of those articles t referred to the Smith shooting spree. The search terms entered to determine if an article referred to Matthew Hale were as follows: ("matthew hale" or "matt hale") and (supremacist or racist or hate) and date(geq (7/5/1999) and leq (5/21/03)). The search terms entered to determine if an article referred to Matthew Hale and the Smith shooting spree were as follows: ("matthew hale" or "matt hale") and (supremacist or racist or hate) and ("benjamin smith" or "shooting spree" or "two dead" or "killed two" or byrdsong) and date(geq (7/5/1999) and leq (5/21/03)).

article, a Tribune reporter John Kass noted that he "talked to the hater, Matthew Hale." The article goes on to say, "Hale is dangerous. He already has blood on his hands. According to a federal indictment, he wanted U.S. District Judge Joan Humphrey Lefkow's blood too." John Kass, *Arrest Shrinks Hatemonger Down to Size*, CHI. TRIB., Jan. 9, 2003, at Pg. 2. Other articles refer to Defendant as a racist, a dangerous man, a hate-monger, and other similar epithets.

8.     In light of such press coverage, Defendant is very likely to suffer prejudice of sufficient magnitude in this District to prevent him from receiving a fair and impartial trial as required by Rule 21. Not only has the local media negatively commented on Defendant to a great extent in general terms regarding his beliefs, but it has clearly and irrevocably linked him to the gruesome, shocking; and, quite frankly, repugnant racial murders committed by Benjamin Smith, despite the fact that Defendant has never been charged with a crime in connection with these shootings and killings. The plain fact of the matter is that the local media has already convicted Defendant of instigating the Smith shooting spree, a particularly horrific crime that produced panic among local residents; and, in light of such local feelings, Defendant cannot receive a fair trial here.

9.     In order to prevail on a Rule 21(a) motion to transfer venue, a defendant must show that there is at least a "reasonable likelihood that prejudicial news prior to trial will prevent a fair trial." *United States v. Maldonado-Rivera*, 922 F.2d 934, 966-67 (2d Cir. 1990), *citing*, *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). Moreover, courts are directed to consider the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, and other factors reflecting on the likely effect of the

4

publicity on the ability of potential jurors in the district to hear the evidence impartially. *See generally* 2 C. Wright, Federal Practice and Procedure, Criminal 2d, §342 (1982).

10. Defendant submits that in this case, the likelihood that pre-trial coverage will prevent a fair trial in this District is far more than a reasonable likelihood; it is, in fact, a substantial likelihood. As well, the factors to be considered regarding prejudicial press coverage weigh strongly in favor of a change of venue. For example, while it is impossible to determine the exact extent to which the government is responsible for generating publicity, the government certainly did not help matters in this case by holding a press conference almost immediately after Defendant's dramatic arrest in the lobby of the Dirksen Federal Building. Moreover, as noted herein, several news articles in the local press quote prosecutors and other government sources to establish a motivational link between Defendant and the Smith shootings. With respect to whether coverage focused on individuals rather than the crimes, Defendant submits that the local press coverage has focused almost exclusively on Defendant, his beliefs, and his association with Benjamin Smith rather than on the two crimes with which Defendant is charged in the indictment. Lastly, other factors regarding local press coverage weigh in favor of a change of venue. For example, Defendant has lived in East Peoria for the entirety of his life, and the residents of East Peoria, Peoria, and the other areas encompassed by the Central District are by now familiar with his extreme beliefs, his use of racial epithets, his desire for a new government, and his penchant for public speeches. Such residents, while they no doubt share the disdain of local residents for Defendant, are less likely to be surprised and shocked when Defendant is portrayed as a murdering hate-monger by the press.

11. The extremely prejudicial coverage also gives rise to a presumption that juror

5

prejudice cannot be remedied in voir dire. *See Willard v. Pearson*, 823 F.2d 1141, 1146 (7th Cir. 1987) (noting that in "rare cases where pretrial publicity is pervasive and inflammatory," courts will presume that jurors can not be fair), *see also Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (same). Therefore, Rule 21(a) requires that Defendant's trial take place in a different district.

12. Defendant requests, therefore, that the Court transfer this case to the Central District of Illinois based on the prejudice to Defendant in this District.[4] Should the Court decline to grant this motion, Defendant reserves the right to renew this motion after voir dire in order that Defendant may learn whether a sufficient number of veniremen admit to disqualifying prejudice. *See Murphy v. Florida*, 421 U.S. 794 (1975).

Respectfully submitted,

**THOMAS ANTHONY DURKIN,**

**PATRICK W. BLEGEN,** Attorneys for Defendant.

**DURKIN & ROBERTS**
53 West Jackson Boulevard, Suite 615
Chicago, Illinois 60604
(312) 922-8980

---

[4]Defendant would reiterate his position set forth in a separate pleading that venue is proper for Count One of the indictment only in the Central District.