UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED** KC

DEC 30 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 03 CR 011 |
| v. | ) | |
| | ) | Judge James T. Moody |
| MATTHEW HALE | ) | (sitting by designation) |

DOCKETED

JAN 02 2004

## NOTICE OF FILING

TO:  Thomas Anthony Durkin
     Patrick Blegen
     Durkin & Roberts
     The Monadnock Building, Suite 615
     53 West Jackson Blvd.
     Chicago, IL  60604
     Fax: (312) 922-2055

*Tuesday, Dec. 30* mdw

**PLEASE TAKE NOTICE** that on ~~Monday, December 29~~, 2003, the undersigned filed with the Clerk of this Court, **GOVERNMENT'S RESONSE TO DEFENDANT'S MOTION TO DISMISS COUNTS TWO AND THREE OF THE INDICTMENT, REQUEST FOR ADDITIONAL DISCOVERY AND FOR AN EVIDENTIARY HEARING**, service of which is being made upon you.

M. DAVID WEISMAN
Assistant United States Attorney
219 S. Dearborn Street - 4th
Chicago, IL  60604
(312) 353-2119

| | | |
|---|---|---|
| **STATE OF ILLINOIS** | ) | |
| | ) | SS |
| **COUNTY OF COOK** | ) | |

M. David Weisman, being duly sworn on oath, deposes and says that he is employed in the Office of the United States Attorney for the Northern District of Illinois; and that on the 29th day of December, 2003, he caused a copy of the above-mentioned Notice along with the Motion to be sent via fax and U.S. mail before 5:00 p.m.

M. DAVID WEISMAN

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
DEC 3 0 2003
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 03 CR 011 |
| v. | ) | |
| | ) | Judge James T. Moody |
| MATTHEW HALE | ) | (sitting by designation) |
| | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNTS TWO AND THREE OF THE INDICTMENT, REQUEST FOR ADDITIONAL DISCOVERY AND FOR AN EVIDENTIARY HEARING

The UNITED STATES, through its attorney, PATRICK J. FITZGERALD, responds as follows to defendant's motion to dismiss counts two and three of the indictment, request for additional discovery, and for an evidentiary hearing.

### BACKGROUND

In 1999, a Cooperating Witness ("CW") began providing information to the Federal Bureau of Investigation on various issues, including white supremacists with whom the CW had contact.

On July 3, 1999, Benjamin Smith, a member of the World Church of the Creator ("WCOTC") engaged in a multi-state shooting spree wherein he killed two people and wounded several others. All of Smith's targets were racial or religious minorities.

During the days immediately following Smith's shooting spree, the defendant made a series of public statements during various television interviews. During these interviews, the defendant claimed that the WCOTC was opposed to illegal activity, yet would steadfastly

refuse to condemn the conduct of Smith, noting that Creativity (defendant's avowed religion) prevented the defendant from feeling any remorse or sadness for the victims of Smith's conduct because these victims were "non-white." Several weeks after the Smith shooting spree (and Smith's resulting death), the defendant presided over two WCOTC services dedicated to Smith and his life. During these gatherings, the defendant praised Smith for his dedication to Creativity and the WCOTC. While the defendant made passing reference to the concept that Creativity did not condone illegal conduct, the vast majority of his presentation extolled Smith's virtues, dedication, and "love" for the white race.[1]

### Initial Investigation

The FBI conducted a full investigation of the Smith shooting spree, and gathered substantial evidence linking Smith to the defendant and the WCOTC. For example, the FBI determined that Smith had given the defendant many of his personal belongings prior to engaging in the shooting spree; that Smith and Hale had spent substantial time together

---

[1] For example during a memorial speech on July 23, 1999, the defendant stated, among other things, "We of course pay homage to this man [Ben Smith] who sacrificed his life for what he believed in, as correct or incorrect as the tactic may be." The defendant continued, "My compassion is for Brother Ben Smith; my love is for Brother Ben Smith and for his family and for those who cared about this man; and the nigger and the gook that died . . . they are drops in the bucket compared to the atrocities committed against ours, our people." Later, defendant tepidly suggests that Creativity does not condone illegal activity, yet that statement is severely qualified. The defendant stated, "Obviously we believe in the legal way but we will not condemn this man as our enemies would want us to do. We will say resoundingly that he was worth not only two muds, but a 100 million muds, that he was worth much more than what he sacrificed or what he did." While defendant's speech is protected by the First Amendment and is not, standing alone, a basis for criminal prosecution, the government is entitled to investigate the defendant and his organization to determine if illegal activity is occurring. *See Brandenburg v. Ohio*, 395 U.S. 444 (1969); *see generally* David M. Park, *Re-examining the Attorney General's Guideline for FBI Investigations of Domestic Groups*, 39 Ariz. L. Rev. 769 (1997).

immediately preceding the shooting spree; and that weeks prior to the shooting spree Hale had entrusted Smith with substantial amounts of money belonging to the WCOTC. In an interview with the FBI shortly after Smith's shooting spree, the defendant admitted that he suspected that Smith was the individual involved in the shooting spree,[2] but failed to contact law enforcement and advise officers of his suspicion.

In March 2000, the CW *was approached* by a member of the WCOTC, who was recruiting the CW to become a member of the WCOTC. The CW, after consulting with the FBI, agreed to attend a WCOTC meeting. After attending his second WCOTC meeting, *the defendant approached the CW* and asked the CW to provide security for him at future WCOTC events. The CW accepted the offer.[3]

The CW began regularly attending WCOTC activities. The CW, at the defendant's directions, began being tasked with making arrangements for WCOTC events. Eventually the CW was asked by the defendant to travel to various WCOTC events, often having the associated travel expenses paid for by the WCOTC. The defendant eventually appointed the CW as head of the White Berets, an "elite" group within the WCOTC.

---

[2]    Initially, the identity of the shooter was not known. The shooting spree garnered extensive media attention. Hale admitted to viewing these news reports, and suspecting that Smith may be the shooter.

[3]    In his motion, the defendant asserts that the "government implanted [the CW] into defendant's church . . .[and] . . . the CW attempted to insinuate himself into Hale's confidence . . ." *See* Defendant's Motion, p. 3. These statements are inaccurate. While defense counsel may not be privy to the exact circumstances that the CW became involved in the WCOTC, surely the defendant himself knows that *he* selected the *CW* to be his head of security, and the defendant himself had the power and authority to remove the CW if the defendant so chose.

relating to his law license. In a recorded statement accessible by phone, defendant made the

following declaration to his followers:

> As a last act in the desecration of the First Amendment, the United States Supreme Court has refused to hear my law license case . . . Today's decision makes clear to all of us in the racial loyalist struggle that the Constitution of the United States is dead. It died a death, not by our choice, but by the choice of those of the Court who were determined to kill it. The United States Supreme Court has made clear that the very Constitution that they have sworn to uphold no longer exists for those who love their white people and wish to assure and secure its future. Therefore, I can no longer in good faith and a good conscience urge, recommend or instruct my adherents and supporters in general to obey the laws of this land.
>
> . . .
>
> Today's decision by the Supreme Court has pushed this nation towards a second American revolution. If the first revolution was just, so be the second revolution to secure our peoples' birth right. Whatever blood is spilled will be on the hands of those who so severely wronged us today.

Thus, early on in the CW's relationship with the defendant, it became apparent that

defendant's public statements that he did not advocate violence were not consistent with his

private statements. Moreover, defendant's private statements made clear that additional

investigation was justified because the defendant was at the least condoning, and more likely,

encouraging others to commit acts of violence.

### Defendant's Approval of Violence

Once the CW had established a trusted relationship with the defendant, the defendant

began openly discussing the use of violence to further his objectives.

During a December 4, 2000,[4] conversation the defendant discussed why the WCOTC's objectives of gaining power over the federal government needed to be achieved. Defendant referenced his desire to achieve these "dreams." The defendant then discussed his willingness to "pull the trigger." The defendant further explained, "I'd love it, God, here's all the enemies of our race. We just got 'em in single file against a wall. I just walk down, [gun shot sound] you know. . . . Yeah, every damn one of 'em you just have a field day. Hey, open your mouth, yeah, [gun shot sound]."

The defendant continued in his narration of his "dreams." In discussing the widely acclaimed movie, *Schindler's List*, the defendant stated, "and another part that was funny as hell is where the guy just picks up a rifle and just starts shooting the Jews in the yard. . . . Yeah, it would be kind of hard not to. I mean all those open targets . . . it's just all in a matter of perspective. I mean some people go out and hunt deer. Well hell, I think it's a hell of a lot more sporting to hunt a Jew, you know theoretically. I'd never hunt a deer or an animal. I don't believe in that personally, but you know, if it were legal to hunt Jews and niggers, well, I'd be game."

Finally, in a nationally syndicated talk radio show, the defendant appeared as a guest. During that interview, defendant again made clear his acceptance of violence against racial

---

[4]     In contrast to defendant's arguments that the CW was an "agent provocateur," defendant's statements on the following issues were not the result of the CW's conduct or incitement. *See* Defendant's Motion, p. 10. To the contrary, the CW was virtually silent throughout the entire portion of the conversations detailed *infra*.

minorities. In discussing the Benjamin Smith shooting spree, the defendant stated, "I do not believe in illegal activity but I am not going to use that word [condemn]" to characterize the Smith shooting spree. The defendant continued, "The other races are not our concern. We don"t care if they die I mean that is just the simple fact of the matter. Actually the white race is our only concern. I mean we are only concerned about the crimes the massive crimes by non-whites against whites." The host then inquired, "So if people die and they are not white, no big deal right?" The defendant replied, "It's no big deal."

Defendant's open endorsement of violence against minorities became increasingly apparent. Moreover, these statements were a product of the defendant's own volition, not a result of an overly aggressive informant as the defendant would have this Court believe.

### *Ken Dippold Incident*

By December 2000, the defendant was aware that Ken Dippold was providing damaging testimony to civil attorneys suing the defendant and the WCOTC based on the Ben Smith shootings. The CW and defendant discussed the issue of Ken Dippold in December 2000. *See* Defendant's Motion, p. 11. During that discussion, in addition to the portions of the conversation that defendant noted in his filing, the defendant also stated, "If somebody came to me and said, well, you know, well yeah I ah, I have the means to make sure that [Ken Dippold] does not continue with this bullshit. I'd say hey, I don't want to know about it. I have nothing to do with it, you know that would be my position."

In a subsequent conversation in January 2001, defendant and the CW met in private to discuss Dippold. During that conversation, the CW and the defendant discussed at length what should be done to Dippold. In his filing, the defendant outlines portions of the conversation (and includes a full transcript as an attachment). What defendant fails to highlight for the Court's consideration is the very essence of the conversation. The CW visited the defendant in hopes of obtaining identifying information regarding Dippold. The CW explained to the defendant that the CW had individuals who could take care of the "rat problem," but the CW needed Dippold's address and a picture of Dippold to help locate and identify him.

While it is clear from the transcript that the defendant is hesitant to discuss this issue, it is equally clear that the defendant wants action taken against Dippold. The CW repeatedly indicated that he needed Dippold's address to execute the purported plans in place. The defendant responded by stating, "I already mailed it [Dippold's address] to you. . . . Just for your information." Significantly, while the CW may have been overly eager to engage in violent conduct at the defendant's behest, the CW's conduct during that conversation had absolutely no bearing on the defendant's willingness to allow violence to occur. *In advance of this conversation,* the defendant had already sent Dippold's address to the CW, which the CW needed to execute the purported plan.

Even more significantly, the defendant then engaged in a lengthy explanation as to how he could evade criminal liability if Dippold's death occurred. In explaining why the CW

received Dippold's address, the defendant explained, "Yeah, well, you know the story on that. That was sent just because you happen to have other addresses. You have a lot of addresses."

The defendant goes on to outline his explanation for the entire conversation (between the defendant and the CW) if he were ever questioned. Defendant sated,

> Let me explain one thing that you know, it's my understanding and your understanding, I hope, you probably will (unintelligible). It's my understanding that you're coming to me as your minister, as your priest so to speak . . . and you're confessing.
>
> . . .
>
> . . . if it ever came back that ah that somehow, you know, it was known that you were here or whatever, well you talked to me about church things, about life and your family and ah, but I don't have to reveal any of the content of the conversation because you're coming to me as your . . . I'm your minister."

After this conversation, FBI agents recovered Ken Dippold's address from the CW's post office box. That night, following the preceding conversation, the defendant then sent an e-mail directing the CW not to follow through with the purported plans. The e-mail is significant on two fronts. First, the defendant demonstrates his ability to control and direct the CW. Second, the defendant does not chastise the CW for his willingness to engage in violent conduct or the CW's suggestion that harm should fall Dippold. Rather, the defendant praises the CW for the loyalty that the CW had demonstrated.

A portion of the e-mail reads as follows:

> I know that this is difficult. You are very persuasive and obviously I think extremely well of your idea. You have demonstrated repeatedly your

-9-

allegiance to me and our great Cause and my love for you as my loyal Brother increases by the day. However, too many allegations could be made. Too many insinuations. Too many individuals would see it as grounds to cast doubt upon our word and my word in the legal realm. With the stakes so high, and with no tangible benefit in the various legal struggles we are engaged in by implementing your idea, I must instruct you not to proceed.

Completely absent from the communication is any counseling or indication from the defendant that he is displeased with the CW's conduct. To the contrary, the defendant thought "extremely well of [the CW's] idea," and further expressed his personal appreciation for the CW's allegiance ("my love for you as my loyal Brother increases by the day").

After the Dippold incident, the CW remained involved in the WCOTC and continued to travel with the defendant in connection with WCOTC activities. Because the WCOTC itself was losing members, and because the defendant became enmeshed in defending the WCOTC from various lawsuits, the defendant's public appearances began to diminish.

As outlined in the indictment, in May of 2000, the WCOTC was sued for trademark infringement, and eventually was found to have infringed on the trademarked name, "Church of the Creator." In November of 2002, Judge Joan H. Lefkow issued an order directing the WCOTC and its members to remove or obliterate the term "Church of the Creator" from any published materials in their possession. As a result of this order, as alleged in the indictment, the defendant solicited the CW to murder Judge Lefkow. The specifics of the solicitation, and how the facts apply to defendant's legal arguments, are detailed *infra*.

-10-

### *LEGAL ANALYSIS*

The defendant raises two legal issues regarding the nature of the government's conduct. First, the defendant claims that the government's conduct violates his Fifth Amendment rights because the government's conduct was "so outrageous that it is shocking to the universal sense of justice, and ought not be countenanced by this Court." *See* Defendant's Motion, p. 3. Second, the defendant claims that his First Amendment rights to freedom of association were violated. The government addresses these arguments in turn.

### *Fifth Amendment Claim*

As the defendant acknowledges, the Seventh Circuit has unambiguously rejected the defense of outrageous government conduct. *See United States v. Sherman*, 268 F.3d 539, 549 (7th Cir. 2001) ("we of course have held that the defense of outrageous government conduct does not exist in this circuit"), citing *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995). To evade this prohibition, defendant frames his argument as one of the "government [being] overly involved in the creation of the crimes with which Hale is charged . . ." *See* Defendant's Motion, p. 4. Defendant proceeds to argue that the CW "prodded, cajoled, and argued with Hale regarding Judge Lefkow," and that as a result, the plan to kill Judge Lefkow was actually the product of the government. *Id.*

Legally, defendant's argument is really one of entrapment. That is, the defendant is really claiming that he did not want Judge Lefkow killed - *i.e.* the government induced the crime and the defendant lacked predisposition. *See United State v. Blassingame*, 197 F.3d

-11-

271, 280 (7th Cir. 1999). Without conceding that defendant is entitled to present such a defense, the issue of entrapment should be brought before the jury for its consideration. *See Blassingame,* 197 F.3d at 279. (before a defendant is entitled to present an entrapment defense, an evidentiary foundation for a valid entrapment defense must be present).

However, the Seventh Circuit, when faced with a similar argument, dismissed the claim of outrageous government conduct noting "it may be safely said that investigative officers and agents may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process . . ." *United States v. Sababu,* 891 F.2d 1308, 1327 (7th Cir. 1989). In *Sababu,* the court found that the FBI's use of multiple informants in the planning of a prison escape "failed to demonstrate any truly outrageous government conduct." *Id. See also United States v. Winslow,* 962 F.2d 845, 849 (9th Cir. 1992) (informant's providing bomb parts in investigating Aryan Nations members not considered outrageous government conduct).

Defendant further complains that the length of the government's investigation is also suspect, and warrants dismissal based on Due Process considerations. *See* Defendant's Motion, p. 4. Yet, as the Supreme Court has recognized, long term investigations are sometimes required to detect the type of criminal activity in which the defendant was involved. *See United States District Court,* 407 U.S. at 311 (noting that individuals involved in criminal conduct against the government piece "together shreds of information received from many sources and many nests").

-12-

More fundamentally, the defendant's argument is not supported by the facts of the case. To support defendant's claim that the government "was overly involved in the creation of the crime," the defendant begins his factual recitation mid-stream in the solicitation. *See* Defendant's Motion, p. 4. Defendant begins his outline of relevant facts with a December 17, 2002 conversation between the defendant the CW. But, what is plainly missing are the events that lead up to the December 17, 2002 conversation.

As set forth in the indictment, the solicitation began on or about November 29, 2002, when the defendant sent an e-mail to the CW and other members of the WCOTC stating as follows:

> According to the website of the Anti-Defamation Leagues, Judge Joan H. Lefkow on November 19th ordered that our World Church of the Creator do the following things in the trademark case against it: 1) stop using our name; 2) give up our web addresses, and 3) "deliver up for destruction" all material – including our Holy Books – that bear our name. We still have not heard anything, however, from our attorney in the case and nor have we received any documentation at all that such an order has been issued. Until we receive such word or documentation, our position is that we have not received legal notice of such a sick, dranconian order that in effect places our Church in a state of war with this federal judge and any acting on authority from her kangaroo court.
>
>   . . .
>
> Instead, those who adhere to the Holy Books of our Creativity religion have the words of its Founder most truly imprinted upon their hearts and minds: "Should the Jewish Occupational government use force to violate our Constitutional rights to freely practice our religion; to peacefully assemble; to peacefully organize; to distribute our White Man's Bible; to use the mails and any other prerogative in promoting and expanding our legal religious organizations and the full practice of our religion, then we have every right to declare them as open criminals violating the Constitution and the highest law of the land. They then obviously are the criminals and we can then treat them like the criminal dogs they are and take the law into our own hands. This

-13-

is the obvious, logical thing to do. We must then meet force with force and open warfare exists. . . ."

Significantly, the defendant authored this e-mail, and the defendant chose words that at a minimum suggested that the defendant sanctioned members of the WCOTC to "take the law into [their] own hands . . . meet force with force and open warfare exists . . ."

After this e-mail (and as alleged in the indictment), the defendant then sent the CW a separate e-mail on December 4, 2002. The e-mail directed the CW as follows:

I need you to find out the home addresses of the following individuals:

Judge Joan H. Lefkow, PROBABLE JEW OR MARRIED TO JEW
United States Courthouse
219 South Dearborn, Room 1956
Chicago, IL 60604

[Individual #1], attorney, JEW
[Individual #2], attorney, JEW
[Individual #3], attorney, TRAITOR OR WHITE
[Entity #1]
[Address]

*Any action of any kind against those seeking to destroy our religious liberties is entirely up to each and every Creator according to the dictates of his own conscience. RAHOWA!*

(Emphasis added.) Again, the language of the e-mail is entirely that of the defendant.

After receiving this e-mail the source then traveled to East Peoria, Illinois to meet with the defendant and clarify the meaning of the preceding e-mail. Equipped with a recording device, the following exchange occurred between the CW and the defendant:

CW:        Well, I got your e-mail about the Jew judge . . .

-14-

HALE:      Right.

CW:        . . . you wanting his address and the other rats. Ah . . .

HALE:      That information . . . yes . . . for educational purposes and for whatever reason you wish it to be.

CW:        Are we gonna ah . . . I'm working on it. I, I got a way of getting it. Ah, when we get it are we going to exterminate the rat?

HALE:      Well whatever you wanna do basically.

CW:        The Jew rat.

HALE:      . . . you know, ah . . . my position has always been that I you know, I'm gonna fight within the law and, but ah that informations been provided if you wish to, ah, do anything yourself, you can. So that makes it clear.

CW:        Consider it done.

HALE:      Good.

Nowhere in the remaining portion of the conversation does the defendant attempt to clarify his wishes regarding Judge Lefkow, or make an effort to ensure that the CW was not intending to commit illegal conduct. To the contrary, the defendant's instructions are, on their face, without limit – "that informations been provided if you wish to, ah, do anything yourself, you can. So that makes it clear."[5]

---

[5]      As discussed *supra*, defendant argues that the CW "attempted to incite and convince Hale to kill, or have killed an individual named Kenneth Dippold." While the government disagrees with this characterization, what cannot be denied is that the defendant was well aware that the source had the means to have "a hit" put out on enemies of the WCOTC. Thus, defendant's statement to the CW – "that informations been provided if you wish to, ah, do anything yourself, you can," – is clearly a veiled solicitation as the defendant was plainly aware of the CW's ability to execute such a scheme.

-15-

In an attempt to ensure that the defendant intended harm to Judge Lefkow, the FBI

(through the CW) sent an e-mail on December 9, 2002, which stated:

> I called the exterminator. I know about the rat problem we talked about. This
> guy is good an does a good quiet job. You have to know where rats hide and
> he think [sic] he located her. He is working to get rid of the femala [sic] rat
> right now.

The defendant never responded to this e-mail.[6] Significantly, he never communicated that

there had been a misunderstanding; that he did not want the "exterminator" to take care of

the "rat problem;" nor did the defendant instruct or order the CW not to follow through with

the plan.[7]

With these significant events as backdrop, the December 17, 2002 conversation

(which the defendant finds so offensive) is more properly framed. During the conversation,

the defendant goes to great lengths to ensure that he in no way aids the CW in the planned

assault on Judge Lefkow. Of course, the defendant is not charged with aiding and abetting

an attack on a federal judge. To the contrary, the defendant is charged with soliciting another

to commit an act of violence. To this end, the defendant does nothing to stop the CW's

purported plans. Rather, the defendant discusses at length that he cannot be involved in the

plan, he cannot provide assistance with the plan, and he cannot know details of the plan.

---

[6]     The FBI did receive confirmation that the e-mail was received and opened at the
American OnLine account used by the defendant.

[7]     Again, the facts surrounding the Dippold incident are instructive. As detailed
*supra*, the defendant ordered the CW not to follow through with the Dippold plan. In the case of
Judge Lefkow, no order or directive was given.

Yet, defendant continues to encourage the CW. Hale remarks:

[I]f I'm eating my, my salubrious living[8] and . . . I happen to see that, you know, that various individual or individuals er, had, had a serious altercation, I'm not gonna say that I, that I won't be happy about it but at the same time, I just simply cannot ah, you know, be any kind of a party.

With this more complete factual backdrop outlined for the Court, defendant's assertion that "the conduct of the informant . . . as well as additional conduct described herein, represents an effort to fabricate a crime solely to secure Hale's conviction, and therefore amounts to outrageous government misconduct [sic]" is completely without merit. The CW did not "fabricate a crime." Rather, the FBI (*vis a vis* the CW) went to great lengths to confirm the defendant's true intent. Clearly, the defendant never instructed or directed the CW not to follow through with the purported plan. The defendant never told the CW that the CW had misunderstood the plan. Rather, the defendant made clear that he could not be *implicated* in the plan. Moreover, the initial exchanges between the defendant and the CW were in the defendant's complete control. The November 29, 2002 e-mail and the December 4, 2002 e-mail were composed and sent by the defendant. The defendant fails to explain how this conduct could be attributable to the CW and/or the government in general.

Moreover, the defendant cites to no legal authority that would support his claim of "outrageous government conduct." Defendant's lack of legal support by itself should be fatal to his motion because the relief that defendant seeks is extraordinary. *See Untied States v.*

---

[8] "Salubrious living" is the diet of Creativity and consists of strictly raw fruits and vegetables.

*Persico*, 1997 WL 867788, *19 ("dismissal of a criminal indictment for outrageous government conduct is rare"). *See also United States v. LaPorta*, 46 F.3d 152, 160 (2d Cir. 1994) (noting that *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978) is one of the few appellate decisions to overturn a conviction based on outrageous government conduct). Moreover, as discussed *supra*, the government did not create the criminal activity. To the contrary, the defendant was in a unique position to eliminate any question of criminal liability. If the defendant had simply instructed the CW that he did not want any action taken against Judge Lefkow, the defendant would likely not be before this Court facing the pending indictment.

### *First Amendment Claim*

Defendant's second claim is that he should be entitled to internal FBI reports relating to the justification for using the CW in this investigation. The defendant further argues that the investigation itself infringed on the First Amendment rights of the defendant and members of the WCOTC.

Citing to *United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1989), the defendant argues that the government's investigation must be conducted in "good faith," and that the informant "must adhere scrupulously to the scope of a defendant's invitation to participate in the organization." *See* Defendant's Motion, p. 8. Assuming *arguendo* that the *Aguillar* case is the controlling law in the Seventh Circuit, the analysis in *Aguillar* supports the government's investigative techniques.

-18-

In *Aguillar*, government agents and informants were used to investigate the sanctuary movement – a loose confederation of churches who were smuggling illegal aliens into the United States, claiming that the aliens were being persecuted in their native countries. The Ninth Circuit, relying on the "invited informer doctrine," found that the government's conduct was proper. *Id.* at 705. The Ninth Circuit articulated a two-prong test: 1) "the government's investigation must be conducted in good faith: *i.e.*, not for the purpose of abridging first amendment freedoms," and 2) "the undercover informers adhere scrupulously to the scope of a defendant's invitation to participate in the organization." *Id.* at 705.

As set forth *supra*, the government developed information that suggested, at the very least, that the defendant advocated his followers to engage in acts of violence. Moreover, defendant cannot consistently argue that the government's protracted investigation was intended to abridge First Amendment activities. To the contrary, the CW's continued presence in the WCOTC reflected that the government was simply gathering intelligence and evidence of potential criminal activity. If the government's true intent of the investigation was to abridge First Amendment activities, it would be illogical for the government to assist the defendant in arranging and traveling to various speeches.

As to the second requirement, the CW did adhere "to the scope of a defendant's invitation to participate in the organization." The defendant does not argue nor identify any conduct on part of the CW of which the defendant was not aware. Indeed, that is at the very heart of the government's case. The defendant was fully aware of the CW's activities in

-19-

general. More specifically, the defendant was plainly aware of the CW's statements and interpretations of the relevant conversations in November and December 2002. As the investigation was purposefully designed, the CW's understanding and resulting actions were made plain to the defendant. As noted earlier, if the defendant had expressed his disagreement with the purported plan, or had clarified the meaning of his statements, the defendant would likely not be before this Court.

Similarly, defense counsel attempts to portray the CW as an "agent provocateur," implicitly suggesting that the defendant was somehow the victim of an uncontrollable WCOTC member. Unfortunately, the evidence simply does not support this characterization. The defendant was the "supreme leader" of the WCOTC. He had complete control over its members and their respective positions. Defendant had dismissed members in the past for a variety of missteps – e.g. failure to pay dues; failure to do work for the WCOTC; stealing funds from the WCOTC. Defendant clearly could have done the same to the CW if he had so chosen. But, as the facts demonstrate, the defendant chose to continue to trust and rely on the CW, believing that the communications sent to the CW and the conversations he had with the CW in which the attack on Judge Lefkow was discussed were with a "loyal Brother." Such conduct on behalf of the government is clearly permitted. *See Untied States v. White*, 401 U.S. 745, 749 (1971) ("however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when

it turns out that the colleague is a government agent regularly communicating with authorities.")

For these reasons, the defendant's motion to dismiss the indictment based on First Amendment violations should be denied.

Finally, as to defendant's discovery request, defendant cites to no legal authority that would entitle him to the FBI internal communications reflecting the basis and progress of the investigation, or the CW's "informant file." *See* Defendant's Motion, p. 7. Procedurally, the defendant is not entitled to such information. *See generally*, Fed. R. Crim. P. 16. Moreover, defendant fails to explain how these documents may assist him in pursuing this motion. The government notes that it has produced thousands of pages of documents in discovery, and has produced greater discovery than is required by the rules. To the extent that defense counsel has sought information that they believe would be of assistance, government counsel has attempted to provide this information, whether or not production was mandated by discovery rules. *See e.g.*, Defendant's Motion, p. 10 ("while no reports have been provided detailing [the CW's] motivation for assisting the FBI . . . it is counsel's understanding that [the CW] decided to help the FBI infiltrate Hale's church after having been upset over receiving unsolicited racist literature in the mail.") For these reasons, the defendant's motion for additional discovery should likewise be denied.

## *CONCLUSION*

For the reasons stated above, the government respectfully moves this Court to deny

defendant's Motion to Dismiss Counts II and III of the indictment, for additional discovery,

and for an evidentiary hearing on defendant's motion.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

BY: _____

M. DAVID WEISMAN
Assistant United States Attorney