**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED

MAR 2 5 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 CR 11 |
| | ) | Judge James T. Moody |
| MATTHEW HALE, | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF FILING**

DOCKETED

MAR 2 6 2004

**TO:** **By Hand Delivery**
M. David Weisman
Victoria Peters
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604

**PLEASE TAKE NOTICE** that on the 25th day of March, 2004, the undersigned filed or

caused to be filed with the Clerk of the District Court for the Northern District of Illinois, at

Chicago, Illinois, the foregoing Defendant's Reply to the Government's Response to His Motion

to Dismiss Counts Two and Three of the Indictment; Request for Additional Discovery & for an

Evidentiary Hearing, a copy of which is hereby served upon you.

Respectfully submitted,

**PATRICK W. BLEGEN,** One of the
Attorneys for Defendant.

**DURKIN & ROBERTS**
53 West Jackson Boulevard, Suite 615
Chicago, Illinois 60604
(312) 922-8980

## CERTIFICATE OF SERVICE

**PATRICK W. BLEGEN**, attorney at law, hereby certifies that on March 25, 2004, he

served, or caused to be served, the foregoing pleading on the following attorneys of record by

hand delivery:

> M. David Weisman
> Victoria Peters
> Assistant United States Attorneys
> 219 South Dearborn Street, 5th Floor
> Chicago, Illinois 60604

**PATRICK W. BLEGEN**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

MAR 2 5 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
MAR 2 6 2004

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 CR 11 |
| | ) | Judge James T. Moody |
| MATTHEW HALE, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS
MOTION TO DISMISS COUNTS TWO AND THREE OF THE INDICTMENT;
REQUEST FOR ADDITIONAL DISCOVERY & FOR AN EVIDENTIARY HEARING**

Defendant, **MATTHEW HALE**, by his attorneys, **THOMAS ANTHONY DURKIN**

and **PATRICK W. BLEGEN**, respectfully submits the following reply to the government's

response to his motion to dismiss counts two and three of the indictment; request for additional

discovery and for an evidentiary hearing.

**I.      Under FBI Instructions Evola Clearly Exceeded the Scope of his Invitation**

In response to Defendant's claims that the confidential informant Tony Evola was

inserted into Defendant's church by the FBI and attempted to ingratiate himself to Defendant in

particular, the government attempts to convince the Court that Evola was sought out by church

members, and that it was Defendant who singled out Evola to make him his head of security.

(Govt's Response, p. 3) This is, of course, an important issue, as case law makes clear that in

order to infiltrate an organization engaging in conduct protected by the First Amendment, the

government must have reasonable suspicion of criminal conduct, and the informant *must adhere*

*scrupulously to the scope of the defendant's invitation to participate in the organization.  See,*

*United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1989).

The government cannot seriously argue that Defendant and his church found Evola rather than the other way around. While the government indicates that in March of 2000, Evola was approached by a member of the church (Govt's Response, p. 3), FBI 302's tendered as discovery reveal that Evola was in contact with a church member as early as July 7, 1999, and that he was reporting to the FBI at that time. Moreover, it is patently obvious that Evola under FBI instructions attempted to ingratiate himself to Defendant, as on only the second occasion they met Evola presented Defendant with an FBI-created button containing Benjamin Smith's photograph. At their very next meeting, Evola presented Defendant with an FBI-created t-shirt which also had Benjamin Smith's picture on it and words to the effect of "Benjamin Smith, First Amendment Martyr."

With regard to Evola's position as head of security, the government claims that Defendant selected Hale to be his head of security rather than Evola ingratiating himself into that position. (Govt's Response, p. 3) Apparently, Evola has told the government that Defendant selected him as head of security in private, as it does not appear in any FBI 302, or on an audio-tape. Of course, the government has objected to Defendant's request for additional discovery including Evola's informant file and internal FBI memorandum seeking approval for its investigation. Such documents would, quite likely, reveal how it was that Evola came into contact with Defendant's church and how he came to be head of security.

Most importantly, however, the government's argument that Evola did not exceed the scope of his invitation into the church misses Defendant's most critical point; *i.e.*, that Evola was never invited to be some sort of hit-man, and was never requested by Defendant to do anything as head of security other than to protect Defendant at public meetings. As the hundreds of tapes

2

make clear, and as the government has not addressed despite it being made explicit in Defendant's original motion, "all the conversations about 'rats,' 'traitors,' murder and mayhem . . . are all, *without exception initiated by Evola. At no time does Hale ever broach the subject of killing or even harming anyone. Rather, it is always Evola who initiates conversations about violence, and attempts to steer conversations in that direction.*" (Defendant's Motion to Dismiss Counts Two and Three, pp. 13-14) (emphasis in original)

Unable to contradict that it is Evola who consistently raises the issue of harming people, the government attempts to establish that Hale condones or "more likely, encourag[es]" violence, in general, by pointing to his comments about minorities and the Benjamin Smith shootings. (Govt's Response, pp. 4) For example, the government points out that Hale refused to condemn Benjamin Smith's actions,[1] that he told people he would no longer be able to tell followers to follow the law if denied a law license,[2] and that he would "love it" to line up the enemies of his race to shoot them,[3] and that the movie *Schindler's List* was funny. (Govt's Response, pp. 2, 3, 6) While these statements are offensive, they are protected by the First Amendment. More importantly, and as addressed herein, none of these statements are indicative of Defendant having committed a crime, and none provide reasonable suspicion of criminal conduct as is required in order to infiltrate a political organization. *See, Alliance to End Repression, et al. v. City of Chicago*, 627 F.Supp.2d 1044, 1056 (N.D. Ill. 1985).

---

[1] As is clear from his statements, Hale repeatedly condemned Smith's conduct, but refused to condemn Smith personally.

[2] Hale said this both privately and publicly.

[3] Of course, Hale's statements in this regard concern what could be done *after* his organization came to political power.

3

II.   **The Government Cannot Establish a Reasonable Suspicion that Hale was Engaging in Criminal Activity Sufficient to Justify the Three Year Infiltration of his Church.**

In an effort to support the FBI's decision to maintain its informant in Defendant's church even after the Benjamin Smith incident had been investigated,[4] the government has pointed to numerous recorded statements by Hale to establish that he encourages violence. None of Hale's statements are indicative of encouraging violence, however, and the government has mis-interpreted the majority of them.

For example, the government argues that Hale's recorded statements that "I'd love it, God, here's all the enemies of our race. We just got 'em in single file against a wall. I just walk down, [gun shot sound] you know. . . . Yeah, every damn one of 'em you just have a field day. Hey, open your mouth, yeah [gun shot sound]." What the government does not make explicit, however, is the context of Hale's statements. Hale is not encouraging the listeners to engage in violence, but rather discussing fantasies that my be possible in the event his organization comes to political power.[5]

Similarly, the government confuses Hale's position that he does not care what happens to

---

[4]The informant and Hale discussed Smith on numerous occasions. Of course, none of those discussions led to Hale being charged, and none were indicative of anything other than what Hale has maintained all along; *i.e.*, that he did not know of Smith's intentions in advance. The government's *suggestions* to the contrary are inaccurate. For example, as noted above, Hale did condemn Smith's actions, but did not condemn him personally. In addition, while the government notes that Smith gave some of his belongings to Hale before beginning his shooting spree, the government fails to mention that it was Hale who provided the government with this information. Likewise, the government indicates that during the shooting spree Hale suspected Smith was involved, but did not call the police. Leaving aside the fact that Hale is not required to call the police, what Hale actually said was that when he heard that the shooter was driving a blue Ford Taurus, he was "hoping to hell" that it was not Smith.

[5]While Hale's words are obviously offensive and shocking to those of us who find his views repugnant, the government should not be permitted to infiltrate his organization based upon this sort of protected speech under the guise that he is encouraging violence. What he is actually doing is encouraging his church members to come to political power legally so that their beliefs can be implemented - absurd as those beliefs may be.

4

minority groups with some sort of effort to encourage violence. There is an obvious distinction between not caring what happens, and *encouraging* something to happen. If this basis is accepted as a sufficient reason for the government to infiltrate a political organization, then all white supremacists organizations can be infiltrated at the government's whim — something the First Amendment certainly does not permit.[6]

Lastly, the government suggests that an incident involving a church member named Ken Dippold indicates that Hale encourages violence. Evola's conduct, Hale's responses, and the transcripts of their conversations belie any such suggestion, however. The government argues that "while the CW may have been overly eager to engage in violent conduct at the defendant's behest, the CW's conduct during that conversation had absolutely no bearing on the defendant's willingness to allow violence to occur." (Govt's Response, p. 8) Saying that Evola was "overly eager" utterly fails to acknowledge the lengths Evola went to, including arguing, cajoling, pleading, invoking Hale's safety, an various other means, to convince Hale to go along with Evola's plan to harm Dippold.[7] After lengthy badgering by Evola, and apparently not sure whether Evola believed he had been told to harm Dippold, Hale tells Evola by e-mail not to harm Dippold. Significantly, however, the government has mis-quoted Hale's e-mail to Evola. Hale does not write that he thinks "extremely well of your idea," as the government's pleading indicates. (Govt's Response, p. 9) Rather, Hale writes that "I think extremely well of you for

---

[6]As an aside, the government boldly argues that it fully respected First Amendment freedoms as evidenced by the fact that Evola assisted Hale "in arranging and traveling to various speeches. (Govt's Response, p. 19) It would be illogical, the government argues, to assist Hale if it wanted to abridge his activities. This argument is absurd. Providing minimal assistance for a limited period of time *as part of an overall effort to destroy a political organization* in no way reflects respect for the First Amendment.

[7]The entire transcript of that conversation was attached to Defendant's initial motion as Exhibit B.

your idea." As such, Hale's e-mail can not be seen as giving Evola tacit approval for violence; but, rather, when viewed in conjunction with their lengthy in-person argument, can be seen as an effort not to avoid insulting or angering Evola.

In sum, the government's argument that Hale was ordering or even encouraging violence is unsupportable, even after a more than three year investigation, the infiltration of Hale's church by an informant, and the recording of literally hundreds of conversations.

### III.    Conclusion

In light of the above, Defendant respectfully request that the Court grant his Motion to Dismiss Counts Two and Three of the Indictment; Request for Additional Discovery & for an Evidentiary Hearing.

Respectfully submitted,

**THOMAS ANTHONY DURKIN**

**PATRICK W. BLEGEN**, Attorneys for Defendant.

**DURKIN & ROBERTS**
53 West Jackson Boulevard, Suite 615
Chicago, Illinois 60604
(312) 922-8980

6