**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 03 CR 11 |
| | ) Judge James T. Moody |
| MATTHEW HALE, | ) |
| | ) |
| Defendant. | ) |

FILED
APR 8 2004
UNITED STATES DISTRICT COURT
DOCKETED

## DEFENDANT'S EMERGENCY MOTION FOR A HEARING
## ON THE COMPETENCY OF GOVERNMENT WITNESS JON FOX

Defendant, **MATTHEW HALE**, by and through his attorneys, **THOMAS ANTHONY**

**DURKIN** and **PATRICK W. BLEGEN**, pursuant to the Due Process, Confrontation and

Effective Assistance of Counsel clauses of the Fifth and Sixth Amendments to the Constitution

of the United States, as well as Rule 601 of the Federal Rules of Evidence, respectfully requests

that this Court hold a competency hearing to determine whether government witness Jon Fox is

competent to testify in this case.

In support of this motion, Defendant, through counsel, shows to the Court the following:

1.      In a letter dated April 1, 2004, the government disclosed to the defense certain

*Giglio* material regarding government witness Jon Fox.[1]

2.      In its disclosure, the government indicated that they had learned from Fox that "in

approximately 1996 he was diagnosed as bi-polar, and that he has, since then and continuing to

the present, been taking Lithium for his condition." In the same disclosure, however, the

---

[1] As the Court is aware, Fox is the member of Defendant's church who came forward shortly before the previously scheduled trial date of November 3, 2003, and indicated to the government that he had been solicited by Defendant to kill Judge Lefkow. Fox first told the government of these allegations on October 6, 2003, and he testified before the grand jury on October 8, 2003. Fox's allegation is now the subject of Count Three of the Third Superseding Indictment.

*140*

government also produced an arrest report of Fox in Minot, North Dakota, on November 5, 2003 —- less than a month from the date of his grand jury testimony in this case on October 8, 2003. Fox was charged and convicted of disorderly conduct and disobeying the movement order of a police officer who had come to question him about a racially instigated incident with a neighbor. Fox was sentenced to 15 days in jail and a fine of $200. Details of the offense, set forth in police reports reveal that Fox was in a tremendously agitated state at the time of his arrest, and that in response to the arresting officer's indication that he was going to be placed under arrest, Fox retreated into his basement and stripped off all of his clothes. A copy of the government's *Giglio* letter dated April 1, 2004, along with the arresting officer's report relating to Fox's November 5, 2003, arrest are attached hereto as Exhibit A.[2]

3.     In that it seemed evident to counsel that Fox's behavior when arrested in November 2003 was consistent with a manic episode, and inconsistent with Fox's representation that he has continued taking his medication since his bipolar diagnosis in 1996, counsel issued a subpoena *duces tecum* to Jon Fox, through his attorney, in an attempt to obtain any records or documentation related to Fox's mental health treatment, diagnosis or counseling. In the event Fox was not in possession of any of those items, counsel requested that Fox provide the names of any mental health professionals who had diagnosed, examined or treated him. A copy of the subpoena and attachment and are attached hereto as Exhibit B.

4.     Subsequent to service of the subpoena on Fox, counsel spoke with Fox's attorney, Paul Brayman. Mr. Brayman informed counsel that Fox had no documents responsive to the subpoena, and that the only information Fox would provide counsel was the information from the

---

[2] After learning of this incident, counsel obtained a copy of the same police report from the public record of the Municipal Court for the City of Minot, Ward County, North Dakota.

label on the prescription bottle for Fox's medication. According to the prescription label, Fox

has been prescribed 300 mg Lithium Carbonate slow-release tablets. Mr. Brayman further

informed counsel that Fox had indicated that he would not consent to an interview by defense

counsel about his history of bipolar disorder or whether Fox continues to take the lithium

prescribed to treat his condition.

5.      A bipolar disorder, or manic depressive illness, is a brain disorder which affects a

person's mood. A person suffering from bipolar disorder typically has feelings of extreme highs

and lows. On one end of the bipolar disorder is mania (an extreme high), on the other end is

depression (an extreme low). Frederick Goodwin and Kay Redfield Jamison, *Manic-Depressive*

*Illness*, Oxford University Press, at 22-44 (1990).[3]

6.      The manic mood state can be present to varying degrees, but all are characterized

by heightened mood, more and faster speech, quicker thought, brisker physical and mental

activity levels, and more energy, irritability, perceptual acuity, paranoia, heightened sexuality and

impulsivity. *Id*. at 22. The least severe form of mania is Stage I mania, or hypomania, which

exhibits more moderate changes in the various indicators. *Id*. Stage II mania, or acute mania, is

similar to hypomania which the exception that subjective stress is heightened. *Id*. at 23. Stage

III, or delirious mania, is relatively rare but is characterized by severe clouding of consciousness,

hallucinations and delusions. *Id*. at 24. Finally, chronic mania is evidenced by reduced

intellectual productivity and general activity levels, and overall intellectual weakening. *Id*. at 25.

During episodes of mania at any stage, nonpsychotic symptoms, such as disorientation and

serious memory difficulties, among others, may be present. *Id*. at 31.

---

[3] The Third Circuit has noted that this book is the leading text on bipolar disorder states. *See, Taylor v. Phoenixville School District*, 174 F.3d 142, 156 n. 5 (3rd Cir. 1999).

3

7.　　The depressive mood state is also present in varying degrees of severity, all of which are generally characterized by a decrease in areas of emotion and behavior, including rate of thought and speech, energy, sexuality and the ability to experience pleasure. *Id*. at 36. Nonpsychotic depression has moderate to severe symptoms, including depression and suicidal thought and behavior. *Id*. at 37-38. Psychotic depression exhibits the same symptoms as that of nonpsychotic depression, but the symptoms are more severe and include delusions and hallucinations. *Id*. at 39. Delirious melancholia is the most severe stage of cognitive and perceptual distortion and disorientation. *Id*. at 40. Clinical features of depressed states of bipolar illness include poor concentration, diminished clarity of thought, and poor memory. *Id*. at 43.

8.　　Combining the degrees of mania and depression results in an overall bipolar spectrum. The spectrum, which progresses from normal mood to severe bipolar disorder, includes the following: (1) normal mood variation; (2) cyclothymic personality, which is described as a pre-bipolar personality; (3) cyclothymic disorder, which is mild bipolar disorder; (4) Bipolar II, which exhibits both mania and depression, but has more frequent and severe episodes of depression; (5) Md, which is bipolar disorder with more frequent and severe episodes of mania than depression; and, (6) Bipolar I, which exhibits equally severe episodes of mania and depression. *Id*. at 79-80.

9.　　Bipolar disorder can be controlled with medication. Lithium is most commonly used to treat bipolar disorder, although patient selection criteria require a clinician to examine the type, frequency, total number and severity of prior episodes to determine if lithium maintenance is appropriate. *Id*. at 666. At a minimum, two manic episodes are required before an individual is placed on lithium. *Id*. Furthermore, lithium is more commonly prescribed for patients more vulnerable to mania than to depression. *Id*. at 668.

10.     With respect to Jon Fox, due to his unwillingness to provide records or information about his mental health treatment, counsel cannot determine the extent and severity of his bipolar disorder on his cognitive functioning and his ability to clearly remember the events about which he may testify.

11.     Furthermore, in addition to the November 5, 2003, arrest, Defendant has further reason to believe that Fox may no longer be taking medication to alleviate the manic depressive episodes, assuming he was previously taking lithium as he represented to the government.  In a speech on January 11, 2003, in Lewiston, Maine, which was recorded by a television news station and recently produced to the defense, Fox stated, among other things, to a group of followers of the Creativity movement the following:

> "Everybody has heard of our program of salubrious living.  Basically we believe in eating healthier foods, living a healthier lifestyle, not using and resisting street narcotics, not using and resisting prescribed drugs that are handed out by Jewish doctors.  For a test, the next time you watch, you know, pay attention to the commercial on TV next time when they advertise any drug.  You will hear disclaimers of 'it only alleviates the symptoms.'  Okay, if you alleviate the symptoms, does that mean it doesn't hurt?  Does that mean you're no longer sick?  That just means your body doesn't know it's sick anymore.  And then at the end of that it tells you all the side effects that may be caused.  I'm sorry. *I'd rather live with what I've got than take a pill and deal with the side effects that's caused by taking that pill.*  And the bottom line is how much money do you spend on them prescribed drugs to alleviate symptoms and still be sick?" (Emphasis added.)

Thus, there is all the more evidence that Fox may well have elected not to take lithium for his bipolar disorder, contrary to what he has represented to the government.

12.     Counsel acknowledge that, pursuant to Rule 601 of the Federal Rules of Evidence, every person is competent to be a witness.  The Seventh Circuit has recognized, however, that "a district judge has the power, and in an appropriate case the duty, to hold a hearing to determine

whether a witness should not be allowed to testify because insanity has made him incapable of testifying in a competent fashion." *United States v. Gutman*, 725 F.2d 417, 420 (7th Cir. 1984). *See also, United States v. Carlisi*, 1993 WL 339079, *25 (N.D.Ill. 1993) (Plunkett, J.). Once a trial judge has been confronted with evidence of a material impact on the competency of a witness, an inquiry must be made into the facts and circumstances relevant thereto. *United States v. Crosby*, 462 F.2d 1201, 1203 (D.C. Cir. 1972). A witness may be disqualified as incompetent if he lacks the capacity to recall or does not understand the duty to testify truthfully. *United States v. Lightly*, 677 F.2d 1027, 1028 (4th Cir. 1982); *United States v. Gutman*, 725 F.2d at 424, *dissent* (Coffey, J.).

13.    As discussed previously, bipolar disorder is evidenced by mood swings that can be severe or mild depending on the severity of the disorder. A common side effect of bipolar disorder is heightened and decreased thought processes. Poor memory and memory impairment are common features of bipolar disorder. If Fox is no longer taking his lithium, his episodes of mania and depression no doubt appear to have returned. If that is indeed the case, Fox's thought processes and cognitive capabilities may well be impaired.[4]

---

[4] While counsel submit that good reason exists to believe that Fox is not currently taking lithium to control his disorder, should the Court conclude that he is taking his medication there is, nonetheless, an independent basis for conducting a competency hearing of Fox. The primary action of lithium is mediated through the central nervous system. Thus, lithium causes varying types and degrees of cognitive impairments. *Manic-Depressive Illness*, at 706. Memory problems are the most commonly reported side effect of use of the drug. *Id.* In a study of cognitive impairment related to lithium usage, it was noted that "controlled studies have consistently described small but consistent performance decrements on various cognitive tests, including memory tests." *Id.* at 707, *quoting*, Judd, *et al.*: Effects of psychotropic drugs on cognition and memory in normal humans and animals. In: HY Meltzer, ed: *Psychopharmacology: The Third Generation of Progress*. New York: Raven Press, 1987. pp 1467-1475. Evidence of lithium's detrimental effects on long-term memory, semantic reasoning and memory retrieval has been identified in many empirical studies. *Id.* Furthermore, lithium impairs an individual's ability to recall events. *See, Bullwinkel v. Federal Aviation Administration*, 23 F.3d 167 (7th Cir. 1994) (where the Court discusses side effects of lithium usage, including memory loss). Thus, Defendant submits, even if Fox is taking lithium, his memory may be impaired to such an extent that he cannot competently testify in this trial.

14. Absent a hearing on Fox's competency, Defendant submits that this Court cannot be confident of Fox's competency to testify in this case. It is within the sound discretion of this Court to hold such a hearing in light of the evidence of Fox's serious mental illness, as well as a recent apparent episode of mania.

Respectfully submitted,

**THOMAS ANTHONY DURKIN,**

**PATRICK W. BLEGEN,** Attorneys for Defendant.

**DURKIN & ROBERTS**
53 West Jackson Boulevard, Suite 615
Chicago, Illinois 60604
(312) 922-8980

7

## CERTIFICATE OF SERVICE

**PATRICK W. BLEGEN**, attorney at law, hereby certifies that on April 7, 2004, he

served, or caused to be served, the foregoing pleading on the following attorneys of record by

facsimile:

> M. David Weisman
> Victoria Peters
> Assistant United States Attorneys
> 219 South Dearborn Street, 5th Floor
> Chicago, Illinois 60604
> *(Facsimile: 312-886-2048)*

PATRICK W. BLEGEN




United States Attorney
Northern District of Ill......s

**U.S. Department of Justice**

Victoria J. Peters
Associate Chief, Criminal Division

Everett McKinley Dirksen Building
219 South Dearborn Street
Chicago, Illinois   60604

(312) 353-5319

FAX 353-4324

April 1, 2004

Hand Delivery

Thomas Durkin
Patrick Blegen
Durkin & Roberts
53 West Jackson Blvd., Suite 615
Chicago, IL   60604

Dear Sirs:

Please find enclosed 25 pages of material received from the Minot, North Dakota police department relating to Jon Fox. Mr. Fox informs me that as a result of the incident which is the subject of this report he was convicted of disorderly conduct and disobeying a movement control order of a police officer and given a sentence of 15 days in jail and a $200 fine.

Mr. Fox also informs me that in approximately 1997 he was convicted in Kentucky for harassment and sentenced to 5 days, in 2002 he was convicted of harassment and given a  fine, and that in approximately 1990 and 1992 he was convicted in Kentucky for DUI.

Finally, Mr. Fox informs me that in 1996 he was diagnosed as bi-polar, and that he has, since then and continuing to the present, been taking Lithium for this condition.

Please contact me if you have any questions about this matter.

Very truly yours,

Victoria J. Peters

VICTORIA J. PETERS
Assistant United States Attorney

November 5, 2003

Summons # 4361803 - Disorderly Conduct
Summons # 4361804 - Disobey Movement Control Order
Jon Stephen Fox

Page 1

On November 5, 2003, at approximately 1730 hours, I was dispatched to 905 - 6th St. S.W. to meet with a Mr. McCoy in reference to a harassment. When I met with Mr. McCoy he explained to me that he had been having problems with some neighbors that had just moved in directly to the south of his residence.

When I asked Mr. McCoy to explain this, he explained that the neighbors were always making comments about them and making faces towards them, and just making them feel uncomfortable ever since they moved in.

Mr. McCoy couldn't give a specific incident or anything that had happened with these people other than the fact that they were just always mumbling things and making other comments that were directed towards them. As far as I know, it is just Mr. McCoy and his 18 year old son that live at that residence. McCoy stated that what caused them to call the police today was that his 18 year olds son, who is disabled, was outside and was going to walk to the grocery store. He explained to me that he was going to Miracle Mart on South Broadway. He stated his son does not work, and he takes care of his son as he has severe Tourette's syndrome. He stated that when his son left, walking southbound on 6th St., he noticed that the father of the individuals that live next door, which I later found out was 909 - 6th St., left and went in the same direction as his son was walking. He stated that this individual, he just knew him as the man of that house, left in his vehicle and his son was walking on foot.

He said that he was concerned because of this individual's behavior in the past that he possibly might do something to his son or approach his son. I did speak with Mr. McCoy's 18 year old son. He reported to me that when he arrived in the area of Miracle Mart on South Broadway, the individual, that would be his neighbor, walked out of Miracle Mart, approached him and accused him of harassing his daughters. When I asked McCoy's son about this, he stated that at no time has he harassed the daughters in any way. I asked if this individual made any other comments or threats towards him, and he stated he did not, but he stated when he accused him of harassing his daughters, he just told him he would have to take that up with his father. He then did state that this individual made the comment that he would take it up with his father and just ended up going back into the store. I believe some profanities were used towards McCoy's 18 year old son at that point, however in visiting with him, he stated he was not alarmed in any way by what this individual was doing or saying to him.

Mr. McCoy was very upset that this individual approached his son and stated he wanted it documented at the Police Department, and in visiting with him, we agreed that I would go over and visit with this individual and ask him to stay away from McCoy's son and

November 3, 200

Summons # 4361803 - Disorderly Conduct
Summons # 4361804 - Disobey Movement Control Order
Jon Stephen Fox

Page 2

also try to get the inside story of what happened at Miracle Mart and find out why he is accusing McCoy's son of harassing his daughters.

When I went over to the residence, I went to the front door, and I noticed right away that there was a sign asking that that door not be used, so I went around to the back of the residence, and I did notice there was lights on in the residence and there was a car in the driveway. I knocked at the back door and rang the doorbell a couple of times and got no response and at one point I did see what appeared to be like a teenage girl standing in the kitchen, and at this point she began to walk back away from the door that I was knocking at, so I again knocked at the door, and I believe that was about the third time I had knocked.

At this point, I noticed an individual walking towards the door, and the door was kind of frosted over so I couldn't exactly see who was coming to the door. A male subject in his approximate 40's answered the door, and I told him I was called by his neighbor directly to the north of him, and right away he interrupted me and asked me what their name was, and I had realized at that point that I didn't even get the individuals name. Then this individual, who I later identified as Mr. Fox, said that he's got plenty of neighbors to the north and he didn't know who I was talking about. At this point I explained again that I was talking about the neighbor directly to the north, right next door, and I described him as being a black male, and I asked Mr. Fox if he knew who I was talking about, and Fox made the comment that of course he did.

At this point I explained to him and asked him if he had had any words with McCoy and his son. I had later learned that the neighbor's last name was McCoy, and he stated to me that no, he didn't have any words with his son at Miracle Mart. I asked him if he was at the Miracle Mart earlier today, and he stated to me that he was not.

At this point it seemed that this individual was kind of being smart mouthed and was not being honest with me, so I asked him, I made the comment that if he was lying to me I didn't know why and then right away he spoke up and made the comment, "Oh, I'm a liar," and it was appearing that he was getting kind of agitated.

At this point I didn't know whether or not he was admitting to me that he was being a liar or if he was just being cocky in reference to what I was saying, so I took it as him admitting that he was lying and then I made the comment that he was, so he was at Miracle Mart South Broadway, and he again denied it, and stated he was not lying.

November 5, 2003

Summons # 4361803 - Disorderly Conduct
Summons # 4361804 - Disobey Movement Control Order
Jon Stephen Fox

Page 3

At this point his daughter came to the door and stated that she was with her dad all afternoon and that he didn't harass anybody. I asked her if they were at Miracle Mart, and she stated that they were, so at this point I turned to the male individual, Mr. Fox, and I questioned him on the fact that he had just told me a couple of times that he wasn't at Miracle Mart and he began defending that, that that is not what he was saying, he was just saying he wasn't harassing anyone at Miracle Mart.

It was very obvious to me, so I told him that I might as well just go back and visit with the neighbor about the complaint, and I began to walk away from the back door area. At this point Mr. Fox was quite agitated. He came running out into the driveway behind me. I turned around and he shoved his body up against me and started pushing me back in the driveway and started hollering for me to get the fuck off his property, to get the fuck out of his house and away from his house, and he kept making the comment that it was his property and I had no right to be there and was using profanities several times throughout his agitated state. He continued to shove me with his chest. His chest was all puffed up. Several times I pushed my hand against his chest, trying to push him out of my personal space. I told him several times to get out of my face and get away from me and he continued to shove and push against me as he was hollering profanities.

At one point I informed him I would arrest him if he did not get away from me, and he kept using profanities and kept hollering that he can do whatever he wants on his own property. At this point I again told him to stay away from me and that I would be going back over to the neighbor's house and he again approached me, and he again started shoving his chest up against mine and shoving against me as I was getting backed up towards the street and shoved out of his driveway.

At this point again I had told him several times to back away from me and to settle down, and he refused to do so. I informed him that he was under arrest for disorderly conduct, and at that point he began to retreat back towards his house, and I followed him at this point since I had placed him under arrest, and he began to speed his walk up. I caught up with him at his back door where I grabbed a hold of his arm. His daughters, or some people that I assumed were his daughters were standing in the doorway and he pulled away from me and ran into the house, and then one of the people standing in the doorway slammed the door. At this point I told him several times that he was under arrest for disorderly conduct, and as soon as the door slammed, I immediately grabbed the door and tried to open it with my hands. I was unsuccessful, so I kicked the door, and it appeared that whoever was inside was holding the door, and they backed away and then I opened the door with my hands and ran into the house after Mr. Fox.

November 5, 2003

Summons # 4361803 - Disorderly Conduct
Summons # 4361804 - Disobey Movement Control Order
Jon Stephen Fox

Page 4

Fox had gone straight in the entry way and down the stairs, and I could see some military type boxes that appeared to be some type of ammo boxes. I am not really familiar if that's exactly what they're used for, but we do use some on the tactical team at the Police Department, and I believe they were former military ammo boxes that we used to contain some of our munitions on the Tactical Team. I could see these boxes sitting on the basement floor down in the area that Mr. Fox had ran. I unsnapped my gun, and I had my hand on my gun, and I had my pepper spray out as I ran down the stairs after Mr. Fox, and as I looked around the corner at the bottom of the stairs I told him that he was under arrest for disorderly again and that he would have to come with me.

At this point he had calmed down quite a bit. He had stripped his clothes off and he was standing naked in the basement and he stated he knew he was going with me and he just needed to change his clothes and get some bond money. At this point I told him I would allow him to do that. I told him I was staying in the house because he was under arrest. Several times he made the comment that I couldn't be in the house. His daughters made the comment that I couldn't be in the house, and I informed them and him that he was under arrest and that as soon as he was ready to leave the house I would leave right along with him.

He ended up getting dressed downstairs and we walked upstairs, and as we walked upstairs a male individual walked in who he claimed was his boss. I told the individual that unless he had a reason to be there that I would like him to leave because I was in the process of dealing with a problem and arresting Mr. Fox, and right then Mr. Fox made the comment that this individual was going to stay there with his kids.

At this point I followed Mr. Fox into the living room area where he continued getting dressed. I believe he was looking for some shoes or some other items, and at one point, he said he was retrieving some money for his bond. I allowed him to do that. I asked him if he wanted to get some shoes on, and he began to do that.

While he was bending over putting his shoes on, one of the females, again, about a teen age girl, again I believed to be his daughter was in the kitchen, hollering, "fucking pig", fucking fag pig, quit looking at my daddy's ass, you fucking fag pig," she hollered a couple of different times.

While we were in the upstairs area of the house, Mr. Fox again became very agitated and started hollering comments about the Minot Police, using profanities again several times, and again he got in my face and started shoving his chest up against me and started pushing me again throughout the kitchen area of his residence with his chest. I continued



November 5, 2003

Summons # 4361803 - Disorderly Conduct
Summons # 4361804 - Disobey Movement Control Order
Jon Stephen Fox

Page 5

to push him away from me and again told him several times to get out of my face and not to shove against me, and I was considering using pepper spray to try and control Mr. Fox, however I noticed there was a young baby in the kitchen area, and I did not want to subject the baby to that atmosphere.

I had called a couple of different times for help and additional officers and at one point I asked for officers to expedite to my location, and I did this immediately after I placed Mr. Fox under arrest outside, and again, I believe a couple of times within the residence or at least the one time that I asked officers to expedite. At this point I felt that if I would have tried to take control of Mr. Fox that the fight would have been on so I chose not to do that at this point until I had additional officers there in case he began to fight at that point. I told Mr. Fox before we left the residence to place his hands behind his back. He told me, no that he wasn't going to do that, told me that I was not going to hand cuff him and that he was not going to wear hand cuffs.

At this point I chose not to push that issue inside the residence where I felt that he was trying to put on somewhat of a show for his boss and other people at the residence, and I figured once we were outside I would push the issue of hand cuffing him once I had additional officers on scene that would be able to assist. Once we were outside, about four officers were coming up to my area which was the driveway area out in front of 909 - 6th St. and at this point I told Fox that he was going to be hand cuffed; and I ordered him to put his hands behind his back and with little resistance he did do that. We did do a pat down search of Mr. Fox's person and placed him in the back seat of one of our caged cars which was being operated by Officer Dump. Officer Dump then transported Mr. Fox to the Ward County Jail. Mr. Fox's intentions were to bond out. Due to his behavior, we felt it would be more appropriate and a better setting to transport him to the jail where we could fill out the different charges in more of a controlled environment. Officer Dump did transport Fox to the Ward County Jail, and I also went to the jail where Fox was turned over to the custody of the Ward County Jail staff. I did fill out the summons for disorderly conduct as well as disobey a movement control order. Mr. Fox continued to ask me questions about what I was doing and kept making comments to people around me that, "Oh, you were a witness to that, you heard what the officer said," and I really don't understand what he was trying to get at.

Several times throughout the time that I was with Mr. Fox, he made comments about his black neighbor, and I would do this for a black man, and he made comments about his 20 some year old daughter being raped and the Minot Police Department wouldn't do a fucking thing about it, and several times made comments about his black neighbor. Just

November 5, 2003

**Summons # 4361803 - Disorderly Conduct**
**Summons # 4361804 - Disobey Movement Control Order**
**Jon Stephen Fox**

**Page 6**

the tone that Mr. Fox was using and the way he was talking about his neighbor gave me the impression that he was possibly a racist.

Mr. Fox eventually bonded out from the Ward County Jail.

OFFICER GOODMAN, 412

AO 89 (Rev. 09/99) Subpoena in a Criminal Case

# United States District Court for the Northern District of Illinois

| | | **SUBPOENA IN A CRIMINAL CASE** |
|---|---|---|

United States     **V.**    Matthew Hale

**CASE NUMBER:**   03 CR 011

TO:    Jon Fox
       909 6th. St, S.W.
       Minot, North Dakota
       c/o Paul Brayman

☐    YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below, or any subsequent place, date and time set by the court, to testify in the above referenced case. This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| PLACE | COURTROOM |
|---|---|
| Dirksen Federal Building<br>219 S. Dearborn St.<br>Chicago, IL 60604 | 1441 |
| | **DATE AND TIME**<br>April 7, 2004, 9:00 am |

☒    YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

See Attachment.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT | DATE |
|---|---|
| **MICHAEL W. DOBBINS, Clerk** | |
| (BY) DEPUTY CLERK<br>*Blanca Franco* | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER

Thomas Anthony Durkin
53 W. Jackson Blvd.
Suite 615
Chicago, IL 60604
(312) 922-8980

## **ATTACHMENT**

Any and all books, records, and documentation pertaining to mental health treatment, diagnosis, or counseling, including, but not limited to, medical records, and/or prescriptions for lithium and/or other drugs.

In the absence of such records, this subpoena also specifically requests the name or names of any and all diagnosing, examining, or treating mental health professionals or counselors as well as the name or names of any and all diagnosing, examining, or treating mental health facilities.