IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

JUN 2 0 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA, )
Plaintiff, )
)
V. ) No. 03 CR 11
)
) Judge James T. Moody
MATTHEW HALE, )
Defendant, )

**DOCKETED**
JUL 2 2 2004

## SUPPLEMENT TO DEFENDANT's POST-TRIAL MOTION

NOW COMES the Defendant, Matthew Hale, now _pro se_, and offers this supplement to his post-trial motion.

I. <u>Additional Reasons why I am Entitled to an Acquittal on Counts Two and Four As a Matter of Law Pursuant to Fed. R. Crim. Pro. 29 (c)</u>

Since nowhere does Tony Evola say on 12/5/02 that Judge Lefkow is the "rat" to be "exterminated"; since there is evidence that the FBI itself was uncertain who the "rat" was; and since there is evidence that _I_ thought he was talking about someone else, I am entitled to acquittal on Counts Two and Four as a matter of law.

Even if the jury could have found beyond a reasonable doubt that I had solicited the murder of _someone_, without Evola specifying on 12/5/02 that Judge Lefkow was _the_ "rat" to be "exterminated," the jury could not have found beyond a reasonable doubt that it was _Judge Lefkow_. A reading of

1

the transcript of the December 5th conversation (see Exhibit A) coupled with the preceding December 4th email (see Exhibit B) show clearly that Evola refers to multiple people as "rats" and at one point even refers to a "Jew judge" and "lawyer rat." There is thus huge doubt as to whom I thought that Evola was talking about and even whom Evola was talking about. No jury could thus find beyond a reasonable doubt that the target of the alleged solicitation was Judge Lefkow. Hence my convictions on Counts Two and Four cannot stand.

The fact that the FBI apparently felt compelled to direct Evola to send an email four days later specifying "the female rat" (see Exhibit C) (emphasis added) illustrates even further the huge doubt about who "the rat" was on December 5th. While Evola testified at trial that he was instructed to specify the "female rat" because he had thought that Judge Lefkow was a man on December 5th, this makes little sense as I obviously knew that she was a woman. There would be thus no reason to specify her sex to me. It is clear that the FBI was hoping that Evola was talking about Judge Lefkow on December 5th, hoping that I thought that he was talking about Judge Lefkow on December 5th, and tried to cement the identity of "the rat," "Jew rat" that was to be "exterminated" after the fact. Specifying that Evola had plans to have killed a "female rat" within his December 9th email in no way makes it so that I thought that he was talking about Judge Lefkow on December 5th.

2

If this were the extent of the doubt concerning whom I thought Evola was talking about on December 5th when he said "Consider it done" to "exterminating the rat," this would already be more than enough for an acquittal. However, there is much more.

Consider the vast difference between my response of "Good" on December 5th and what I said on December 17th (see Exhibit D) - once I had received the "female rat" email. Instead of saying "Good" to Evola's plans, I say things like "This is too serious," "the shit's gonna really hit the fan," "I don't want anything," and other statements completely at odds with what I said on December 5th. This further shows that I thought that Evola was talking about someone other than Judge Lefkow on December 5th.

At a minimum, there is overwhelming doubt. No jury could find beyond a reasonable doubt that I solicited the murder of Judge Lefkow, even if they could find that I solicited the murder of an unnamed "rat" on December 5th. Thus I am entitled to an acquittal as a matter of law.

The simple fact of the matter is that when I knew definitively that Evola had violent designs on Judge Lefkow and spoke about the matter, I completely renounced any desire that she be harmed. In other words, the evidence shows that when Evola expressed his fervent desire that Judge Lefkow be murdered, I explicitly stated that I did not

3

desire it (see Exhibit D). Put still another way, when Evola clearly expressed a plan to murder Judge Lefkow for the first time in conversation on December 17th, my responses included "This is too serious," "The shit's gonna hit the fan," "I don't want anything" and other statements completely at odds with my saying "Good" on December 5th. It is plain that I did not know that Evola was talking about Judge Lefkow on December 5th, or at a minimum, that there is overwhelming doubt. I must be acquitted as a result.

And yet, there is even further evidence of doubt. Consider the testimony of James Burnett. He testified that I had called Judge Lefkow a "traitor" for being married to a Jew (see Exhibit E). This shows that I knew that she was not Jewish. Why would I therefore think that Judge Lefkow was the "Jew rat" to be "exterminated" as opposed to one of the other individuals listed in the December 4th email (see again Exhibit B) as Jewish and who were equally referred to as "rats" by Evola on December 5th (see again Exhibit A)?

Once again, even if the government could have proven beyond a reasonable doubt that I solicited the murder of someone (which I certainly dispute), it could not and did not prove beyond a reasonable doubt that it was Judge Lefkow

4

and <u>without proof beyond a reasonable doubt that it was Judge Lefkow, no conviction on Counts Two and Four</u> can stand.

The evidence, once again, shows that Evola referred to a "Jew judge" and "lawyer <u>rat</u>" within the same sentence. If it was unclear whom <u>Evola</u> was talking about when he stated earlier that he was going to "exterminate" the "Jew rat," then certainly there is reasonable doubt whom <u>I</u> thought he was talking about as well. (At the time of this writing, I do not know if the transcript furnished to the jury contained commas between "Jew judge lawyer rat" but in any case, clearly "Jew" modifies "judge" and "lawyer" modifies "rat." There is further <u>no</u> pause between "Jew" and "judge" but there <u>is</u> a pause between those two words and "lawyer rat." clearly on the tape.)

The government thus utterly failed to prove beyond a reasonable doubt that I solicited the murder of a federal official and therefore I am entitled to an acquittal as a matter of law on Counts Two and Four, 18 U.S.C. sec. 373 and 18 U.S.C. sec. 1503, respectively.

5

II. <u>Should Your Honor not acquit me of Courts Two and Four for the reasons stated above, there are Additional Reasons why the Interests of Justice At Least Require A New Trial under Fed. R. Crim. Pro. 33.</u>

My trial counsel failed to present numerous pieces of exculpatory evidence which, had it been offered, likely would have affected the outcome. This evidence attached and discussed provide further reasons why a new trial is required in the interests of justice.

### Preliminary Note

While my access to legal research materials is quite limited, the research I <u>have</u> been able to do has uncovered no restriction on Your Honor's authority to grant a new trial under Rule 33. It is not, for example, limited by events at the trial itself but can and should cover acts or omissions that occurred outside of trial, evidence that was or wasn't brought before the jury, or whatever the case may be. If you, Your Honor, believe that the interests of justice would be served by the granting of a new trial, for whatever reason, you have the power to do just that, and I submit that this supplement provides additional

6

strong reasons why a new trial should indeed be granted. I submit further that my case is precisely the type of case for which Rule 33 was designed.

The fact that my trial counsel put on no case at all, calling no witnesses even though I faced seventy years imprisonment, itself calls into question whether justice was served at my trial. Several witnesses could have and would have testified to matters that would have severely undermined the prosecution's case if only they had been called. Provided that Your Honor allows live testimony at the hearing on this motion, these witnesses will be testifying. A summary of some of these witnesses' testimony follows.

A. Witnesses who would have provided testimony highly favorable to the defense and whose omission from trial casts doubt on whether justice was served.

1. Russell Hale—would have testified that I denounced the crimes of Ben Smith on numerous occasions (thereby rebutting the notion that my other statements on Smith offered by the prosecution revealed an intent or predisposition to harm Judge Lefkow); that I did come into the house crying following a television interview outside (thereby rebutting count I); that I had expressed distrust of Evola on

7

multiple occasions before and after I allegedly solicited him (thereby rebutting the notion that I would trust Evola enough to solicit him to murder); that after Evola left my house on 12/17/02, I told him, Russell Hale, that Evola had wanted me "to do something wrong" and I "sent him on his way" (this helping to rebut the notion that I was somehow in favor of harm to Judge Lefkow). (Mr. Hale testified to a number of these items before the grand jury, I note.)

2. Rev. Chris Peterson — that I expressed distrust in Evola before and after the period in which I allegedly solicited him to kill Judge Lefkow; that I routinely use the word "war" in a non-violent context (hence the "state of war" with Judge Lefkow was simply hyperbole); that I denounced the Smith crimes; etc.

3. Glenn Greenwald (my attorney in various civil matters) — that he told me that Judge Lefkow's order did not require the destruction of any materials whose trademarked name could be covered up

4. John Bash — that I applied for a trademark on another name (thereby helping to show that I was not seeking

8

to defy Judge Lefkow despite my rhetoric)

5. Other witnesses - that I was not predisposed towards violence prior to contact with Evola or after; that my way of effecting social change was strictly legal and peaceful; that in essence, the FBI found a man involved in legal and peaceful activities and sought to steer him towards illegal and violent activities

This list is not exhaustive.

9

B. The existence of documentary evidence that I

used similar language to that contained within my 12/4/02 email to Tony Evola with others.

At trial, the prosecution admitted into evidence an email from me to Evola which it alleged was part of a solicitation, inducement, and endeavor to persuade Evola to murder her Honor Judge Lefkow. This email (attached as Exhibit B) contained the following language: "Any action of any kind against those seeking to destroy our religious liberties is entirely up to each and every Creator according to the dictates of his own conscience."

What the jury was deprived of knowing, however, is that I did not use such language with Evola alone but in fact used it with my supporters in general. The prosecution's discovery shows that I, for example, told listeners to my internet radio show to "Do that which meets the dictates of your own conscience" (see Exhibit F, excerpts of transcript from "In Klassen We Trust: The White Power Hour with Reverend Matt Hale") in response to the court order.

While not identical, the language from the radio program does tend to show that my use of "conscience" language with Evola on 12/4/02 was not part of a "solicitation, inducement, and endeavor to persuade" Evola to commit murder, but rather a general policy statement made to a man who habitually queried of _me_ whether I wanted violence and encouraged _me_ to give up on _non_-violence. It is

10

hardly surprising, that I would make such a statement to Evola in light of his previous conduct for it was inevitable that he would be propositioning me in the current controversy as he had in the past.

This, incidentally, is another reason why Jacobson v. United States, 503 U.S. 540 (1992) controls here and I should more appropriately receive a judgment of acquittal on these counts Two and Four, for the "Any action of any kind..." language in the email to Evola would obviously never have been included had Evola refrained from trying to induce me into criminal activity on numerous occasions. In other words, it was the government's conduct in trying to involve me in criminal activity, specifically murder plots, that induced me into including that sentence in the 12/4/02 email. But for the government's inducements, there simply would not have been a crime here assuming that I even committed one. This was precisely the scenario in Jacobson. Absent government inducements, Jacobson would not have ordered child pornography. Absent government inducements, I would not have "solicited" Evola to murder. (See also United States v. Hollingsworth, 27 F. 3d 1196 (7th Cir. 1994) which is perhaps even more favorable to my position than Jacobson.))

In any case, if the jury had seen the excerpt from the Internet radio program, it would likely have viewed my 12/4/02 email to Evola in an entirely different light and a different verdict likely would have resulted. It is thus in the interests of justice that

11

Should Your Honor not grant my Motion for Judgment of Acquittal, that you grant a new trial so that this evidence may be heard. The 12/4/02 email was a major part of the prosecution's case. Had the jury known that I was using similar language with others, it likely would have made the difference between decades in prison and a not guilty verdict.

C. The existence of documentary evidence that I routinely used the term "war" and similar terms in a non-violent context and hence my statement about a "state of war" with Judge Lefkow in my 11/29/02 email as simply typical attention-getting rhetoric and not part of a "solicitation, inducement, and endeavor to persuade" Evola to commit murder.

Aside from the fact that this email of 11/29/02 was sent to twenty-six other people along with Evola; clearly notes that it was going to be emailed to the Church's email list a few days later; and only the government (conveniently enough) took it as part of a "solicitation, inducement, and endeavor to persuade" someone to murder Judge Lefkow, the jury was deprived of key evidence showing that I _routinely_ used the word "war" and other similar terms in a non-violent context (exhibits will be provided at hearing) as a means of gathering media attention. Once again, if the jury had seen and heard such evidence, the verdict may well have been different. The militant language of the email would have been put into its proper perspective. Instead of the email being viewed as a possible "call to arms" or the word "war" being taken literally, the jury would have realized that the language was simply typical rhetoric on my part and hence

12

in no way intended to "solicit, induce, or persuade" Evola or anyone else for that matter to murder Judge Lefkow,

D. The existence of tape recordings of me denouncing the Smith shooting spree.

Unfortunately, once again, my trial counsel failed to present evidence which if the jury had heard, may well have resulted in a different verdict: evidence of me denouncing Smith's shooting spree (exhibits will be provided at hearing; transcript excerpts of recordings Evola made of me). This evidence would have negated the government's theory and contention that my humor about his actions and praise of him as an individual somehow helped to show that I intended that Evola murder Judge Lefkow. (The simple fact of the matter is that one can laugh at things without approving of them. For example, there are undoubtedly many people who would laugh if I were killed in prison but probably far fewer who would approve of that happening). This evidence would further have negated any claim that I was predisposed to solicit murder.

The reality is that my humor about Smith's actions was just that: humor. It in no way revealed any intent to harm Judge Lefkow years later. If a person laughs about harm that occured to A, this hardly means that he intends harm to B. As noted in my post-trial motion though a bit ineffectively, the government actually offered my comments

13

on Ben Smith to show _propensity_ to commit crime which is patently what Fed. Rules of Evidence 404(b) prohibits. The admission of such evidence itself requires a new trial, but when it is further noted that there was evidence that the jury _didn't hear_ of me denouncing Smith's conduct, a new trial where such evidence is exposed would manifestly serve the interests of justice under Rule 33. It is practically certain that the inclusion of the government's Smith evidence coupled with the omission of denunciatory evidence, negatively affected the fairness and accuracy of the jury's verdict and calls for a new trial.

As far as predisposition is concerned, how could I possibly be predisposed to solicit Judge Lefkow's murder based on my statements concerning Ben Smith when I actually denounced his acts? When I actually stated, for example, that Smith's acts hurt my church and that I wished that Smith had shot me in the leg instead?.

III. <u>Further doubt that I thought that Evola was speaking about Judge Lefkow on 12/5/02</u>

If, as Evola testified at trial, I was afraid of being recorded, why would I solicit the murder of a federal judge in <u>my house</u> on 12/5/02 but repeatedly repudiate any intent of violence towards Judge Lefkow on 12/17/02 while Evola and I walked <u>outside</u>?

14

Further, why would I be willing to "nod" and "smile" at Evola on December 5th but not gesture at him in any way on December 17th (see Exhibit H)?

The only answer to these questions, taking the government's own witness at his word, is that I thought that Evola was talking about a lawyer on December 5th. If the state of Illinois wants to charge me, that is their option, but a conviction under 18 U.S.C. section 373 and 18 U.S.C. sec. 1503 simply cannot lie. As a matter of law, I am entitled to acquittal on Counts Two and Four. Even taken in the best possible light, the government's evidence of the supposed target of the solicitation is riddled with doubt.

The mere fact that I didn't correct or steer Evola back towards murdering a lawyer on December 17th only shows that I wasn't seeking harm towards anyone. The prosecution's desire that I be imprisoned for a very long time does not make "the rat" Judge Lefkow. I am entitled to the benefit of the doubt under the law, and posit that if there is not reasonable doubt here, then it exists no where. I am an innocent man.

15

## IV. Correction

Page 9, towards the bottom of the page, Defendant's Post-Trial Motion should read, "In other words, there is no evidence that Defendant did so intend to obstruct justice, and the only reasonable conclusion based on the evidence offered by the government is that he did not so intend."

V. The government's reference in closing argument to a passage from The White Man's Bible, taken completely out of context and without any evidence that I had endorsed or promoted the passage in any way, was horribly prejudicial and, should acquittal on Counts Two and Four not be granted, warrants a new trial on those counts.

At a time when the nation is focused on a war against terrorism, it was horribly prejudicial for the government to find a passage from The White Man's Bible (a book that was written by someone else when I was ten years old) seemingly endorsing terrorism and reading the passage to the jury (see Exhibit H.) No evidence was offered at trial that I had ever quoted the passage to anyone or supported it in any way. The idea that a passage in a book — a religious book at that — can be used to show one's intent to commit a crime is an extremely dangerous proposition and in fact novel when there is no evidence

16

that I had ever even recited it to anyone. If the government is allowed to use a passage from The White Man's Bible to convict me, then clearly this opens the door to using passages from The Holy Bible and other religious books to convict others.

The government's claim in essence was that I intended harm to Judge Lefkow because I read The White Man's Bible and the passage is contained within that book. This is as specious as saying that a Christian intends that homosexuals be stoned because that appears in The Holy Bible, etc.

Clearly the government prejudiced the jury by quoting this passage. Instead of holding me accountable for what I myself have said and done, the government urged the jury to hold me accountable for the words of another I had nothing to do with. No evidence to the contrary was offered. Thus, I submit, a new trial is necessary in the interests of justice under Rule 33.

17

Respectfully submitted,

_Matthew F. Hale_

Matthew F. Hale, pro se

Matthew F. Hale #15177424
Metropolitan Correctional Center
71 West Van Buren Street
Chicago, Illinois 60605

18

```
1D#:        1D-01
DATE:       12/05/02
ACTIVITY:   CONSENSUAL MONITORING
```

**DRAFT 9/17/03**

```
SPEAKERS:
    HALE:          Matthew Hale
    EVOLA:         Anthony Evola
    R. HALE JR.:   Russell Hale Jr.
```

\*      \*      \*      \*

(Vehicle door opens/shuts)

(Dog barks)

(Zipper zips)

(Traffic noises)

(Horn beeps)

EVOLA          (Sighs)

(Traffic noises)

EVOLA          (Clears throat)

(Traffic noises)

EVOLA          (Clears throat)

(Traffic noises)

(Knocking)

(Traffic noises)

EVOLA          (Clears throat)

(Knocking)

(Traffic noises)

(Dog barking)

EVOLA          Reverend Hale?

HALE           Yes brother.

EVOLA          Rahowa.

*A—* 1

HALE — Rahowa. I wish you would give me notice when you come down, brother.

R. HALE JR. — Oh.

HALE — It's good to see ya, of course. I just...

EVOLA — Good to see you.

HALE — ...you know I, anyway.

EVOLA — Sorry I scared ya.

HALE — No that's all right...

R. HALE JR. — Oh.

HALE — ...That's all right.

R. HALE JR. — I'd be darned. How ya' doin'?

EVOLA — Oh, fine. How ya doin'?

R. HALE JR. — Fine and dandy...

EVOLA — Great.

R. HALE JR. — ...by golly. Go ahead.

HALE — Come on in.

R. HALE JR. — It's cold out here.

HALE — Yes indeed.

(Door shuts)

HALE — Yes indeed.

EVOLA — (Coughs)

HALE — Okay.

(Background TV noises...Friends)

HALE — Great.

(Background TV noises...Friends)

R. HALE JR. — You just get here?

*A—* 2

EVOLA  Yeah, I was here for a few minutes...

HALE  Oh yeah?

EVOLA  ...knocking.

HALE  Right. Right.

EVOLA  I thought maybe the doorbell wasn't working.

HALE  For a while, yeah.

R. HALE JR.  Excuse me.

HALE  Okay. Come on in brother.

(background voices continue)

HALE  (Unintelligible)

EVOLA  (Unintelligible)

HALE  Yeah, it surprised me. I thought well, hell, you know (unintelligible) I only saw you in the dark and I thought well...

EVOLA  (Laughs)

HALE  ...who the hell is this,...

EVOLA  (Laughs)

HALE  (Laughs) you know? A lot of shit going on.

EVOLA  I wanna apologize about Milwaukee.

HALE  Well, I...

EVOLA  ...I was there, ah...

HALE  I, I know.

EVOLA  ...the police had that all surrounded off where...

HALE  Right.

EVOLA  ...there was a lot of people.

*A-* 3

HALE — Bring the pictures?

EVOLA — Ah no, I'm still getting...

HALE — Oh.

EVOLA — ...them developed. I'm waiting for them to come back from the photographer...

HALE — Um.

EVOLA — ...at Walgreens of whatever.

HALE — Right.

EVOLA — I didn't get overnight thing.

HALE — Right.

EVOLA — I just let it go.

HALE — Right.

EVOLA — ...ah, but I will have 'em for ya. I will mail 'em.

HALE — That will be great, great.

EVOLA — So how ya' doin'?

HALE — Okay, all things considered, you know. We're under the gun.

EVOLA — Right. I've been getting all these emails. I'm wondering it doesn't look good...

HALE — No.

EVOLA — ...What's going on?

HALE — Well, you know, this court has basically ordered that we, all members of our church, all believers in our church, turn over their books...

EVOLA — Ah, that's bullshot. That's...

HALE — (Laughs) you know?...

EVOLA — ...missed up.

$A- 4$

HALE ...so ah...

EVOLA Well, I got your email about the Jew judge...

HALE Right.

EVOLA ...you wanting his address and the other rats. Ah...

HALE That information yes, for educational purposes and for whatever reason you wish it to be.

EVOLA Are we gonna...I'm workin' on it. I, I got a way of getting it. Ah, when we get it, we gonna exterminate the rat?

HALE Well, whatever you wanna do...

EVOLA Jew rat?

HALE ...basically, it's, you know? Ah, my position's always been that I, you know, I'm gonna fight within the law and, but ah, that information's been pro-, provided. If you wish to, ah, do anything yourself, you can, you know?

EVOLA Okay.

HALE So that makes it clear.

EVOLA Consider it done.

HALE Good.

EVOLA Consider it done. Ah, it's fucked up, man.

HALE Yeah well (laughs). It's ah, it's, you know, it's been sickening, just sickening, ah, to have a situation in which we have to worry about people kicking down our doors for our Bibles. They don't do that to the Christians.

EVOLA No.

HALE They sure as hell don't do that to the Jews, because it's Jews and Christians that are doing this shit to us...

*A–* 5

EVOLA    Right.

HALE    ...you know?  Very simple.  So ah, anyway, I'm gonna do whatever I can to, ah, stave this off with the legal front, as much as I can and ah, ah, in fact, world headquarters has been moved officially to Wyoming right now. Another minister is taking over that.  I remain Pontifex as always and I'll certainly, let's just put it this way, have a very strong advisory role of things and ah, you know, basically, ah, you know, if somebody tells us that we have to, ah, turn over the White Man's Bible or be arrested, then we have a real problem with them, you know, and that's basically what it's gonna come down to in my, in my opinion it's quite possible that I'm gonna get, you know, arrested and, and that kind of thing and, but I'm, I'm willing to be that. I'm, I'm not gonna kiss their ass, you know, so, so, that's why I say that whatever a Creator wants to do is, is their decision...

EVOLA    Right.

HALE    ...and ah, you know, we've been spat upon too many times, you know?

EVOLA    Okay.

HALE    We've been, we've been...

EVOLA    ...well I...

HALE    Fucked with too many times.

EVOLA    ...I'll get that address of that ah...

HALE    And (unintelligible)...

EVOLA    Jew, judge, lawyer, rat...

HALE    Right and that's...

EVOLA    ...and...

HALE    ...you know, you can call that stuff as, I mean yeah, as soon as you get it, I

A - 6

mean send it certainly. I'll post it on the internet. We want our people to know and, and ah, information about these people and...

EVOLA          Okay.

HALE           ...(unintelligible).

EVOLA          I'm working on that now...

HALE           Okay.

EVOLA          ...and I gotta way and...

HALE           Okay.

EVOLA          ...consider it done.

HALE           Good.

EVOLA          Okay.

HALE           Very good.

EVOLA          Rahowa!

HALE           Rahowa. We will win.

EVOLA          Good to see you again, Reverend...

HALE           Good to see you. Very good.

EVOLA          ...and I'm kinda...

HALE           (Unintelligible)

EVOLA          ...surprised that you were surprised that I was, I was coming.

HALE           Yeah, well.

EVOLA          ...send that email, you know me. (Laughs).

HALE           (Laughs) yeah, yeah I, I ah...

EVOLA          You know I pop up, I won't answer it.

HALE           That's true.

               (Television sound)

A- 7

EVOLA — Sorry I scared you and your dad though.

HALE — No, no you didn't. Didn't, it wasn't really so much scaring. It was just that we were talking about something. I was deep in thought and I looked up and I thought hell, is this either another process server or...

HALE — ...a guy who wants to...

EVOLA — (Laughs)

HALE — ...you know, seize my books, you know?

EVOLA — Na, just a guy who's tryin' to keep you alive.

HALE — I know. I know brother.

EVOLA — Okay.

HALE — And if something, if you, let me just put it this way, if you get word that I've been, you know, something happens to me, then, you know, make sure that, that the world knows about it in a very strong way, you know.

(Background television sound continues)

HALE — So ah...

EVOLA — Any special way or...?

HALE — Yeah, well, just use your imagination...

EVOLA — Okay.

HALE — ...and that will be good because I don't put anything past them at this point. It's not good, the situation.

EVOLA — Well...

HALE — (Unintelligible)

EVOLA — ...you know I'm loyal to you.

HALE — I know...

EVOLA — So...

A— 8

HALE ...I know. Good. Okay.

EVOLA ...and I always will be.

HALE I know brother, as I am to you. We will win.

EVOLA Oh yeah. Rahowa! If you need me, ...

HALE I know where...

EVOLA ...email me.

HALE ...to contact you. Okay.

EVOLA Okay. Take care.

HALE You too. Rahowa.

EVOLA Rahowa.

(Door shuts)

EVOLA (Sighs)

(Door slams)

EVOLA (Enter vehicle/drives away)

EVOLA (Sighs)

(Consensual terminated)

4- 9

Subj: Assignment
Date: Wed, 4 Dec 2002 6:52:21 PM Eastern Standard Time
From: PM Hale1
To: The White Berets

Dear Brother Tony,

I need you to find out the home addresses of the following individuals:

Judge Joan H. Lefkow, PROBABLE JEW OR MARRIED TO JEW
United States Courthouse
219 South Dearborn, Room 1956
Chicago, IL 60604

James Amend, attorney, JEW
Paul Steadman, attorney, JEW
Kevin O'Shea, attorney, TRAITOR WHITE
Kirkland & Ellis Law Firm
200 East Randolph, Suite 5400
Chicago, IL 60601

Any action of any kind against those seeking to destroy our religious
liberties is entirely up to each and every Creator according to the dictates
of his own conscience. RAHOWA!

Your Pontifex

"The Jew is through in 2002!" -Rev. Matt Hale in
his "State of the Church" Address Delivered on
January 2. 29AC (2002) Join or otherwise support
the Church today! Go to: http://www.creator.org/sub.html

Subscribe to the most informational and dynamic email
newsletter in the world! Send a blank email to:
subscribe@wcotc.com Type SUBSCRIBE in the subject line.

White Liberation and Self-Determination
http://www.creator.org - http://www.wcotc.com
Go to our sites for daily updates.

What really happened on 9-11? New book by
the Reverend Matt Hale finally tells the truth!
Go to: http://www.wcotc.com/wtcbook

Listen to the Church's dynamic internet radio program!
In Klassen We Trust: The White Power Hour with The
Rev. Matt Hale"! Go to: http://www.wcotc.com/media

Join the Church forum! Express your stance for White
people today and communicate with our global network
White Racial Loyalist Comrades!
Go to: http://www.churchofthecreator.com

ß

GOVERNMENT
EXHIBIT
12/4/02
E-mail

Evola - direct

80

A. Yes.

Q. Is this the e-mail that you sent to the defendant on December 9, 2002?

A. Yes, sir.

MR. WEISMAN: Your Honor, we would move into evidence Government Exhibit E-mail 12/9/02.

THE COURT: Any objection?

MR. DURKIN: No.

THE COURT: Admitted.

(Said exhibit was received in evidence.)

MR. WEISMAN: Permission to publish, your Honor?

THE COURT: Yes.

BY MR. WEISMAN:

Q. And just so we have everyone's bearings, is it, subject: Good news?

A. Yes.

Q. And it says, May 9 -- I'm sorry -- Monday, December 9, 2002?

A. Correct.

Q. From the White Berets to PM Hale1?

A. Correct.

Q. And does it read, "Reverend Hale, Rahowa. I called the exterminator. I know about the rat problem we talked about. This guy is good and does a good, quite job. We have to know where rats hide, and he think he located her. He is working to

C

Evola - direct                                                                 81

get rid of the femala rat right now. Rahowa. We will win.

Your friend and follower, Brother Tony."

A.   Yes.

Q.   Now, after you sent that e-mail --

          MR. WEISMAN:  If I can have a moment, your Honor?

     (Brief pause.)

BY MR. WEISMAN:

Q.   Mr. Evola, are you familiar with America Online -- the America Online e-mail system as far as confirmations?

A.   Yes.

Q.   And do you know that if it's possible to determine whether an e-mail you sent was received and opened?

A.   Yes.

Q.   And do you know if the e-mail -- did you obtain records showing the e-mail that you sent on 12/9/02 was sent and opened?

A.   Yes.

          MR. WEISMAN:  Your Honor, may I approach the witness?

          THE COURT:  Yes.

BY MR. WEISMAN:

Q.   Sir, I'm showing you what's previously been marked as Government Exhibit E-mail 12/9/02 Confirmation.  Can you look at that document and tell us if you're familiar with it?

          MR. DURKIN:  I object to this.  I think it's beyond the scope of his knowledge.

```
1D#:        1D-11
DATE:       12/17/02
ACTIVITY:   CONSENSUAL MONITORING
```

SPEAKERS:
    HALE:            Matthew F. Hale
    R. HALE JR.:     Russell Hale Jr.
    EVOLA:           Anthony Evola

EVOLA:      (Clears throat)

(Vehicle door shuts)

HALE:       Come on in.

EVOLA:      Hi Reverend Hale.

HALE:       Hello brother. (door shuts) I wish you'd quit doing this, frankly. Come on in.

R. HALE JR.:    (Unintelligible).

HALE:       What's that?

R. HALE JR.:    (Unintelligible).

HALE:       Yeah.  May be.  Anyway.

EVOLA:      How ya' doin' Reverend Hale?

HALE:       Okay brother.  Okay, but I just...

EVOLA:      I talked to ah, I talked to Reverend Peterson and he said you was gonna contact me in a couple of days.  I felt like you needed me to come down here.

HALE:       No, No.  I sure didn't brother, and I just...(background noise). I mean I, I just ah, I, I, you know, the stuff you talked about last time, I just cannot talk about.  I cannot talk about stuff like that, you know?  I mean, that's why...

EVOLA:      Can we ah...

HALE:       ...I get uncomfortable every time I see you unannounced because I don't, you know...

1

*D*

HALE: ...well of course...

EVOLA: ...figure you trust me...

HALE: ...well of course.

EVOLA: ...so that's, trust has got nothing to do with it. All I got is, is...

HALE: You got to understand what kind of...

EVOLA: ...they...

HALE: ...if everything you're saying, I mean, if what I surmise, without saying that I know anything, if what I surmise...

EVOLA: Watch the road.

HALE: ...were the case, then ah, the shits gonna really hit the fan, you know? I mean...

EVOLA: Right.

HALE: ...that type of stuff...

EVOLA: Well, from what, from what I was gonna ask you was...

HALE: So I gotta be prepared...

EVOLA: Right.

HALE: ...psychologically and I have to be innocent, which of course...

EVOLA: Right.

HALE: ...I am, so, go ahead.

EVOLA: Well when this, when this stuff does come to happen, ah, I was wondering if I could come up this way and spend a couple of days with you...

(Dog barking)

HALE: Well I, I ah...

10

EVOLA: don't assume anything these days. I know that these are dangerous times.

EVOLA: Yeah but, we gotta make that point. You know, that's what I got from the last conversation we had and I figured, you know....

HALE: Well, you gotta understand I could never, never order such a thing or...

EVOLA: Right. Right. Right.

HALE: ...instruct or encourage...

EVOLA: Well, you know, that, that's not the case anyway cause does this mean you knowing about it? I ain't bragged to nobody and I'm...

HALE: I know.

EVOLA: ...sure you ain't bragged to nobody about it so...

HALE: I know.

EVOLA: ...you know? You know that...

HALE: (Unintelligible).

EVOLA: ...these guys they in it...

HALE: I keep...

EVOLA: ...so...

HALE: ...I keep people's confidences confidential. That's all true.

EVOLA: (Unintelligible).

HALE: You gotta understand that...

EVOLA: That Jew rat got, you know...

HALE: I, I have no love for that. (laughs)

EVOLA: Right.

HALE: You know that full well. (laughs)

13

EVOLA: That Jew rat, you know, she gotta go down I guess, you know.

HALE: Well...

EVOLA: But...

HALE: ...I don't, I just...

EVOLA: And it's in play. My guys have been, you know, my guys been, like...

HALE: I...

EVOLA: ...I was saying, it's, it's costing me more than what I figured...

HALE: Right, well you gotta understand, though...

EVOLA: ...and ah...

HALE: ...I just cannot. I cannot.

EVOLA: It'd be cheaper if I had two trusted brothers where I could trust to drive and stuff and...

HALE: Yeah...(unintelligible)

EVOLA: ...do you have any idea of anybody...

HALE: ...I...

EVOLA: ...I could...

HALE: I don't have any idea. I really don't, I just, we're fighting in the courts and, and ah, going relatively well with that. That's my approach, I just, ah.

EVOLA: ...cause I'm...

HALE: I cannot be...

EVOLA: ...here to defend you and...

HALE: ...I know brother...

EVOLA: ...my church...

HALE: ...I know brother.

14

HALE: ...it's not exactly wise to tell me anything...

EVOLA: Well.

HALE: ...and ah, you know, it's just too much, you know?  It's just not wise.  Anyway, I mean, whatever a person wants to do once again is their...

EVOLA: You'd rather...

HALE: ...is their own decision.

EVOLA: ...just have it done and not, not know nothing, that's what's you're telling me.

HALE: Well, I'm not...

EVOLA: Okay.

HALE: ...I'm not gonna have anything done. I'm just...

EVOLA: No, I'm just...

HALE: ...saying that whatever a person wants to do and I, I have to be, I just can't, this is too serious.  I just can't ah, yeah, incredible.  Anyway, I don't want anything, you know.  I'm not a party of anything...

EVOLA: Right.  Right.  Right.  Right.  Right.

HALE: ...not encouraging anything, just...

EVOLA: I understand that, but...

HALE: If they do something, that's there own business.

EVOLA: Right.

HALE: If people tell me about it and, ah, (Noises), you know, it's like the old Catholic priest who somebody, some guy approaches him and says "oh yeah, I just killed my wife." (Noises)

EVOLA: (Laughs)

18

HALE: Well you know, the Catholic, it puts the Catholic priest in kind of a bind, you know?

EVOLA: Well nobody's gonna, it, the way it's gonna be done, nobody's even gonna think about us...

HALE: Well, you know, but...

EVOLA: ...doin' it, but it's gonna be done. It's not like I'm gonna do it and drop our flag on top of her...

HALE: Well that, that would be (laughs)

EVOLA: ...because that would waste our flag on her, but ah, you know.

HALE: But ah, in any case ah. Okay, well I guess that's the deal on that and ah...

EVOLA: Right.

HALE: ...I'm sorry that you came so far.

EVOLA: I came because Reverend Peterson said you wanted to contact me...

HALE: Yeah, he must...

EVOLA: ...I thought it was important for me to come this way...

HALE: Yeah.

EVOLA: ...and ah, in motion, it's gonna be tooken care of, ah, it's what ordered I have followed, but ah...

HALE: You know, I haven't...

EVOLA: We.

HALE: ...I haven't given you anything...

EVOLA: We, we gonna win so, ah, is it okay for me to come down here and use you as my alibi?

19

EVOLA: ...and my people, they don't know you or the church so...

HALE: Right. Right.

EVOLA: ...none of that's ever coming back to us...

HALE: Right.

EVOLA: ...ever.

HALE: Just understand theoretical terms.

EVOLA: And they good. That's the reason I'm using 'em.

HALE: Right, well, you know, in theoretical terms ah, you gotta understand that if all this would come to pass, it would be a very, very heated situation. A lot of individuals coming to me wanting answers and obviously...

EVOLA: And you just tell them you don't know nothing, like...

HALE: ...and obviously that's...

EVOLA: ...you know? And it'll pass.

HALE: ...what would, has to be maintained. I just...

EVOLA: Right.

HALE: I mean, there's a guy sitting in federal prison right now because he didn't rat on Tim McVeigh, you know? He knew...

EVOLA: I ain't worried about it...

HALE: He knew.

EVOLA: ...if it comes down to that situation, I'm not worried about it, you know. I spend the rest of his life in jail, you know, but I don't think that's coming down to that...

HALE: Yeah, well...

24

20

A.    Um, 2002.

Q.    Where did these conversations occur?

A.    Reverend Fox's house.

Q.    And who was present for the conversations?

A.    Reverend Fox, Reverend Gulbranson.  It's a hard name to pronounce.

Q.    Gulbranson?

A.    Gulbranson, yes.

Q.    Okay.

A.    Members from Joliet, the Joliet unit, and just a few other local members, including myself.

Q.    What did the Defendant say about the trademark lawsuit?

A.    That he would not hand over any books, that he would have them shipped out to another state.

Q.    All right.  And when the Defendant talked about the trademark lawsuit, can you describe his demeanor for the jury?

A.    Angry.

Q.    Did the Defendant discuss the Judge who was involved in the trademark lawsuit?

A.    I believe he did, but I can't recall his exact words.

Q.    Do you recall generally what he said about the Judge?

A.    That she was married to a Jew, and that she was a traitor.

Q.    A traitor?

A.    Yes.

        MR. WEISMAN: Judge, can I have a moment?

and distributed!

Third, contact Lefkow and tell her in polite but strong terms to cease her violation of the law. While I do not possess her phone number in time for this broadcast, her secretary can be reached by calling information and requesting the number of the United States Courthouse, 219 S. Dearborn St., in Chicago. The mailing address is:

Joan H Lefkow
United States Courthouse
219 South Dearborn, Room 1956
Chicago, IL 60604

Fourth, step up activism for the Church on all fronts. Don't let my single-minded attention to this situation distract you from doing what you usually do and in fact, increase your tenacity. I want demonstrations in cities from coast to coast I want rallies. I want public meetings. I want as much attention brought to our Church as humanly possible. My recent appointment of Reverend Thomas Kroenke as Hasta Primus and the moving of our World Headquarters to Wyoming was designed to enable me to concentrate my full force upon this situation. I believe in fact that all of you would rather have me concentrate on utilizing my legal knowledge in the defense of our Holy Church rather than on paperwork, filling of book, orders, etc. Reverend Kroenke can be written at P.O. Box 1482 Riverton, WY 82501. The transfer of World Headquarters operations to Wyoming further has no impact at all on our overwhelmingly important project of member consolidation to central Illinois. As always, we need more members here to fulfill our great goals.

Fifth, keep your wits. No silly rumors. Everything is under control. Someone emailed me earlier asking me if it were true that I were in jail. Since I responded, I obviously answered his question in the negative. If I am indeed jailed--something I am prepared for--you will hear of it from Reverend King and our email newsletter There must be no panic if such an event occurs. Keep your wits and do that which meets the dictates of your own conscience. We are ready for such a scenario in every way.

We have stated before that Lefkow has declared war against us. All bets are off if that war manifests itself as violence to our adherents. There is simply no other position to take. We have the right to defend ourselves-- both from common thugs as well as from thugs who think that their "legal" tyrannies give them the right to enslave us. The answer is that our right to freely exercise our religious beliefs is NON-NEGOTIABLE.

F   10

EVOLA - CROSS - BY MR. DURKIN

53

question.

THE COURT:  It is.

BY MR. DURKIN:

Q.    You were willing to do what they wanted, correct?

A.    I was helping them, yes.

Q.    And you didn't ask them why they wanted you to do that with respect to the alibi, correct?

A.    Right.

Q.    You just did it?

A.    Right.

Q.    Let's take a look at page 13, line 33.  You say there, "Yeah, but we got to make that point.  You know, that's what I got from the last conversation we had, and I figured, you know --

      And then Hale says, "Well, you got to understand.  I could never order such a thing or instruct or encourage." That's what he says, correct?

A.    He said that, yes.

Q.    Right.  And you're referring to the December 5th conversation, correct?

A.    Yes.

Q.    And, once again, he's not winking and nodding or waving his hands, or giving any other sign, correct?

A.    Not at that time, no.

Q.    Right.

EVOLA - CROSS - BY MR. DURKIN

54

The only time you claim that occurred was on December 5th, right?

A. He did that, yeah.

Q. And you don't say to him, "But, Reverend, you know, when you nodded your head, I sent these people on their way"?

A. Beg your pardon?

Q. You don't say right there, when you're talking about the very conversation where you claim he nodded his head, you don't say on the tape there, "Oh, but, Reverend, I" -- when you were nodding your head, I took that to mean you wanted this done, and I sent these people on their way."

A. No, I didn't say that.

Q. But you did say, "I figured, you know," right?

A. Uh-huh.

Q. And then he says, "Well, you got to understand, I could never order such a thing or instruct or encourage it," correct?

A. That's what he's saying, yes.

Q. And then, once again, take a look at page 15. Notwithstanding that he just told you that, you bring up the idea again of what it's costing you, and whether he'll come up with two trusted brothers; am I right?

A. Yes.

Q. Once again, instructions from the FBI, right?

A. Yes.

Q. Once again, he tells you no, correct?

Peters - closing                                                    18

And what does the White Man's Bible teach is the appropriate response when their survival is put at risk?  In the chapter entitled Law and Order Versus Violence, Terrorism and Self-preservation -- could we get the next slide please?

(Brief pause.)

MS. PETERS:  Survival at all costs, the end justifies the means, any means.  We must decide -- the issue we must resolve is this:  If our survival is at stake, is so-called illegal terrorism justified, and the answer overwhelmingly is yes.

And later in the same chapter, The Ultimate Defense.  There is an ultimate weapon that such a beleaguered people can resort to against its own government that has been utilized for thousands of years when the situation has become desperate and intolerable.  That weapon is terrorism and violence, taking the law into our own hands.

Members of the jury, when Judge Lefkow ordered that they could no longer use their name, the situation was -- in the words of the White Man's Bible, the situation was, in his mind, desperate and intolerable.

If his holy books, what he describes as his holy books, were to be destroyed, it was time to take the law into his own hands, time to meet violence with violence.

And that's why, members of the jury, when on December 4th he refused that -- after he refused that Federal Express

H