Rec'd
7/19/0

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

JUL 1 9 2004

Chief Judge Charles P. Kocoras
United States District Court

UNITED STATES OF AMERICA

Plaintiff,

v.

MATTHEW HALE

Defendant.

No. 03 CR 11

Judge James T. Moody

NOTICE of filing

DOCKETED

AUG 0 3 2004

Please take notice that on this 15th day of July, 2004, the undersigned mailed for filing to the Clerk of the District Court for the Northern District of Illinois, at Chicago, Illinois the attached Supplement to Defendant's Post-Trial Motion, a copy of which is hereby served upon you.

Respectfully submitted,

Matthew Hale, pro se

Matthew F. Hale #15177424
Metropolitan Correctional Center
71 West Van Buren Street
Chicago, Illinois 60605

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
    Plaintiff, )
                      )
    V.                 )    No. 03 CR 11
                      )
MATTHEW HALE,      )    Judge James T. Moody
    Defendant.      )

FILED

JUL 1 9 2004

Chief Judge Charles P. Kocoras
United States District Court

DOCKETED
AUG 0 3 2004

SUPPLEMENT TO DEFENDANT'S POST-TRIAL MOTION

Now comes the Defendant, Matthew Hale, now _pro se_, and offers this supplement to his post-trial motion.

I. <u>Additional Reasons Why I am Entitled to an Acquittal on Counts Two and Four As a Matter of Law Pursuant to Fed. R. Crim. Pro. 29 (c)</u>

Since nowhere does Tony Evola say on 12/5/02 that Judge Lefkow is the "rat" to be "exterminated"; since there is evidence that the FBI itself was uncertain who the "rat" was; and since there is evidence that I thought he was talking about someone else, I am entitled to acquittal on Counts Two and Four as a matter of law.

Even if the jury could have found beyond a reasonable doubt that I had solicited the murder of <u>someone</u>, without Evola specifying on 12/5/02 that Judge Lefkow was <u>the</u> "rat" to be "exterminated", the jury could not have found beyond a reasonable doubt that it was <u>Judge Lefkow</u>. A reading of

1

the transcript of the December 5th conversation (see Exhibit A) coupled with the preceding December 4th email (see Exhibit B) show clearly that Evola refers to multiple people as "rats" and at one point even refers to a "Jew judge" and "lawyer rat." There is thus huge doubt as to whom I thought that Evola was talking about and even whom Evola was talking about. No jury could thus find beyond a reasonable doubt that the target of the alleged solicitation was Judge Lefkow. Hence my convictions on Counts Two and Four cannot stand.

The fact that the FBI apparently felt compelled to direct Evola to send an email four days later specifying "the female rat" (see Exhibit C) (emphasis added) illustrates even further the huge doubt about who "the rat" was on December 5th. While Evola testified at trial that he was instructed to specify the "female rat" because he had thought that Judge Lefkow was a man on December 5th, this makes little sense as I obviously knew that she was a woman. There would be thus no reason to specify her sex to me. It is clear that the FBI was hoping that Evola was talking about Judge Lefkow on December 5th, hoping that I thought that he was talking about Judge Lefkow on December 5th, and tried to cement the identity of "the rat," "Jew rat" that was to be "exterminated" after the fact. Specifying that Evola had plans to killed a "female rat" within his December 9th email in no way makes it so that I thought that he was talking about Judge Lefkow on December 5th.

2

If this were the extent of the doubt concerning whom I thought Evola was talking about on December 5th when he said "Consider it done" to "exterminating the rat," this would already be more than enough for an acquittal. However, there is much more.

Consider the vast difference between my response of "Good" on December 5th and what I said on December 1 ~~st~~ - once (see Exhibit D) I had received the "female rat" email. Instead of saying "Good" to Evola's plans, I say things like "This is too serious," "the shit's gonna really hit the fan," "I don't want anything," and other statements completely at odds with what I said on December 5th. This further shows that I ~~thought~~ that Evola was talking about someone other than Judge Lefkow on December 5th.

At a minimum, there is overwhelming doubt. No jury could find beyond a reasonable doubt that I solicited the murder of Judge Lefkow, even if ~~they~~ could find that I solicited the murder of an unnamed "rat" on December 5th. Thus I am entitled to an acquittal as a matter of law.

The simple fact of the matter is that when I knew definitively that Evola had violent designs on Judge Lefkow and spoke about the matter, I completely renounced any desire that she be harmed. In other words, the evidence shows that when Evola expressed his fervent desire that Judge Lefkow be murdered, I explicitly stated that I did not

3

desire it (see Exhibit D). Put still another way, when Evola clearly expressed a plan to murder Judge Lefkow for the first time in conversation on December 17th, my responses included "This is too serious," "The shit's gonna hit the fan," "I don't want anything" and other statements completely at odds with my saying "Good" on December 5th. It is plain that I did not know that Evola was talking about Judge Lefkow on December 5th, or at a minimum, that there is overwhelming doubt. I must be acquitted as a result.

And yet, there is even <u>further</u> evidence of doubt. Consider the testimony of James Burnett. He testified that I had called Judge Lefkow a "traitor" for being ~~married~~ to a Jew (see Exhibit E). <u>This shows that I knew that she was not Jewish.</u> Why would I therefore think that Judge Lefkow was <u>the</u> "Jew rat" to be "exterminated" as opposed to one of the other individuals listed in the December 4th email (see again Exhibit B) as Jewish and who were equally referred to as "rats" by Evola on December 5th (see again Exhibit A)?

Once again, even if the government could ~~have~~ proven beyond a reasonable doubt that I solicited the murder of ~~someone~~ (which I certainly dispute), it could not and did not prove beyond a reasonable doubt that it was Judge Lefkow

4

and without proof beyond a reasonable doubt that it was Judge Lefkow, no conviction on Counts Two and Four can stand.

The evidence, once again, shows that Evola referred to a "Jew judge" and "lawyer rat" within the same sentence. If it was unclear whom Evola was talking about when he stated earlier that he was going to "exterminate" the "Jew rat" then certainly there is reasonable doubt whom I thought he was talking about as well. (At the time of this writing, I do not know if the transcript furnished to the jury contained commas between "Jew judge lawyer rat" but in any case, clearly "Jew" modifies "judge" and "lawyer" modifies "rat". There is further no pause between "Jew" and "judge" but there is a pause between those two words and "lawyer rat" clearly on the tape.)

The government thus utterly failed to prove beyond a reasonable doubt that I solicited the murder of a federal official and therefore I am entitled to an acquittal as a matter of law on Counts Two and Four, 18 U.S.C. sec. 373 and 18 U.S.C. sec. 1503, respectively.

5

II. Should Your Honor not acquit me of Counts Two and Four for the reasons stated above, there are Additional Reasons why the Interests of Justice At Least Require A New Trial under Fed. R. Crim. Pro. 33.

My trial counsel failed to present numerous pieces of exculpatory evidence which, had it been offered, likely would have affected the outcome. This evidence, attached and discussed provide further reasons why a new trial is required in the interests of justice.

## Preliminary Note

While my access to legal research materials is quite limited, the research I have been able to do has uncovered no restriction on Your Honor's authority to grant a new trial under Rule 33. It is not, for example, limited by events at the trial itself but can and should cover acts or omissions that occurred outside of trial, evidence that was or wasn't brought before the jury, or whatever the case may be. If you, Your Honor, believe that the interests of justice would be served by the granting of a new trial, for whatever reason, you have the power to do just that, and I submit that this supplement provides additional

6

strong reasons why a new trial should indeed be granted. I submit further that my case is precisely the type of case for which Rule 33 was designed.

The fact that my trial counsel put on no case at all, calling no witnesses even though I faced seventy years imprisonment, itself calls into question whether justice was served at my trial. Several witnesses could have and would have testified to matters that would have severely undermined the prosecution's case if only they had been called. Provided that Your Honor allows live testimony at the hearing on this motion, these witnesses will be testifying. A summary of some of these witnesses' testimony follows.

A. Witnesses who would have provided testimony highly favorable to the defense and whose omission from trial casts doubt on whether justice was served.

1. Russell Hale—would have testified that I denounced the crimes of Ben Smith on numerous occasions (thereby rebutting the notion that my other statements on Smith offered by the prosecution revealed an intent or predisposition to harm Judge Lefkow); that I did come into the house crying following a television interview outside (thereby rebutting count II); that I had expressed distrust of Evola on

7

multiple occasions before and after I allegedly solicited him (thereby rebutting the notion that I would trust Evola enough to solicit him to murder); that after Evola left my house on 12/17/02, I told him, Russell Hale, that Evola had wanted me "to do something wrong" and I "sent him on his way" (this helping to rebut the notion that I was somehow in favor of harm to Judge Lefkow). (Mr. Hale testified to a number of these items before the grand jury, I noted)

2. Rev. Chris Peterson - that I expressed distrust in Evola before and after the period in which I allegedly solicited him to kill Judge Lefkow; that I routinely use the word "war" in a non-violent context (hence the "state of war" with Judge Lefkow was simply hyperbole); that I denounced the Smith crimes; etc.

3. Glenn Greenwald (my attorney in various civil matters) - that he told me that Judge Lefkow's order did not require the destruction of any materials whose trademarked name could be covered up

4. John Bash - that I applied for a trademark on another name (thereby helping to show that I was not seeking

8

to defy Judge Lefkow despite my rhetoric)

5. Other witnesses - that I was not predisposed towards violence prior to contact with Eaola or after; that my way of effecting social change was strictly legal and peaceful; that in essence, the FBI found a man involved in legal and peaceful activities and sought to steer him towards illegal and violent activities

This list is not exhaustive.

9

B. The existence of documentary evidence that I used similar language to that contained within my 12/4/02 email to Tony Evola with others.

At trial, the prosecution admitted into evidence an email from me to Evola which it alleged was part of a solicitation, inducement, and endeavor to persuade Evola to murder her Honor Judge Lefkow. This email (attached as Exhibit B) contained the following language: "Any action of any kind against those seeking to destroy our religious liberties is entirely up to each and every Center according to the dictates of his own conscience."

What the jury was deprived of knowing, however, is that I did not use such language with Evola alone but in fact used it with my supporters in general. The prosecution's discovery shows that I, for example, told listeners to my internet radio show to "Do that which meets the dictates of your own conscience" (see Exhibit F, excerpts of transcript from "In Klassen We Trust: The White Power Hour with Reverend Matt Hale") in response to the court order.

While not identical, the language from the radio program does tend to show that my use of "conscience" language with Evola on 12/4/02 was not part of a "solicitation, inducement, and endeavor to persuade" Evola to commit murder but rather a general policy statement made to a man who habitually queried of _me_ whether I wanted violence and encouraged _me_ to give up on _non_-violence. It is

10

hardly surprising, that I would make such a statement to Evola in light of his previous conduct for it was inevitable that he would be propositioning me in the current controversy as he had in the past.

This, incidentally, is truly (another reason) Jacobson v. United States, 503 U.S. 540 (1992) controls here and I should more appropriately receive a judgment of acquittal on these counts Two and Four, for the "Any action of any kind..." language in the email to Evola would obviously never have been included had Evola refrained from trying to induce me into criminal activity on numerous occasions. In other words, it was the government's conduct in trying to involve me in criminal activity, specifically murder plots, that induced me into including that sentence in the 12/4/02 email. But for the government's inducements, there simply would not have been a crime here assuming that I even committed one. This was precisely the scenario in Jacobson. Absent government inducements, Jacobson would not have ordered child pornography. Absent government inducements, I would not have "solicited" Evola to murder. (See also United States v. Hollingsworth, 27 F. 3d 1196 (7th Cir. 1994) which is (perhaps) even more favorable to my position than Jacobson.))

In any case, if the jury had seen the excerpt from the Internet radio program, it would likely have viewed my 12/4/02 email to Evola in an entirely different light and a different verdict likely would have resulted. It is thus in the interests of justice that

11

should Your Honor not grant my Motion for Judgment of Acquittal, that you grant a new trial so that this evidence may be heard. The 12/4/02 email was a major part of the prosecution's case. Had the jury known that I was using similar language with others, it likely would have made the difference between decades in prison and a not guilty verdict.

C. The existence of documentary evidence that I routinely used the term "war" and similar terms in a non-violent context and hence my statement about a "state of war" with Judge Lefkow in my 11/29/02 email was simply typical attention-getting rhetoric and not part of a "solicitation, inducement, and endeavor to persuade" Evola to commit murder.

Aside from the fact that this email of 11/29/02 was sent to twenty-six other people along with Evola; clearly notes that it was going to be emailed to the Church's email list a few days later; and only the government (conveniently enough) took it as part of a "solicitation, inducement, and endeavor to persuade" someone to murder Judge Lefkow, the jury was deprived of key evidence showing that I routinely used the word "war" and other similar terms in a non-violent context (exhibits will be provided at hearing) as a means of gathering media attention. Once again, if the jury had seen and heard such evidence, the verdict may will have been different. The militant language of the email would have been put into its proper perspective. Instead of the email being viewed as a possible "call to arms" or the word "war" being taken literally, the jury would have realized that the language was simply typical rhetoric on my part and hence

12

in no way intended to "solicit, induce, or persuade" Evola or anyone else for that matter to murder Judge Lefkow.

D. The existence of tape recordings of me <u>denouncing</u> the Smith shooting spree.

Unfortunately, once again, my trial counsel failed to present evidence which if the jury had heard, may well have resulted in a different verdict: evidence of me <u>denouncing</u> Smith's shooting spree (exhibits will be provided at hearing; transcript excerpts of recordings Evola made of me). This evidence would have negated the government's theory and contention that my humor about his actions and praise of him as an individual somehow helped to show that I intended that Evola murder Judge Lefkow. (The simple fact of the matter is that one can laugh at things without approving of them. For example, there are undoubtedly many people who would laugh if I were killed in prison but probably far fewer who would approve of that happening). This evidence would further have negated any claim that I was predisposed to solicit murder.

The reality is that my humor about Smith's actions was just that: humor. It in no way revealed any intent to harm Judge Lefkow years later. If a person laughs about harm that occured, to A, this hardly means that he intends harm to B. As noted in my post-trial motion though a bit ineffectively, the government actually offered my comments

13

on Ben Smith to show propensity to commit crime which is patently what Fed. Rules of Evidence 404(b) prohibits. The admission of such evidence itself requires a new trial, but when it is further noted that there was evidence that the jury didn't hear of me denouncing Smith's conduct, a new trial where such evidence is exposed would manifestly serve the interests of justice under Rule 33. It is practically certain that the inclusion of the government's Smith evidence coupled with the omission of denunciatory evidence, negatively affected the fairness and accuracy of the jury's verdict and calls for a new trial.

As far as predisposition is concerned, how could I possibly be predisposed to solicit Judge Lefkow's murder based on my statements concerning Ben Smith when I actually denounced his acts? When I actually stated, for example, that Smith's acts hurt my church and that I wished that Smith had shot me in the leg instead?

III. Further doubt that I thought that Evola was speaking about Judge Lefkow on 12/5/02

If, as Evola testified at trial, I was afraid of being recorded, why would I solicit the murder of a federal judge in my house on 12/5/02 but repeatedly repudiate any intent of violence towards Judge Lefkow on 12/17/02 while Evola and I walked outside?

14

Further, why would I be willing to "nod" and "smile" at Evola on December 5th but not gesture at him in any way on December 17th (see Exhibit H)?

The only answer to these questions, taking the government's own witness at his word, is that I thought that Evola was talking about a _lawyer_ on December 5th. If the state of Illinois wants to charge me, that is their option, but a conviction under 18 U.S.C. section 373 and 18 U.S.C. sec. 1503 simply cannot lie. As a matter of law, I am entitled to acquittal on Counts Two and Four. Even taken in the best possible light, the government's evidence of the supposed target of the solicitation is riddled with doubt.

The mere fact that I didn't correct or steer Evola back towards murdering a _lawyer_ on December 17th only shows that I wasn't seeking harm towards anyone. The prosecution's desire that I be imprisoned for a very long time does not make "the rat" Judge Lefkow. I am entitled to the benefit of the doubt under the law, and posit that if there is not reasonable doubt here, then it exists no where. I am an innocent man.

15

## IV. Correction

Page 9, towards the bottom of the page, Defendant's Post-Trial Motion should read, "In other words, there is no evidence that Defendant did so intend to obstruct justice, and the only reasonable conclusion based on the evidence offered by the government is that he did not so intend."

## V. The government's reference in closing argument to a passage from The White Man's Bible, taken completely out of context and without any evidence that I had endorsed or promoted the passage in any way, was horribly prejudicial and, should acquittal on Counts Two and Four not be granted, warrants a new trial on those counts.

At a time when the nation is focused on a war against terrorism, it was horribly prejudicial for the government to find a passage from The White Man's Bible (a book that was written by someone else when I was ten years old) seemingly endorsing terrorism and reading the passage to the jury. (see Exhibit H.) No evidence was offered at trial that I had ever quoted the passage to anyone or supported it in any way. The idea that a passage in a book — a religious book at that — can be used to show one's intent to commit a crime is an extremely dangerous proposition and in fact novel when there is no evidence

16

that I had ever even recited it to anyone. If the government is allowed to use a passage from The White Man's Bible to convict me, then clearly this opens the door to using passages from The Holy Bible and other religious books to convict others.

The government's claim in essence was that I intended harm to Judge Lefkow because I read The White Man's Bible and the passage is contained within that book. This is as specious as saying that a Christian intends that homosexuals be stoned because that appears in The Holy Bible, etc.

Clearly the government prejudiced the jury by quoting this passage. Instead of holding me accountable for what I myself have said and done, the government urged the jury to hold me accountable for the words of another I had nothing to do with. No evidence to the contrary was offered. Thus, I submit, a new trial is necessary in the interests of justice under Rule 33.

17

Respectfully submitted,

Matthew F. Hale

Matthew F. Hale, pro se

Matthew F. Hale #15177424
Metropolitan Correctional Center
71 West Van Buren Street
Chicago, Illinois 60605

18

# See Case File For Exhibits