UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA     )
                                 )   No. 03 CR 011
        v.            )   Judge James T. Moody
                                 )   (Sitting by designation)
MATTHEW HALE           )

### NOTICE OF FILING

**To:**  Matthew Hale                 Law Offices of Tim Murphy
     Inmate #15177424          3758 W. Montrose Avenue,
     Metropolitan Correctional    Chicago, IL 60618
     Center
     71 W. Van Buren Street
     Chicago, IL 60605

PLEASE TAKE NOTICE that on August 6, 2004, the undersigned filed with the Clerk of this Court, **GOVERNMENT'S CONSOLIDATED RESPONSES TO DEFENDANT'S POST TRIAL MOTIONS** service of which is being made upon you.

M. DAVID WEISMAN
Assistant United States Attorney
219 South Dearborn Street - 4th
Chicago, Illinois 60604
(312) 353-5300

### CERTIFICATE OF SERVICE

I, M. David Weisman, an attorney, certify that I have served a copy of the above Notice, together with **GOVERNMENT'S CONSOLIDATED RESPONSES TO DEFENDANT'S POST TRIAL MOTIONS** upon those individuals named above via U.S. Mail on August 6, 2004.

M. David Weisman
Assistant United States Attorney



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 03 CR 011 |
| | ) | |
| v. | ) | Judge James T. Moody |
| | ) | (sitting by designation) |
| MATTHEW HALE, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S CONSOLIDATED RESPONSES TO DEFENDANT'S POST TRIAL MOTIONS

The UNITED STATES, through its attorney PATRICK J. FITZGERALD, responds as follows to defendant's various post trial motions:

### *BACKGROUND*

After a seven day trial, and three days of deliberation, a jury found the defendant guilty of four out of five counts with which he had been charged. Specifically, the defendant was found guilty of one count of soliciting a crime of violence in violation of Title 18, United States Code, Section 373, and three counts of obstructing justice, in violation of Title 18, United States Code, Section 1503.

During the trial, defendant was represented by Thomas Durkin and Patrick Blegen. After his conviction, Messrs. Durkin and Blegen were granted leave to withdraw as counsel, and Timothy Murphy was appointed as counsel. On June 24, 2004, Mr. Murphy filed Defendant's Post Trial Motions. In that motion, the defendant moved for acquittal on the four counts of conviction. On July 7, 2004, the defendant filed a motion seeking to represent

himself.[1] On July 1, 2004, the defendant filed *pro se* Supplement to Defendant's Post-Trial Motion in which the defendant posits "additional reasons" why he is entitled to acquittal, and then, in the alternative, seeks a new trial pursuant to Fed. R. Crim. P. 33.[2] The government addresses each of the bases for acquittal and a new trial in turn.

### *LEGAL STANDARD*

A motion for a judgment of acquittal based on the sufficiency of the evidence requires this Court to view the evidence in the light most favorable to the government. *United States v. Arocho*, 305 F.3d 627, 639 (7th Cir. 2002). Additionally, this Court should give deference to the jury's prerogative to make credibility determinations, resolve evidentiary conflicts, and draw inferences. *Id.* Only if there is *no* evidence upon which a rational trier of fact could find guilt beyond a reasonable doubt is the defendant entitled to acquittal. *United States v. Griffin*, 310 F.3d 1017, 1022 (7th Cir. 2002). *See also United States v. Adeniji*, 1997 WL 666306, *1 (N.D. Ill.) (Moody, J.)[3]

---

[1] Defendant's motion has not yet been ruled on, and is currently scheduled to be heard on August 10, 2004 by the Honorable Andrew P. Rodovich, who is the assigned magistrate judge in this matter.

[2] On July 28, 2004, the defendant filed a motion seeking to add a claim of ineffective assistance of counsel to his post-trial motions. As of this date, there has been no ruling on this motion.

[3] A copy of this opinion is attached as Exhibit 1.

-2-

## *ARGUMENT*

### *Motion for Judgment of Acquittal as to Count One*

In Count One, the defendant was charged with violating 18 U.S.C. § 1503 by:

> corruptly influenc[ing], obstruct[ing] and imped[ing] . . . the due administration of justice, namely, by transmitting via U.S. mail, in connection with a pending civil case before the Honorable Judge Lefkow, a letter to Judge Lefkow falsely stating that "from my understanding of the Court's order, I have no material in my control or possession that falls afoul of it," when in fact, at the time of writing this letter, defendant HALE had in his possession and control at least 97 publications with the trademarked term "Church of the Creator" at various locations in Illinois.

In order to convict the defendant of this offense, the Court charged the jury as follows:

> First, that the defendant endeavored to influence, obstruct, or impede the due administration of justice. Second, that the defendant acted knowingly. Third, that the defendant's acts were done corruptly, that is, with the purpose of wrongfully impeding the due administration of justice.

R. 160, Court Instruction # 17.[4]

The government presented evidence on each of these elements. As explained by James Ahmend, and the Honorable Joan H. Lefkow, Judge Lefkow issued an order on November 19, 2002, directing that all members of the World Church of the Creator should either destroy or "where feasible" remove or obliterate any infringing mark [containing the

---

[4] Citations to the Original Record on appeal are designated "R." followed by the document number. References to the trial transcript are designated "Tr." followed by the page number. References to trial exhibits are designated "Ex." References to tape transcripts are designated "[Date of Transcript] Trans." References to Defendants' Original Post Trial Motion are designated by "Def. Mot." followed by the page number. References to Defendant's Supplemental Post Trial Motion are designated "Def. Supp. Mot." followed by the page number.

-3-

term "Church of the Creator"] from all letter head, labels, signs, etc. 4/12/04 Tr. 63 - 64; Ex. 29; 4/12/04 Tr. 138. The order also required that the WCOTC report to Judge Lefkow what steps had been taken to comply with her November 19, 2002 order. 4/12/04 Tr. 62.

The government presented evidence that the defendant was aware of the order and its contents. 4/13/04 Tr. 108, 110.

In response to this order, the defendant sent a letter to Judge Lefkow, who was presiding over the trademark infringement case, stating that "[i]n any case, I have no material in my control or possession that falls afoul of" the Court's order to either destroy offending materials, or obliterate the offending mark. 4/12/04 Tr. 144 - 145.

As evidenced by the testimony of Special Agent Judith Coughenour, on January 8, 2003, Federal Bureau of Investigation ("FBI") agents found multiple publications, documents and other tangible items containing the mark "Church of the Creator" at 217 Randolph Street, East Peoria. 4/19/04 Tr. 112 - 114. Agent Coughenhour's testimony also established that these materials were in plain view in the room. Tr. 117 - 121. A reasonable inference is that anyone who had been in the room would have known these material were there.[5] Additionally, Jon Fox testified that he was with the defendant at 217 Randolph on January 7, 2003 and removed some items from the WCOTC World Headquarters. The defendant

---

[5]     The government through multiple witnesses, including Jon Fox and Anthony Evola, established that the defendant was at 217 Randolph during December 2002. Additionally, there was repeated testimony that 217 Randolph Street served as the World Headquarters for the WCOTC. Thus, there the jury reasonably concluded that the materials found

purposefully had Fox leave WCOTC publications so Hale could "leave some things to be confiscated." 4/13/04 Tr. 143.

The government also presented evidence that the defendant stated that he and the WCOTC would not follow Judge Lefkow's order to discontinue using the term "Church of the Creator." James Burnett testified that Hale stated, he [Hale] would not hand over any WCOTC books, and he would instead send them to another state. 4/13/04 Tr. 20. Jon Fox also testified that the defendant stated he was not going to comply with the order, and he would not have others comply with the order. 4/13/04 Tr. 111.

Additionally, the government presented evidence that as early as June 2000, defendant indicated that he would knowingly disobey any order directing the WCOTC not to use the trademarked term "Church of the Creator." In a consensually recorded conversation on June 29, 2000, the defendant stated in response to questions about the trademark litigation:

> They can't stop our people from using the ner - , the name World Church of the Creator. We got people all over the place that are going to use that name and they will continue to use that name an no matter how many judges' order there are saying we can't use the name if that's what happens, it's not gonna be done.
>
> * * *
>
> So I'd be more than happy if it ever came to it, you know, and the judge says, oh, I wanna know where your stuff is. I'm just gonna say (chuckling) sorry judge, ah, you know, I'm, I really don't know and I wish I did but gosh, I'd love to make everybody happy here but, you know, if he puts me in jail, put me in jail.

*See* 6/29/00 Trans.

Thus, the government presented sufficient evidence for the jury to conclude that the defendant attempted to impede the outcome of the civil litigation by knowingly providing a false statement to Judge Lefkow regarding his and the WCOTC's compliance with her November 19, 2002 order.

The crux of defendant's position appears to be that the defendant could have complied with Judge Lekfow's order by obliterating or masking the term "Church of the Creator." Def. Mot. 4. While conceding that there was absolutely no evidence that the defendant intended on complying with the order by "obliterating" the trademarked term, the defendant suggests that the government must disprove that possibility beyond a reasonable doubt. Def. Mot. 5. However, in reviewing for sufficiency of evidence, the question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2002). Thus, from a legal standpoint, the defendant has turned the standard of review on its head. More importantly, the evidence presented by the government directly rebuts any suggestion that the defendant even contemplated abiding by Judge Lefkow's order. As the defendant stated:

> So I'd be more than happy if it ever came to it, you know, and the judge says, oh, I wanna know where your stuff is. I'm just gonna say (chuckling) sorry judge, ah, you know, I'm, I really don't know and I wish I did but gosh, I'd love to make everybody happy here but, you know, if he puts me in jail, put me in jail.

*See* 6/29/00 Trans. Through the defendant's own words, the government established his intent not to comply with Judge Lefkow's order.

-6-

## *Motion for Judgment of Acquittal as to Count Two*

Defendant next argues that the government failed to present sufficient evidence to support the defendant's conviction under 18 U.S.C. § 373. In order to sustain a conviction under Title 18, United States Code, Section 373, the government needed to prove:

> That the defendant, with strongly corroborative circumstances, intended for Tony Evola to engage in conduct constituting a felony that involved the use, attempted use, or threatened use of physical force of physical force against Judge Joan H. Lefkow in violation of the laws of the United States; and, that the defendant solicited, commanded, induced or otherwise endeavored to persuade Tony Evola to engage in that conduct.

R. 160, #18.

The defendant's first line of attack is that the government presented no evidence of circumstances that strongly corroborated the defendant's intent. As this Court instructed,

> Examples of "strongly corroborative" circumstances that are highly probative of the intent to solicit another to use physical force against an individual include, but are not limited to, the following:
>
> (1) the fact that the defendant offered or promised payment or some other benefit to the person solicited if he would commit the offense;
>
> (2) the fact that the defendant threatened harm or some other detriment to the person solicited if he would not commit the offense;
>
> (3) the fact that the defendant repeatedly solicited the commission of the offense, held forth at length in soliciting the commission of the offense, or made express protestations of seriousness in soliciting the commission of the offense;
>
> (4) the fact that the defendant believed or was aware that the person solicited had previously committed similar offenses; and,
>
> (5) the fact that the defendant acquired weapons, tools, or information suited

for use by the person solicited in the commission of the offense, or made other apparent preparations for the commission of the offense by the person solicited.

The surrounding circumstances in general must indicate that the solicitor is serious that the person solicited actually carry out the crime.

R. 160, #19A

The government presented various forms of evidence to establish strongly corroborative circumstances. Primarily, the government presented evidence of various exchanges between the defendant and Anthony Evola in November 2002 and December 2002. In an e-mail sent by the defendant on November 29, 2002 to the Anthony Evola and other members of the WCOTC, the defendant stated that Judge Lefkow's order "in effect [placed] our Church in a state of war with this federal judge and any acting on authority of her kangaroo court." Ex. E-mail 11-29-02. The e-mail continued by quoting from the *White Man's Bible,* and stating that the WCOTC and its members can take "the law into our own hands" and "we must then meet force with force and open warfare exists."

This e-mail was followed up with an e-mail sent only to Evola, in which the defendant instructed Evola to find the home address of Judge Lefkow, and the three attorneys representing the Church of the Creator. Ex. E-mail 12-4-02. Significantly, the e-mail also informed Evola who the judge presiding over the trademark case was. The e-mail also instructed, "Any action of any kind against those seeking to destroy our religious liberties is entirely up to each and every Creator according to the dictates of his own conscience." *Id.*

Evola then traveled to East Peoria and met with the defendant. During that

-8-

conversation, Evola advised Hale that he had received Hale's e-mail. The defendant then stated, "*That information* yes, for educational purposes and for whatever reason you wish it to be." 12-5-02 Tr. (Emphasis added.)

Evola then explained that he was working on obtaining the address and then asked, "Ah, when we get it, we gonna exterminate the rat?" Hale then responded by stating, "Ah, my position's always been that I, you know, I'm gonna fight within the law and but, ah, that information's been pro–, provided. If you wish to, ah, do anything yourself, you can, you know?" *Id.* Evola then responded, "Consider it done," and Hale retorted, "Good."

Hale then ended the same conversation by speaking about his possible arrest. Hale stated, "And if something, if you, let me just put it this way, if you get word that I've been, you know, something happens to me, then, you know, make sure that, that the world knows about it in a very strong way." Evola then asked, "Any special way or?" And Hale concluded by stating, "Yeah, well, just use your imagination . ." *Id.*

Following this conversation, at the FBI's instruction, Evola sent an e-mail on December 9, 2002 which stated, "I called the exterminator I know about he rat problem we talked about. This guy is good and does a good quiet job. You have to know where rats hide and he think he located her. He is working to get rid of the femala rat right now." Ex. E-mail 12-9-02. The evidence further established that the e-mail had been received and opened through the e-mail account used by the defendant. 4/15/04 Tr. 82.

Then on December 17, 2002, Evola again met with the defendant at the headquarters

of the WCOTC. That conversation makes clear that the defendant understood an attack on Judge Lefkow was planned. Evola repeatedly referred to the object of the attack as "her," and the defendant made repeated comments acknowledging that he understood an attack was imminent. And, significantly, the defendant never instructed Evola to discontinue with the plan, or that there had been some misunderstanding regarding the meaning of their previous communications. Indeed, the December 17, 2002 makes clear that Hale understood exactly what Evola had purportedly done to date. *See e.g.* Hale's statement, "you gotta understand that if all this would come to pass, it would be a very, very, heated situation. A lot of individuals coming to me wanting answers and obviously . . ."

Taking the events of November and December 2002 in isolation, the government established that the defendant provided information to Evola that would assist Evola in attacking Judge Lefkow. Specifically, Hale provided Evola with her name and business address. There is no question that Hale understood what he was doing, when he explained to Evola "*That information* yes, for educational purposes and for whatever reason you wish it to be." Ex. 12-5-02 Transcript. Hale also made clear in December 17, 2002 that he would be happy if Evola succeeded in his endeavor, and that he appreciated Evola's loyalty and concern. Finally, the period of time from defendant's first e-mail regarding retaliation against Judge Lefkow on November 29, 2002 through his last meeting with Evola on December 17, 2002 is another circumstance strongly corroborative of his intent. While the November 29, December 4, and December 5 communications were more direct, the

December 17, 2002 conversation established defendant's defense of plausible deniability, which further evidenced defendant's intent that the scheme be completed.

However, the events of November and December 2002 are even more strongly supportive of the defendant's intent when the defendant's (perceived) relationship with Evola is examined. The government presented a number of consensually recorded conversations between the defendant, Evola, and in some cases, other members of the WCOTC. These conversations established that Hale believed that Evola was willing to commit acts of violence for Hale. For example in May 2002, Hale stated to Evola, "I know brother. I know. I know. And I know damn well that if I were to tell you right now to go out there and shoot the bastard [referring to Dan Hassett] you would in a heartbeat. *See* 5-24-02 Trans.

In that same conversation, the defendant, in his own words, established that when speaking with Evola about committing acts of violence, he could not use direct language to express his true wishes. When discussing retaliating against Dan Hassett for his insubordination, the defendant stated to Evola, "[Y]ou have to understand my position. I can't ever say anything illegal and nor can I ever encourage anything illegal and that's why I simply have to say or hope . . ." *Id.* When pressed further by Evola as to what he would like done, Hale responded, "Well, see I just can't, I can't really put it that way, you know. I just can't. All I can say is that I hope the guy, however, one day, shuts up. I mean, what else can I say?" *Id.*

The defendant's means of communicating in vague and veiled terms is further

-11-

substantiated in other conversations. For example, in a December 6, 2001 conversation, Hale and Evola discussed possible retaliation against a former WCOTC member, Patrick Langballe. In explaining a vague e-mail Hale had sent to Evola, Hale stated, "I just wanted to leave it at that. I just wanted to say, well, you know, ah, persuade this guy not to write such trash to me again and I just, I deliberately kept it vague. . . . I'm, you didn't need to come down. I, I appreciate that you did. I mean you're always, you know, you're, you're there. I mean like, if something like this comes up, (snaps finger), boom, you're, you're down here and I, I know I can always count on that. . . ." 12-6-01 Trans.

In earlier conversations, Hale expressed his admiration for Ben Smith in the presence of Evola, and stated, "I mean [Ben Smith] set out to undoubtedly make a point and he did. And furthermore, he made us a household name. So that's why I'll always remember him and respect him and appreciate him, you know." Trans. 6/23/00. And in still other conversations, Hale demonstrated his ability to control Evola regarding acts of violence, and to direct Evola not to follow through with such acts when Hale believed them to be imprudent.

The preceding is simply an outline of highlights of evidence that establish the defendant intended for Evola to kill Judge Lefkow under strongly corroborative circumstances, and secondly that the defendant's solicited Evola to engage in an attack on Judge Lefkow. In fact, as the record makes clear, there was substantially more evidence supporting these two elements. But, to be victorious on a claim of insufficient evidence, the

-12-

defendant must show that "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *Curtis*, 324 F.3d at 505. The defendant has failed to meet this burden.

Defendant's argument as to the issue of strongly corroborative circumstances is misdirected. Defendant seems to discount the evidence presented on this element, rather than claim that there was no evidence on the point. *See* Def. Mot. p. 15 ("There is *very little evidence* put forth for this by the government."); Def. Mot. p. 16 ("The *only evidence offered by the government* which could be considered to fit into this category was the allegation that the Defendant attempted to procure the address of Judge Lefkow.").

As to the solicitation itself, defendant makes two separate arguments. First, defendant argues that the conversation on December 5, 2002 was vague and therefore, it is not clear that Evola was referring to Judge Lefkow when he used the term "rat." *See* Def. Supp. Mot., p. 2. Elaborating on this point, the defendant further argues that by having Evola send the December 9, 2002 e-mail, the government implicitly recognized that there was some ambiguity in the December 5, 2002 conversation. *Id.* The second argument posited by the defendant on this point is that the conversation of December 17, 2002 somehow exonerated the defendant of liability. *See* Def. Mot., p. 19. The government responds in turn.

As to the meaning of the communications between the defendant and Evola occurring between November 29, 2002 and December 17, 2002, the jury could consider circumstantial evidence in determining defendant's intent. *See United States v. Britton*, 289 F.3d 976, 981

-13-

(7th Cir. 2002) (noting that direct evidence of defendant's intent is not normally available, intent may be determined by circumstantial evidence and by inference). Defendant argues that the Evola's statements on December 5th were vague, and that the defendant may not have realized that Evola was referring to Judge Lefkow. Yet, defendant offers no explanation for why he failed to correct Evola's misunderstanding. The defendant did not respond to the December 9th e-mail by correcting Evola as to the defendant's desires and intentions. Reasonable jurors are entitled to infer from the defendant's failure to correct Evola that Evola's understanding (as reflected in the e-mail) was correct. Moreover, during the December 17th conversation, the defendant never stated that Evola had misunderstood the defendant's wishes. Indeed, the multiple prior conversations between Hale and Evola made clear that Hale would order and command Evola regarding acts of violence. *See* Ex. E-mail 1-12-01 ("After thinking and dreaming about your idea for hours before awaking abruptly at three this morning, *I must veto it.*"); and, Ex. E-mail 11-30-01 ("Look at what this freak Pat Langballe has said to me. *Persuade him to never say such sick crap to me again.*"). The defendant's failure to instruct Evola not to follow through with the attack on Judge Lefkow after having done so in the past, would allow a reasonable jury to find beyond a reasonable doubt that the defendant did intend for Evola to follow through with the attack.

As to defendant's second point (that the December 17, 2002 conversation exonerated the defendant), defendant's argument misstates the facts presented to the jury. The defendant argues that a subject of a government investigation is put in "an impossible situation"

-14-

because if the subject says "kill him" or if the subject says "don't kill him" the government would argue both statements implicate the subject of the investigation. *See* Def. Mot. 19 - 20. The problem, of course, with defendant's argument is that at no point did the defendant ever instruct Evola not to follow through with the attack. Indeed, the evidence showed that Hale praised Evola for his "concern," made clear that Evola and his conversation would be confidential, and that Hale would be "happy" if various individual or individuals had a serious altercation. *See* Ex. 12-17-02 Trans., p. 3, 7, 23. All supporting the government's theory that the defendant was creating plausible deniability for his conduct.

Finally, the defendant argues that government failed to prove beyond a reasonable doubt that the defendant was not entrapped. Again, the defendant improperly invites this Court to review the evidence *de novo*. *See Adenji,* *1 ("the court may grant the motion [for new trial] only if no rational jury could have found guilt beyond a reasonable doubt"). The government presented evidence that supported a finding that the defendant was not induced or persuaded to commit the solicitation by law enforcement officers. *See* R. 160, #20. The defendant approved others committing acts of violence in the name of the WCOTC. *See e.g.* Ex. Trans. 6-23-00 ("And, furthermore, he made us a household name. So, that's why I'll always remember him and respect him and appreciate him, you know."); Ex. Trans. 6-29-00 (". . .if our flag is being seen, I'm happy, you know. It's alright. There's me and certainly brother Ben knew that when he was doing all this, he knew it would be all over the news. . . .It must, h-, I mean, really, it must have been fun while he was doing it. I mean it must have

-15-

really been fun, just walked up, hello, are you Ricky Byrdsong?"). In addition, the government presented evidence that the defendant was willing to have Evola commit acts of violence prior to December 2002. *See* Ex. 11-30-01 E-mail; Ex. 12-17-00 IM ("I know that it should be legal to dispose of big rats. So, I wouldn't mind if something happens to big rats.") Second, the government presented evidence that it was the defendant who first suggested harming Judge Lefkow. *See* Ex. 11-19-02 E-mail (declaring war on Judge Lefkow), and Ex. 12-4-02 E-mail ("any action of any kind against those seeking to destroy our religious liberties is entirely up to each and every Creator according to the dictates of his own conscience.").

Moreover, defendant's reliance on *Jacobsen v. United States*, 503 U.S. 540 (1992) is misplaced. Defendant argues that he has no history of violent crime or violent action against federal officials. *See* Def. Mot., 22. However, defendant was charged with soliciting another to commit acts of violence, not committing the acts themselves. The government demonstrated that the defendant did not show reluctance. Nowhere in the December 17th conversation does the defendant show reluctance. To the contrary, the December 17th conversation shows that the defendant does not want to be caught, not that the defendant does not want the attack on Judge Lefkow to occur, or that he did not want Evola to carry it out. More fundamentally, *Jacobsen* involved repeated attempts by the government to convince Jacobsen that he had the right or should have the right to possess child pornography. The Court concluded by noting that "the Government may not play on the weaknesses of an

-16-

innocent party and beguile him into committing crimes which he otherwise would not have attempted." *Jacobsen*, 503 U.S. at 553. The evidence in the instant matter plainly established that the defendant was aware that his conduct was illegal, and during the course of the December 17th conversation, the defendant created false alibis in an effort to shield himself from criminal liability. The defendant was not "an innocent party" beguiled by the government's conduct. Indeed, the defendant made plain that he believed he could beguile the government.

### Motion for Judgment of Acquittal on Count Four

The government relies on its previous arguments as to Count Two in support of the proposition that a reasonable jury could find the defendant guilty of Count Four. The government notes that the only two elements of Count Four that would not be covered by a finding of guilty on Count Two is that Judge Lefkow was a judicial officer of a United States court, and that the defendant's acts were done to impede the due administration of justice. *See* R. 160, #25. Judge Lefkow testified to her position as a judicial officer. The jury could properly infer from the totality of evidence that the defendant's acts were done "corruptly, that is, with the purpose of wrongfully impeding the due administration of justice."

### Motion for Judgment of Acquittal on Count Five

In order to sustain a conviction under Title 18, United States Code, Section 1503(a), as charged in Count Five, the government needed to prove that:

There was a pending grand jury investigation;

-17-

That the defendant endeavored to influence, obstruct or impede the due administration of justice;

That the defendant acted knowingly; and
That the defendant's acts were done corruptly, that is, with the purpose of wrongfully impeding the due administration of justice

R. 160, #26.

To support this charge, the government presented evidence of a recorded phone conversation between the defendant and his father, Russell Hale, Jr., in which the defendant provided specific directions to his father regarding the nature and content of the father's grand jury testimony. *See* Ex. Tr. 4-14-03. In that conversation, the defendant stated,

> The third one, is remember the next day I did an interview with CNN and I had to cut it off because I start, you know, I start crying. Ira n into the house and you, you said what's wrong? What's wrong? I said I just can't, you know . .
> .

*Id.*

The defendant then proceeded to provide specific details of the interview, including the names of the reporter and the producer.

To establish that the defendant's statements were not true, the government presented the video taped interview of the defendant with Jeff Flock, the CNN reporter that the defendant identified. During that interview, the defendant is not observed crying or breaking down in tears. The government also presented the testimony of Tracy Scruggs, who was the CNN field producer during the interview. Ms. Scruggs testified definitively that she never observed the defendant cry during the interview of July 5th or at any time during her dealings

-18-

with the defendant on July 5th. 4-20-04 Tr. 7 - 9. During cross-examination, Ms. Scruggs clarified that she did not even recall the defendant becoming misty-eyed as she had previously indicated to the government during an interview. 4-20-04 Tr. 13. This evidence is sufficient for a reasonable jury to find the defendant guilty as charged in Count Five.

Defendant counters by arguing that the government failed to prove that the defendant acted knowingly. *See* Def. Mot., p. 29. However, the jury is entitled to infer the defendant's intent from circumstantial evidence. *See Britton*, 289 F.3d at 981. After the defendant instructed his father how to testify before the grand jury regarding the CNN interview, the defendant then instructs his father to testify that he (the defendant) is willing to take a polygraph examination. Russell Hale, Jr. then informs Hale that defense counsel will not Hale take a polygraph examination. Hale responds by saying:

> . . . well you can still mention it though, what, what could they do? See mention it. It's okay to mention it. I mean, ah, they wouldn't require me to do it anyway.

Ex. 4-14-03 Trans.

Thus, in the same conversation, the defendant is instructing his father to lie before the grand jury on another issue. The jury could therefore reasonably infer from the contents of the taped conversation that the defendant's false instructions to his father regarding the CNN interview were done "knowingly."

### *Defendant's Motion for New Trial Under Fed. R. Crim. P. 33*

The defendant raises a series of arguments for a new trial pursuant to Fed. R. Crim.

P. 33. Pursuant to Fed. R. Crim. P. 33, a new trial may be ordered when required by the interest of justice. The rule does not define "interest of justice" and courts have had little success in trying to formulate a general standard. *United States v. Reed*, 986 F.2d 191, 192 (7ᵗʰ Cir. 1993). In general, to obtain a new trial, the defendant must demonstrate that his substantial rights have been jeopardized. *Adeniji*, 1997 WL 666306, *3.

Defendant first argues that the admission of evidence relating to the Benjamin Smith shootings was "unduly prejudicial." The defendant further asserts that "the government argued Defendant's involvement in Smith shootings as if he had been proven to had an involvement . . ." Def. Mot., p. 31. Defendant cites to no portion of the record that supports this assertion. Indeed, the government never argued that the defendant was instructed Ben Smith to engage in a shooting spree. Rather, the government argued that the defendant applauded Smith's conduct, which justified the government's investigation in the first place.[6] Tr. 4-21-04, 122 - 123.

Similarly, defendant argues that *The White Man's Bible* was improperly admitted by the government to inflame the jury. However, *The White Man's Bible* was admitted by the defendant, not the government. 4-13-04 Tr. 183 - 184.

The defendant also makes a series of arguments relating to evidence that was not

---

[6] The evidence regarding the Smith shooting also served other purposes, which the defendant acknowledges as being proper use of the evidence. *See* Def. Mot., 31. However, the defendant's suggestion that the government improperly used this evidence by suggesting that the defendant "had done it before" is simply not supported by the record.

presented to the jury. *See* Def. Supp. Mot., 6 - 15. The government notes that these arguments were presented in a *pro se* filing, and that the defendant's motion to represent himself has yet to be granted. Therefore, the government questions the propriety of responding to the merits of the motion at this time.

In summary, however, a district court should not grant a new trial on the basis of "newly discovered evidence" if the defendant was aware of the evidence prior to trial. *United States v. Severson*, 49 F.3d 268, 271 (7th Cir. 1995).[7] The "evidence" that defendant outlines is all information of which the defendant was aware prior to trial. Defendant makes no attempt to explain how his substantial rights were affected because of a reasonable decision not to present evidence. At base, defendant's argument is that he would like a "do over," defendant's motion for a new trial should be summarily denied.

---

[7] In addition to the "newly discovered requirement," the defendant must also show that the evidence could not have been discovered sooner through due dilligence; the evidence is material and not merely impeaching; and would probably have lead to an acquittal. *Severson*, 49 F.3d at 271. In the event the Court deems it appropriate, the government also would argue that these requirements have not been met.

-21-

## CONCLUSION

For the reasons stated above, defendant's motions for a judgment of acquittal and for a new trial should be denied.

Respectfully submitted,

PATRICK FITZGERALD
United States Attorney

BY:    _____

M. David Weisman
Assistant United States Attorney

# See Case File For Exhibits