IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
SEP 23 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA, )
Plaintiff, )
) No. 03 CR 11
v. )
) Judge James T. Moody
MATTHEW HALE, ) (sitting by designation)
Defendant. )

NOTICE OF FILING

**DOCKETED**
SEP 24 2004

By U.S. Mail to:

Judge James T. Moody
United States District Court
Northern District of Indiana
5400 Federal Plaza
Hammond, IN 46320

M. David Weisman
Assistant U.S. Attorney
219 S. Dearborn St. 5th Floor
Chicago, IL 60604

PLEASE TAKE NOTICE that on this 20th day of September, 2004, the undersigned mailed to the Clerk of the District Court for the Northern District of Illinois at Chicago, Illinois, the attached Transcript Excerpts Relating to Pending Motion for New Trial for filing, a copy of which is hereby served upon you.

Respectfully submitted,

Matthew F. Hale
Matthew F. Hale, pro se #15177424
Metropolitan Correctional Center
71 West Van Buren St.
Chicago, IL 60605

238

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
SEP 23 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA, )
    Plaintiff, )
v. ) No. 03 CR 11
MATTHEW HALE, ) Judge James T. Moody
    Defendant. ) (sitting in designation)

DOCKETED
SEP 24 2004

### Transcript Excerpts Supporting Pending Motion for New Trial

MATTHEW HALE, pro se, attaches the following transcript excerpts supporting his pending motion for a new trial.

As stated in my Motion for New Trial, "[t]he government argued Defendant's involvement in the Smith shootings as if he had been proven to have had an involvement, when he has not. This is obviously highly prejudicial." (pp. 31-32 of Defendant's Post Trial Motion).

Attached is the segment from the government's rebuttal (from Volume II, pp. 139-141, April 21, 2004) in which the government clearly told the jury that I ordered the Smith shootings despite earlier telling the Court and defense counsel that it wasn't going to argue that (see further transcript excerpts attached

1

238

from Volume Y, pp. 189-194, April 12, 2004).

Even more prejudicial is that the government made its claim that I ordered the Smith shootings within the context of arguing that I was predisposed to solicit the murder of Judge Lefkow. Thus there was a high likelihood that the jury was left with the impression that since "[T]he government had evidence that the defendant had a member of his organization kill two people and shoot lots of others" — a contention no where supported in the record of this trial — that I was "predisposed" to solicit murder, thereby defeating the entrapment defense. The prejudice that thus inured to me was monumental. Not only would the jury be motivated to convict me due to the government's assertion, itself, but it would also be prompted to lower, or erase in fact, the government's duty to prove that beyond a reasonable doubt, I had a predisposition to commit the offense or that I was not induced to commit it by law

2

enforcement or its agents. It's clear that the government hoped the jury would say "he did it before and he did it again" and destroyed my right to a fair trial in the process. A new trial is thus required in the interest of justice. It's simply impossible that the verdict was reliable in light of the foregoing.

Respectfully submitted,

*Matthew F. Hale*
Matthew Hale, pro se

3

1    And what does Mr. Fox tell you?  He tells you what --
2 completely understandable explanation.  Not until he talks to
3 an attorney did he feel comfortable enough to know that he
4 wasn't in trouble.  And in one of the defendants' exhibits he
5 even says that to the other members of the world -- the white
6 supremacy movement, that he was willing to go to jail for Matt
7 Hale.
8    And then he explains, it's got -- the whole fact of
9 his family situation has turned him around.  He says the same
10 thing to Judge Lefkow.  He is worried about his family.
11    Now, I am not going to tell you that Jon Fox has had a
12 conversion.  But it is clear that from December of 2002 until
13 the summer and fall of 2003 his priorities have changed.  And
14 he's come forward, and for all the problems that Mr. Durkin
15 pointed out about Jon Fox, remember this:  The government
16 didn't choose that witness.  The defendant chose that witness.
17    Now, Mr. Durkin has talked about this issue of
18 entrapment.  That's on the instructions that Judge Moody is
19 going to give you.  And he is going to give you an instruction
20 on entrapment.  And what we need to prove, the government, we
21 need to prove beyond a reasonable doubt that before contacted
22 law enforcement the defendant was predisposed to commit an act
23 of violence, or is ready and willing to do so, or that the
24 defendant was not induced or persuaded to commit the offense by
25 law enforcement.

1  Jon Fox, it's clear that he was not entrapped by Jon
2  Fox. Jon Fox was not working for the government. So that's
3  not even an issue as to Jon Fox.
4  As to Mr. Evola, and I am going to get to him next --
5  MR. DURKIN: I object to the reason he is referring.
6  I made an issue of that. Jon Fox, I didn't.
7  THE COURT: Continue.
8  MR. WEISMAN: As to Mr. Evola, before Tony Evola ever
9  had any conversations with the defendant, we knew a lot about
10  him. Ben Smith killed two people, and he thought that was --
11  MR. DURKIN: Judge, I object to the prosecutor's use
12  of we as putting his own integrity at issue here.
13  THE COURT: I think his use of the word we, probably
14  the government I am assuming.
15  MR. WEISMAN: The government had evidence that the
16  defendant had a member of his organization kill two people and
17  shoot lots of others. And the defendant got on national
18  television and said it wasn't that bad of a thing. The problem
19  with it wasn't that there were two people dead, but that his
20  law license might be denied.
21  The government knew that this man, the defendant, had
22  an organization that had all the things that are in this White
23  Man's Bible. And he says he believes this stuff. Not the
24  stuff about racism. That's offensive. But you can believe
25  that. But there is chapters in here that talk about terrorism

1  and resorting to violence when you don't like what the Jewish
2  occupied government is doing.
3       Was he predisposed? I think so. Clearly he believed
4  in these -- what was in this book. And you can read it. If
5  you have any questions, read it.
6       The defendant was law school educated. And if you
7  believe for a second that the defendant was worried about
8  hurting Tony Evola's feelings, then we haven't been sitting
9  through the same trial. If this were entrapment, the defendant
10 could have simply said, Mr. Evola, get out of here.
11      MR. DURKIN: Objection, objection. That is not the
12 law at all.
13      THE COURT: Continue.
14      MR. WEISMAN: The defendant could have told Mr. Evola
15 to leave in January of 2001. He could have told him to leave
16 in May of 2002. Or he could have told him to leave in December
17 of 2002. But he doesn't. And let's face it. It's not because
18 he is worried about hurting people's feelings.
19      He kept Tony Evola around for a reason. And that
20 reason was, he wanted to have a stick of dynamite around when
21 he needed it, someone he could light up. If you have any doubt
22 about it, let's go through some of those issues.
23      As you recall, Mr. Durkin spent a lot of time with
24 Mr. Evola talking about the fact that he was a hitman. I don't
25 think that word was ever used in any of the transcripts. But

Case: 1:03-cr-00011 Document #: 238 Filed: 09/23/04 Page 8 of 13 PageID #:1351
189

Burnett - direct by Weisman

1  THE COURT: Okay.
2  MR. DURKIN: Here's the problem I have --
3  THE COURT: I just hate this double barreling. It's
4  just not fair.
5  MR. DURKIN: It is fair because --
6  THE COURT: No, it's not, but go ahead.
7  MR. DURKIN: The problem is that I'm not quite sure in
8  the whole picture of the case, not just for Burnett, where the
9  government stands with respect to Smith.
10  When this issue came up during jury selection, they
11  said they were not taking the position that Hale had anything to
12  do with the Smith --
13  THE COURT: Yes, I heard that.
14  MR. DURKIN: Right, but this seems to be getting
15  perilously close to that, and it's going to take us off into --
16  and if they do it with this witness, I suspect they'll do it
17  with other witnesses -- it will get us off into very tangential
18  issues and collateral matters about whether Smith did it alone,
19  whether Smith did it with Hale's knowledge or not, and we'll get
20  into all kinds of --
21  THE COURT: Is that where you're coming from?
22  MR. WEISMAN: No. We are going to show that they --
23  that Smith and Hale had a close relationship. He goes on the
24  shooting spree, and Hale talks well about the guy.
25  THE COURT: Well, certainly allows an inference that

Burnett - direct by Weisman

1  Hale had something to do with Ben Smith and his shooting spree.
2      MR. WEISMAN: Judge, it may allow an inference. It's
3  not what we're going to argue.
4      What we're arguing is that the defendant praises
5  people who commit violent acts and that --
6      MR. BLEGEN: So what does the close relationship have
7  to do with that?
8      MR. DURKIN: But, Judge, that's why it's a 403 issue
9  because if that's all they're trying to get out of it, then the
10 probative value is vastly outweighed by the prejudice that's
11 going to inure here.
12     THE COURT: And you're offering this for -- under
13 404(b) because I think it clearly comes under there, parts of
14 it, the part that you just told me does.
15     MR. WEISMAN: Well, I think it comes under
16 circumstances strongly corroborative of his intent, one of the
17 elements of this offense.
18     THE COURT: Probably -- it straddles it probably.
19     MR. WEISMAN: Okay. Well, I think that's where it
20 comes under. If it comes under 404(b), then it does go --
21     THE COURT: So it's relevant to that part of your
22 case-in-chief.
23     MR. WEISMAN: Right.
24     THE COURT: The elements that you have to prove.
25     MR. WEISMAN: Yes.

Burnett - direct by Weisman

1  THE COURT: That's why it has to come in.
2  MR. WEISMAN: Yes.
3  THE COURT: But if you want a limiting instruction,
4  I'll certainly give it.
5  MR. WEISMAN: I have no objection to that.
6  MR. DURKIN: But, Judge, I'm at a loss to understand
7  how his closeness to Smith and his praise of Smith has anything
8  to do with corroborating, strongly corroborative evidence with
9  respect to his intention to kill Lefkow. I don't understand it.
10 It doesn't make any sense to me.
11      I don't see how it even straddles it, because it --
12 there's all kinds of factual problems here. For every tape that
13 Hale praises Smith, like this speech, there are also tapes where
14 Hale says I had no idea what he was doing. There are other
15 tapes that say I didn't -- I wish he hadn't done it.
16     MR. BLEGEN: I wish he had shot me instead of shooting
17 one of the victims.
18     THE COURT: Is that part of the tapes?
19     MR. DURKIN: Not part of the government's tapes.
20     THE COURT: But you have tapes.
21     MR. DURKIN: Right.
22     THE COURT: Okay.
23     MR. DURKIN: But that's my point. We're going to get
24 off into a real collateral issue with respect to Smith, and
25 we're going to end up trying the Smith case.

Burnett - direct by Weisman

1  THE COURT: I'm not doing that.
2  MR. WEISMAN: We're not, your Honor.
3  MR. DURKIN: But how could it -- maybe I'm just
4  confused, but I don't understand how the fact that he was close
5  to Smith and praises Smith makes it corroborative or strongly
6  corroborative of what he did with Lefkow.
7  MR. WEISMAN: Judge, if I can answer that. He praised
8  a man who killed two people and shot numerous others. He
9  praises him in a public speech before his followers. He praises
10 him on national television.
11     Now, he also says, and we're playing these tapes,
12 where he says we must remain peaceful and legal, and the jury is
13 entitled to hear that a man who says we should remain peaceful
14 and legal is also saying that a guy who did this is a really
15 good guy, I will always respect and admire him.
16 THE COURT: Here's the deal. We're going to cut this
17 short. I'm going to allow it. If you wish a 404(b) limiting
18 instruction, I will give it.
19 MR. DURKIN: All right. You'll deny my 403 objection?
20 THE COURT: I am.
21 MR. DURKIN: Right? Am I right?
22 THE COURT: Well, I'm denying the objection that --
23 who made it, Blegen or you? See, that's my problem.
24 MS. PETERS: Durkin.
25 THE COURT: I'm denying it.

Burnett - direct by Weisman

1     MR. DURKIN: Right.
2     THE COURT: And now you're asking that I give a
3 limiting instruction.
4     MR. DURKIN: And what will that instruction be?
5     THE COURT: Seventh Circuit, but -- I've got a plug
6 in, does it go to that one element.
7     MR. WEISMAN: Circumstances strongly corroborative of
8 his intent.
9     MS. PETERS: Goes to intent.
10     THE COURT: I'm just going to say intent. Is that
11 what you want me to do?
12     MR. DURKIN: I need to think for 30 seconds.
13     THE COURT: Take your time. Right now I've got all
14 month, so just take your time, but I don't want to be here all
15 month.
16     (Pause.)
17     MR. DURKIN: We'd rather not have a limiting
18 instruction at this time.
19     THE COURT: You do not want a limiting instruction.
20     MR. DURKIN: If it becomes a problem down the road --
21     THE COURT: Then you tell me.
22     MR. DURKIN: -- we'll ask for it, but we think that
23 it's so prejudicial that we don't want to highlight it.
24     THE COURT: Okay. I find that its probative effect
25 overweighs any prejudice to the defendant, and I'll allow them

1  to do it because it goes directly to an element of two of the
2  counts in my indictment. That's my ruling.
3       MR. DURKIN: We'll try to get you to revisit it
4  because we're going to show you how complicated it's going to
5  become.
6       MR. WEISMAN: Judge, and not that I disagree with
7  Mr. Durkin, but on this point, I think he's wrong. Mr. Burnett
8  is going to be the closest thing we get to a true Ben Smith --
9  he advocated Ben Smith to do it, and we're not even getting near
10 it.
11      THE COURT: Well, make sure you stay away from it.
12      MR. WEISMAN: If you want, I will take out the salute
13 part --
14      THE COURT: What if you led him through this part of
15 his testimony.
16      MR. DURKIN: I'd prefer that he lead him, yeah.
17      THE COURT: Would you do that?
18      MR. WEISMAN: Sure.
19      THE COURT: Just have him say yes or no to the
20 following series of questions.
21      MR. WEISMAN: Yeah.
22      THE COURT: And stay away from anything that's going
23 to be inherent in saying that Hale had anything to do with Ben
24 Smith --
25      MR. WEISMAN: Okay.