IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

NOV - 9 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MATTHEW HALE,

    Defendant.

No. 03 CR 011

Judge James T. Moody
(sitting by designation)

DOCKETED

NOV 1 0 2004

NOTICE OF FILING

By U.S. Mail to:

Judge James T. Moody
United States District Court
Northern District of Indiana
5400 Federal Plaza
Hammond, IN 46320

M. David Weisman
Asst. United States Attorney
219 S. Dearborn Street
5th Floor
Chicago, IL 60604

Carol Anne Bozarth
U.S. Probation Officer
55 E. Monroe St. Suite 1500
Chicago, IL 60603

    PLEASE TAKE NOTICE THAT on this 5th day of November, 2004,
I mailed for filing with the Clerk of the United States District
Court for the Northern District of Illinois at Chicago, Illinois
the attached Defendant's Position Paper as to Sentencing Factors
for filing, a copy of which is hereby served upon you.

                Respectfully submitted,

                MATTHEW HALE, PRO SE

Matthew Hale #15177424
Metropolitan Correctional Center
71 West Van Buren St.
Chicago, IL 60605

248

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

NOV - 0 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MATTHEW HALE,

      Defendant.

No. 03 CR 011

Judge James T. Moody

DOCKETED

NOV 1 0 2004

## DEFENDANT'S POSITION PAPER AS TO SENTENCING FACTORS

Now comes MATTHEW HALE, PRO SE, presenting his position paper as to sentencing factors pursuant to LCrR32.1(g), stating as follows:

Instead of being fair to both parties, the Probation Officer in her Presentence Investigation Report goes out of her way to be a large club for the prosecution. Her Offense Level Computations have no relationship to either the facts or the law and I thus strenuously object to them. She apparently paid very little consideration to my version of the offense. In this position paper, I will set forth in great detail why none of the enhancements posited by the Probation Officer in her Report may be lawfully imposed as well as why they are factually inappropriate to the facts of this case.

I. Why the Imposition of Any of the Enhancements Posited by the Probation Officer Would Be Unconstitutional and Hence Unlawful per Blakely v. Washington, - U.S. -, 2004 WL 1402697 (June 24, 2004) and United States v. Booker, No. 03-4225 (7th Cir. July 9, 2004).

1

248

A. Why the "Victim Related Adjustments" may not be imposed.

Blakely held that any fact which is neither admitted by the defendant nor found by a jury beyond a reasonable doubt may not be used to increase the defendant's sentence. Booker squarely applied this holding to the Federal Guidelines.

The Victim Related Adjustments posited on page 11 of the Presentence Investigation Report require that 1)"the victim was a government officer or employee" and 2) that the offense of conviction was motivated by such status. While the jury found #1 in its verdict, it did not find #2 in its verdict as motivation is not an element of 18 U.S.C. sec. 373. Thus the Victim Related Adjustments are barred by Blakely and Booker.

B. Why the "Adjustments for Obstruction of Justice" may not be imposed.

Blakely held that any fact which is neither admitted by the defendant nor found by a jury beyond a reasonable doubt may not be used to increase the defendant's sentence. Booker squarely applied this holding to the Federal Guidelines.

The Adjustments for Obstruction of Justice posited on page 12 of the Presentence Investigation Report may not be imposed because there was no jury finding that I indeed obstructed justice by mailing Fox the letters in question.

C. Why the "Terrorism Adjustment" may not be imposed.

Once again, Blakely held that any fact which is neither admitted by the defendant nor found by a jury beyond a reasonable doubt may not be used to increase a defendant's sentence. Booker squarely applied this holding to the Federal Guidelines.

The Terrorism Adjustment posited on pages 12-13 of the

Presentence Investigation Report requires a <u>jury finding</u> that I committed an offense that 1) was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" <u>and</u> that 2) I violated one of the listed offenses in 18 U.S.C. sec. 2332b (g)(5)(B)(i). There was no jury finding of <u>either</u> of these propositions. Thus the Terrorism Adjustment is barred by <u>Blakely</u> and <u>Booker</u>.

(It is further of note that the Probation Officer wrongly attempts to add 12 points to the base level of 28 for 18 U.S.C. sec. 373 when it is my conviction under 18 U.S.C. sec. 1503 (Count Four) that is the basis for her claimed adjustment. In other words, even if it were somehow found that the jury in its verdict had found the elements of a federal crime of terrorism and it was otherwise permissible to apply this adjustment (the law of this district says that it <u>isn't</u>, as discussed below), the 12 points could only be added to the base level of 14 for Count <u>Four</u>, not the base level of 28 for Count Two, for a level of <u>26.</u> This adjusted level of 26 for Count Four would of course be lower than the base level of 28 for Count Two and thus the base level of 28 would be the level applied. In any case, the Probation Officer wrongly attempts to use my conviction for Obstruction of Justice in an effort to have the Terrorism enhancement imposed when it (the conviction under Count Four) is twice removed from those crimes listed as federal crimes of terrorism by the statute. "Bootstrapping", I believe the term is.

Neither 18 U.S.C. sec. 1503 nor 18 U.S.C. sec. 373 were listed by Congress as federal crimes of terrorism. While the Probation Office states that "[a]n extensive review of the applicable case law reflects that the twelve-level enhancement may be applied, even though the defendant was not convicted of a statutorily-enumerated federal crime of terrorism," she doesn't cite a single case to this effect and in fact, the law of this district is that the enhancement may not be applied unless the defendant was convicted of a statutorily-enumerated federal crime of terrorism (see <u>U.S. v. Arnaout</u>, 282F.Supp. 2d 838, 843-845, attached). As Judge Conlon stated:

> In sum, Congress has specifically and exhaustively identified criminal offenses that constitute federal crimes of terrorism. Those specifications control application of sec. 3A1.4. Further, Congress clearly intended the revised terrorism guideline to be "applicable <u>only to those specifically listed</u> federal crimes of terrorism, <u>upon conviction of those crimes</u> with the necessary motivational element to be established at the sentencing phase of the prosecution." Conference Report on S.735, 142 Cong. Rec. H. 3305-01, sec. 730, Directions to Sentencing Commission [Emphasis added].

(<u>Blakely</u> and <u>Booker</u> of course now require that a <u>jury</u> find the necessary motivational element, which has not been done in this case). I was not convicted of violating 18 U.S.C. sec. 1114 and thus the terrorism guideline is inapplicable. The plain language of 18 U.S.C. sec. 2332 b(g)(5)(B)(i) requires a violation of one of the enumerated crimes. While there was a jury finding that I violated 18 U.S.C. sec. 373 and 18 U.S.C. sec. 1503, these are not federal crimes of terrorism.

As noted earlier, there was no jury finding that my alleged offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." This is so regardless of the fact that the jury did find that I "endeavored to influence, intimidate or impede Judge Lefkow" and that I acted "with the purpose of wrongly impeding the due administration of justice" as elements of Count Four since there was still no jury finding that my actions were "by intimidation or coercion." There was no evidence at trial that I intimidated or coerced Judge Lefkow, let alone a jury finding beyond a reasonable doubt to that effect. *(see also next page, 5a)

In summation, the Terrorism Adjustment in legally inapplicable for the following reasons:

1) there was no jury finding that I committed an offense that was a) "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and b) no jury finding that I violated one of the listed offenses in 18 U.S.C. sec. 2332b(g)(5)(B)(i).

2) the law of this district is Arnaout, which precludes applying the guidelines to crimes not specifically listed in 18 U.S.C. sec. 2332b(g)(5)(B)(i).

3) to impose the Terrorism Adjustment in this case would be against the intent of Congress

4) to impose the Terrorism Adjustment, with its penalty of life imprisonment, would be wildly disproportionate to the conduct I was convicted on and my lack of a previous criminal record.

*The government may be tempted to argue that since the jury found beyond a reasonable doubt that I "endeavored to influence, intimidate, or impede" Judge Lefkow that the "by intimidation" segment of 3A1.4 has indeed been found beyond a reasonable doubt.  This is false, however, for <u>we don't know which</u> the jury found beyond a reasonable doubt.  Did it find that I endeavored to <u>influence</u> beyond a reasonable doubt?  Did it find that I endeavored to <u>impede</u> beyond a reasonable doubt?  Or, did it find, as the government would wish, that I endeavored to <u>intimidate</u> beyond a reasonable doubt?  Since the phrase "endeavored to influence, intimidate, or impede" is disjunctive, the jury could have found only one of them beyond a reasonable doubt and we simply do not know which one it was.  Thus there was no clear jury finding allowing the imposition of the guideline regardless of however way it is interpreted.

D. Why the "Special Offense Characteristic" adjustment may not be imposed.

Once again, <u>Blakely</u> held that any fact which is neither admitted by a defendant nor found by a jury beyond a reasonable doubt may not be used to increase the defendant's sentence. <u>Booker</u> squarely applied this holding to the Federal Guidelines.

The Specific Offense Characteristic posited by the Probation Officer on page 13 of the Presentence Investigation Report could only be applied if the jury had found that "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." There was no such finding. "Causing or threatening to cause physical injury to a person, or property damage," is not an element of 18 U.S.C. sec. 1503 and nor was there a jury finding otherwise that I caused physical injury to Judge Lefkow or that I threatened to cause physical injury to her. As defined by Black's Law Dictionary, sixth edition, a threat is "a communicated intent to inflict physical or other harm on any person or on property." There was no jury finding that I <u>communicated</u> such an intent. When a person "threatens" another with physical harm, that person is attempting to put the other in apprehension of harm. If I had threatened Judge Lefkow with personal injury, I would surely have been charged with that. I didn't and I wasn't.

I understand the impulse to consider a solicitation conviction a "threat to cause physical injury" but I submit that a solicitation and a "threat" are very different concepts as a

6

matter of law and linguistics. A threat is a <u>communication</u>, not an act, at least for purposes of this guideline. Otherwise, <u>every</u> crime of violence could be subjectively labeled a "threat".

    E. The "Victim Related Adjustments" on page 14--why they may not be imposed.

I wish to incorporate I.A. above herein.

II. Why None of the Enhancements and Upward Departures Posited by the Probation Officer are <u>Factually</u> Appropriate Even If <u>Blakely</u> and <u>Booker</u> were <u>Not</u> the Law.

    A. The "Victim Related Adjustments" (page 11)

There is no evidence that my offense of conviction was motivated by Judge Lefkow's <u>status</u> as a judge. In other words, there is no evidence that I solicited her murder <u>because</u> she was a judge. Instead, the government alleges that it was one of her <u>court orders</u> that motivated me. This is not the same as committing the crime because of her <u>status</u>. Judge Lefkow had presided over the case for two years and there is simply no evidence at all that I suddenly wanted her dead because of that <u>status</u>. Thus this adjustment would be factually inappropriate.

    B. The "Adjustments for Obstruction of Justice" (p. 12)

The Probation Officer has her facts wrong. I only told Fox in my letter to him to tell the <u>media</u> that I suspected that Evola was a spy all along and this can hardly be considered obstruction of justice. Further, while she quotes me as saying about Evola "yeah, I trust you" (in response to Evola's question, "And you do-trust me, right"?, I note), telling a person that

7

you trust them hardly means that you actually do. It was Evola in fact who would occasionally ask me if I trusted him (apparently on instructions by the FBI to get me to say on tape that I trusted the man for later use in its hopeful prosecutions) and I simply responded to him in a manner that would not hurt his feelings as most people would if asked that question.

In any case, Fox is hardly a credible witness on this point as borne out by the jury's verdict and I did tell Fox in fact shortly before my arrest that Evola was probably an informant- as I told Reverend Peterson (see exhibit b, #18 of his affidavit). I further told the FBI when I was arrested, "I've suspected that he (Evola) was sent by you guys." (see record from trial, portion involving potential testimony from FBI agent Mike Evans). There is thus not a preponderance of evidence that what I wrote Fox was untrue.

C. The "Terrorism Adjustment" (pp. 12-13).

The terrorism adjustment is factually inapplicable because there was no evidence at trial that my alleged crime was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." The evidence, in fact, was that Judge Lefkow had ruled in my Church's favor and that she was ordered by the 7th Circuit Court of Appeals to issue her order of November 19, 2002. Further, the evidence is that I secured a trademark on another name, thereby demonstrating my interest in complying with her order. Since there was more evidence that my alleged crime was not calculated to influence or affect the conduct of government by intimidation or coercion,

8

or to retaliate against government conduct than the reverse, the enhancement should not be applied. Further, once again, there is no evidence at all that I intimidated or coerced Judge Lefkow or even that my alleged crime was calculated to do so. My alleged crime simply was not an act of terrorism. Why "retaliate" against Judge Lefkow for something she had nothing to do with?*(see next page)

D. The "Specific Offense Characteristic" Adjustment (p. 13)

This adjustment is factually inapplicable because there is no evidence at all that I caused physical injury to Judge Lefkow or threatened to cause physical injury to Judge Lefkow. (I wish to incorporate the contents of I.D. above herein).

E. The "Victim Related Adjustments" (p. 14)

I wish to incorporate the contents of II.A. above herein.

## Conclusion

All of the adjustments (enhancements and upward departures) posited by the Probation Officer in her Presentence Investigation Report are barred by Blakely v. Washington and United States v. Booker and are further factually inappropriate. This is so for all of the reasons above. As a consequence, my base level and final level for sentencing remains at 28 with a criminal history category of I. My sentencing under the Guidelines should thus be in the 78 to 97 months range.

IV. A downward departure, however, is warranted due to mitigating circumstances.

Under U.S.S.G. sec. 5K2.0 and 18 U.S.C. sec. 3553(b), a district court may depart from the applicable Guideline range

\*Nor can it be said that my offense was calculated to in-
fluence or affect the conduct of government by intimidation
or coercion <u>as a whole</u>.  There was no evidence at all that I
wanted the Federal Government to change its policies by virtue
of my alleged crime and Evóla himself said "the way it's gonna
be done, nobody's even gonna think about us doin' it, but it's
gonna be done.  It's not like I'm gonna do it and drop our flag
on top of her."  (12-17-02 transcript, p. 20, lines 20-26).  In
other words, there was to be no "claim of responsibility" as
<u>real</u> terrorists use in their hopes to "influence or affect the
conduct of government by intimidation or coercion."  There
would have been no impact on the <u>conduct</u> of government had
Judge Lefkow been murdered, by intimidation or coercion, with-
out the government having any idea why she was murdered.  Plus,
there is no evidence at all that I hoped to obtain a better
ruling from another judge or even discussed such a thing.

Thus for the myriad reasons stated above, the imposition of
the Terrorism Adjustment would be factually inappropriate.  I
neither intimidated or coerced Judge Lefkow, sought to intimid--
ate Judge Lefkow, nor intimidated or coerced the government
as a whole, nor sought to do so.

where it finds that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. United States v. Almaguer, 146 F.3d 474, 476 (7th Cir. 1998). See also Koon v. U.S., 518 U.S. 81 (1996).

The mitigating circumstance in this case is that my arrest and conviction is the result of a two year long effort by the government to induce me into criminal activity. As the transcripts I provided to the Probation Officer show, it was the government informant who repeatedly browbeated me, implored me, etc. in an effort to get me to commit a crime. Assuming for a moment that I committed the offense (18 U.S.C. sec. 373), my offense only came after repeated government inducements. This is not a case where I called Tony Evola on the phone and asked him to kill someone. This is instead a case where Evola tried repeatedly to persuade me that various people should be killed. This, surely, is a mitigating circumstance. The transcripts show decisively that if I committed the crime, it was only after repeated inducements.

That the mitigating circumstance was "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines" is shown by the fact that no mentkion of extreme provocation is discussed in the guidelines. Clearly there is a difference between a person soliciting a government informant to murder without any history of that informant pressuring the defendant to do so and a person soliciting a government infor-

10

mant to murder only after two years of pressure. When a court finds an atypical case, "one to which a particular guideline linguistically applies but [the] conduct significantly differs from the norm, "a departure may be warranted." <u>United States v. Furkin</u>, 119 F.3d 1276, 1283 (7th Cir. 1997).

Even if the phrase "conduct significantly differs from the norm" is viewed narrowly, without any regard for the two years of the government informant pressuring me to commit a crime, my conduct still significantly differs from the norm. Where did I ever ask Evola to kill anyone? Where did I ever tell him to kill anyone? Typical solicitation cases are very different fox from this one. The transcriptsxfox of 12/5/02 and 12/17/02 beg the question: where is the solicitation? At most I allowed Evola to do what he wanted and said "Good". If my conduct wasn't atypical as far as solicitation cases go, it is difficult to conceive of what would be. The typical solicitation case is where the defendant says something kix like, "hey, I want you to kill someone. Here's $1000 ixxx if you'll do it." This case is nothing like that at all. And, I submit that even the government would have to agree with me on that.

I therefore humbly request a downward based on the manifestly atypicality of my alleged conduct.

V.  A downward departure based upon the extraordinary conditions of my confinement is also warranted.

Pursuant to 18 U.S.C. sec. 3553(b) and U.S.S.G. sec. 5K2.0, I wish to also ask for a downward departure based upon the extraordinary conditions of my confinement. Courts have held

11

that if a defendant has been under extraordinary pre-sentence confinement conditions, this may in an appropriate case be a basis for a downward departure. United States v. Carty, 264 F.3d 191, 196 (2d Cir. 2001); United States v. Mateo, 299 F.Supp.2d 201 (S.D.N.Y. 2004). Similarly, if a defendant is likely to encounter extraordinary conditions of confinement while in custody after sentencing, this also is a permissible ground for a downward departure under proper circumstances. See Mateo, supra, and cases cited therein, including Koon v. United States, 518 U.S. 81, 116 S.Ct. 2935 (1996), and United States v. Wilke, 156 F.3d 749 (7th Cir. 1998).

I am under Special Administrative Measures (SAM's) restrictions and apparently will continue to be under these restrictions for the indefinite future. These restrictions make the conditions of my confinement extraordinarily harsh compared with that of other inmates. Other inmates get visits more often, get contact visits, more phone calls, read daily newspapers, and in general population get to play board games, watch television, etc.

In contrast, I am locked in my cell 23 hours a day in solitary confinement. I am not allowed to speak to other inmates. I am not allowed to read current newspapers or magazines. I have no television. I am only allowed visits from my immediate family, and I am not allowed contact visits. I am not allowed to speak to the press. I am allowed to speak on the telephone only with my immediate family members, and only for 15 minutes a week. I am allowed one two hour non-contact visit from them every two weeks. Further, if anyone I write posts my letter on the Internet without my knowledge, they are forever banned from

writing me again.  I have lost contact with numerous friends
this way.

When my parents pass on, who will I have to talk and visit
with?  My wife and I are estranged and she has refused contact
with me.  My two older brothers are emotionally distant.  My
brother David is a convicted felon and I fear that I will not
be allowed because of this to communicate with him.  This is
all the family that I have.  I have lived with the SAM's
restrictions for 19 months but it feels more like 5 years.

I have heard that there is a possibility that I could be
sent to an underground facility in Colorado, a place where
I would never get to see the sun, feel the wind, or breathe
fresh air.  These things, this type of treatment, can and
probably would, destroy me.  Nor do I forsee the Attorney
General lifting the SAM's anytime soon.  Many years under
under such conditions would be unbearable.

When creating the sentencing range, the Commission did not
anticipate a person serving their sentence under such conditions.
For example, serving 78 months without such onerous conditions
is certainly different from serving 78 months with such onerous
conditions. Thus a downward departure is warranted.  Otherwise,
I would be punished disparately.  If the government wants to
hold me under the SAM's--conditions profoundly more psycholog-
ically severe than the norm--it shouldn't be able to get a nor-
mal sentence.

While the following case deals with deportable alien status,
United States v. Bautista, 258 F.3d 602, addresses collateral
incarceration penalties as are present here.  Certainly my

having Special Administrative Measures imposed upon me should be defined as "collateral incarceration penalties." (page 25)

I thus request a downward departure from the otherwise applicable sentencing range due to the extraordinary conditions of my confinement.

VI.  Why the government's position that there should be upward departures is legally, and factually in error. (page 25)

The government's position that an upward departuee is warranted based on sec. 3B1.3, Abuse of a Position of Trust is legally barred by Blakely and Booker because there was no jury finding. However, even if this were not the law, it would be factually inappropriate in this case.  The idea that I abused my position as a minister and as someone with legal training is absolutely absurd.  The evidence in this case shows clearly that I told Evola that I was his minister because I was and that I told him that I wouldn't be telling anyone of his plans because of his expectation that our conversation would be confidential.  The government cannot have its agents urge people to not tell people about their communications and then increase their sentence for indeed keeping the communications confidential.  I am indeed a minister and as a minister, I keep confidences confidential. Period.  The government should not be able to successfully increase my sentence because of my minister status and indeed, this may be prohibited by U.S.S.G. SH1.10.  It is Evola who abused his position as the head of my security. Evola repeatedly told me not to tell anyone about what we spoke about.  How the government can turn these facts upside down with a straight face is beyond me.

14

Nor is the government's legal training argument for upward departure well founded since it doesn't take any legal skill to be cautious about what one says. Nor is there any evidence at all that I "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Thus section 3B1.1(a) is factually inappropriate as well.

As for an upward departure pursuant to sec. 3A1.2, Application Note 5, as with the others, it is legally barred by <u>Blakely</u> and <u>Booker</u>. It is further factually inappropriate because there was no evidence at all that my alleged crime was motivated by Judge Lefkow's <u>status</u> as a judge, which is required by the guideline.

In conclusion, there was no jury finding allowing any of the upward departures the government seeks. Further, there is no evidence supporting the imposition of these upward departures. Thus my sentencing range remains 78 to 97 months not counting the downward departures I have requested.

VII. Other corrections (not including my denial of guilt on my convictions) to the Presentence Investigation Report.

<u>page 9, lines 298-314</u> The idea posited by FBI agent Sara Lopez that Evola never initiated discussions about harming someone is absolutely preposterous. See the transcripts attached to my <u>Supplemental Memorandum to Defendant's Version</u>. It is further untrue that <u>I</u> ever initiated such discussions with Evola.

<u>page 10, lines 315-318</u> Evola was talking about a <u>lawyer</u> on December 5, 2002 and <u>not</u> Judge Lefkow. The FBI deliberately tried to conceal this fact by inserting a comma between "lawyer"

15

and "rat" in its transcript.

page 10, lines 319-321  As far as "manipulation" is concerned, I
learned on October 26, 2004 during a visit with my parents that
government witness James Burnett asked my brother David Hale to
tell my father that he was sorry for testifying at my trial and
that he simply said (falsely) what the FBI wanted him to say out
of fear.  I submit that it is the FBI that has been doing the
manipulating, not me.

page 16, line 500  Just for clarification, the flag I set fire
to was not an American flag.

page 17, lines 522-524  The police officer had ordered me into
the back of his squad car and proceeded to ask me questions.  When
I asked to see an attorney, he told me that I had no right to one
and that I had to answer his questions.  He didn't give me my
Miranda rights.  After 30 minutes in his squad car telling him
that I didn't want to answer, I finally told him that I didn't
know if my brother had a gun or not.  I was then arrested for
Obstruction of Justice.  The appellate court naturally and rightly
threw out my conviction in a unanimous decision.

page 19, line 570  I actually lived off campus.

page 19, lines 572-576  The Character and Fitness Committee of the
Illinois Bar claimed that my religious and political beliefs would
interfere with my ethical practice of law.  I totally disagree and
note that when I worked in Champaign, Illinois, I dealt with the
firm's nonwhite clients and had no problem doing so at all.  I
have been and will continue to follow the law and whatever rules
bind my conduct.

page 19, line 579  Peggy's daughters were from her previous

marriage.

page 20, lines 622-624  It is untrue that my better spirits was
due to the Blakely and Booker decisions.  Instead, I felt, and
feel, that justice will be done and the solicitation conviction
will be thrown out and I will be vindicated as the innocent man
that I am.

page 22, lines 676-677  $6000 of the $6150 is not actually my
money but comprises--so my former counsel Timothy Murphy told
me--a trust for purposes of my defense only.  I only own ~~possess~~
approximately $150, if that.  My father has provided my upkeep
since my arrest.

   I have tried to address the Presentence Investigation Report
as thoroughly as possible in the time allotted to me (I only
received it on November 2nd)and hope that I have made my case
well for a sentence falling within the 78 to 97 range not
counting the downward departures I have requested.  I thank
the Court for its consideration. As the Court is aware, the
difference between 78-97 months and life is stark indeed.

                              Respectfully submitted,


                              Matthew Hale


Dated November 4, 2004

Addendum:   I wish to note that the Offense Level for Obstruction
            of Justice was 12, not 14, when my alleged crimes took
            place.
            Also, there were many clerical errors in the typed
            version of my version of the offense not present in the
            handwritten originals.

                              17

$66,991, one-half of the government's estimate. Def. Supp. Br. at 14.

**Conclusion.** For the foregoing reasons, Arnaout's objections to the loss calculations for Chechen hand and foot warmers and storage items donated to the Bosnian army are sustained in part. The loss attributed to the fraud totals $315,624 [$248,-633 + $66,991] and results in the addition of 12 levels to the sentencing guideline calculations.

## II. Terrorism enhancement

### Application of § 3A1.4.

Arnaout does not stand convicted of a terrorism offense. Nor does the record reflect that he attempted, participated in, or conspired to commit any act of terrorism. In its written plea agreement, the government agreed to dismiss sensational and highly publicized charges of providing material support to terrorists and terrorist organizations. Nevertheless, the presentence report applies the terrorism enhancement, § 3A1.4 of the sentencing guidelines. The terrorism guideline provides:

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase [the offense level] by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category . . . shall be Category VI.

U.S.S.G. § 3A1.4 [Emphasis in original]. Application of the terrorism guideline would not only require imposition of the statutory maximum sentence (20 years), but it would also place Arnaout in the

highest criminal history category even though he has no prior arrests or convictions. Based on his actual criminal history, Arnaout falls in Category I.[4]

The terrorism enhancement in its present form is a relatively new guideline, promulgated by the United Sentencing Commission as an emergency amendment in November 1996. Sentencing Guidelines, Appendix C, Amendment 539. The amendment responded to a congressional directive that the existing international terrorism guideline be defined more broadly to include **only** federal crimes of terrorism. Antiterrorism and Effective Death Penalty Act of 1996 § 730, Pub.L. 104–132, 110 Stat. 1303.

As reflected in Application Note 1 of § 3A1.4, federal crimes of terrorism are defined and identified by statute. Specifically, 18 U.S.C. § 2332(b)(g)(5) defines a federal crime of terrorism as an offense "calculated to influence or affect conduct of government by intimidation or coercion, or to retaliate against government conduct." In addition, the offense must be a violation of one of a list of specified offenses: destruction of aircraft or aircraft facilities; violence at international airports; arson within special maritime and territorial jurisdiction; biological weapons; chemical weapons; congressional, cabinet, and Supreme Court assassination and kidnaping; nuclear materials; plastic explosives; arson and bombing of Government property risking or causing death; arson and bombing of property used in interstate commerce; killing or attempted killing during an attack on a Federal facility with a dangerous weapon; conspiracy to murder, kidnap, or maim persons abroad; protection of computers; killing or attempted

---

3. The court notes that adopting the government's full $133,982 estimate would not change this result.

4. A prisoner's criminal history category has a direct effect on the designation of the facility by the Bureau of Prisons and the conditions of his incarceration.

A

killing of officers and employees of the United States; murder or manslaughter of foreign officials, official guests or internationally protected persons; hostage taking; destruction of communication lines, stations, or systems; injury to buildings or property within the special maritime and territorial jurisdiction of the United States; destruction of an energy facility; Presidential and Presidential staff assassination and kidnaping; wrecking trains; terrorist attacks and other acts of violence against mass transportation systems; destruction of national defense materials, premises, or utilities; violence against maritime navigation and fixed platforms; homicides and other violence against United States nationals occurring outside the United States; use of weapons of mass destruction; acts of terrorism transcending national boundaries; bombing of public places and facilities; harboring terrorists; providing material support to terrorists or terrorist organizations; financing of terrorism; torture; sabotage of nuclear facilities or fuel; aircraft piracy; assault on a flight crew with a dangerous weapon; explosive or incendiary devices, or endangerment of human life by means of weapons, on aircraft; homicide or attempted homicide on aircraft; and destruction of interstate gas or hazardous liquid pipeline facility.

In sum, Congress has specifically and exhaustively identified criminal offenses that constitute federal crimes of terrorism. Those specifications control application of § 3A1.4. Further, Congress clearly intended the revised terrorism guideline to be "applicable only to those specifically listed federal crimes of terrorism, **upon conviction of those crimes** with the necessary motivational element to be established at the sentencing phase of the prosecution." Conference Report on S.735, 142 Cong. Rec. H. 3305–01, § 730, Directions to Sentencing Commission [Emphasis added].

Arnaout stands convicted of conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d). Arnaout's offense is not included in the exhaustive list of federal offenses defined by Congress as terrorism crimes. The enabling legislation and § 3A1.4 plainly preclude application of the terrorism enhancement to the racketeering fraud conspiracy offense of conviction. Nonetheless, the government argues that the crime of conviction need not be enumerated in 18 U.S.C. § 2332b(g)(5) because the Sentencing Commission's use of the phrase "a felony that involved, or was intended to promote, a federal crime of terrorism" in § 3A1.4 should be read to expand application beyond the congressional directive that the enhancement shall apply only to federal crimes of terrorism. The government relies on a decision of another Circuit to support its interpretation. *United States v. Graham,* 275 F.3d 490, 517 (6th Cir.2001). In *Graham,* the terrorism enhancement was applied to a conviction for conspiracy to possess machine guns, threaten to assault and murder federal officers and employees, to forcibly assault, resist, oppose, impede, intimidate and interfere with federal officers when they were engaged in their official duties, and to maliciously damage and destroy and attempt to damage and destroy by means of an explosive a building, or other real or personal property used in interstate commerce. *Id.* at 515. Even though conspiracy offenses under 18 U.S.C. § 371 are not included in the statutory list of federal crimes of terrorism, some of Graham's predicate offenses and offense behavior are virtually identical to listed crimes of terrorism. *Id.* at 515–16. A majority of a divided appellate panel agreed with the district court's conclusion that the nature of Graham's conspiracy conviction was sufficiently analogous to the terrorist acts listed in § 2332b(g)(5). In the specific context of the *Graham* case, the majority

concluded that the objects of th0 offense of conviction—conspiracy—constituted federal crimes of terrorism, and the terrorism enhancement could be applied on that basis. *Id.* at 518–19. A vigorous dissent found application of the terrorism enhancement unsupportable on the record and under the clear terms of § 2332b(g)(5) and its legislative history. *Id.* at 528–37.

[4] The divided *Graham* opinion is neither binding authority on this court nor factually analogous to this case. Even if this court followed the majority's questionable redrafting of § 2332b(g)(5), the racketeering fraud conspiracy offense of conviction is not predicated on any terrorist conduct enumerated in that statute. The government has not established that the Bosnian and Chechen recipients of BIF aid were engaged in a federal crime of terrorism, nor that Arnaout intended the donated boots, uniforms, blankets, tents, x-ray machine, ambulances, nylon, and walkie-talkies to be used to promote a federal crime of terrorism.

Moreover, it should be noted that the phrase "involved, or was intended to promote" in § 3A1.4 was carried over *verbatim* from the original international terrorism guideline. The phrase is repeated in the revised guideline without any explanation or comment in the application notes or even acknowledgment that the enhancement was to apply only to 'federal crimes of terrorism. Indeed, all the Sentencing Commission did to comply with the congressional mandate was to change the phrase "international terrorism" to "federal crime of terrorism." Even if it is inferred that the Sentencing Commission intended to expand application of the terrorism enhancement to conduct beyond the offense of conviction, the Sentencing Commission lacks authority to preempt the specific directives of Congress. *United States v. LaBonte,* 520 U.S. 751, 757, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997).

Finally, in 2002, the Sentencing Commission obviated any ambiguity about § 3A1.4's use of the phrase in issue by striking Application Note 1 containing the "involved, or was intended to promote" language and inserted in its place the following:

'Federal Crime of Terrorism' Defined.— For purposes of this guideline, 'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5).

Accordingly, the court concludes that § 3A1.4 does not apply to a racketeering offense because it is not a federal crime of terrorism as defined by § 2332b(g)(5).

## Obstruction of Justice

Alternatively, the government invokes Application Note 2 as a basis for applying § 3A1.4 because Arnaout's relevant conduct includes obstruction of justice. At the June 16th sentencing hearing, the court determined that a two-level enhancement under § 3C1.1 for attempted obstruction of justice applied, based on two declarations under penalty of perjury Arnaout signed and filed in *Benevolence International Foundation, Inc., v. John Ashcroft, et al.,* 02 C 0763 (Judge Alesia). GX 15, Declaration of Enaam Arnaout executed March 22, 2002; GX 16, Corrected Declaration of Enaam Arnaout executed April 1, 2002. The two declarations are identical in all material respects. Arnaout's declarations were submitted in support of BIF's motion for a preliminary injunction seeking release of BIF assets frozen by the government several months earlier under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–06. This legislation empowers the Department of the Treasury to take such action against persons or groups who plan, authorize, aid or engage in hostilities or attacks *against the United States.*

# AFFIDAVIT OF REVEREND CHRISTOPHER LEE PETERSON

Under penalty of perjury, I swear that the following is true to the best of my knowledge and belief:

1. That I was a member of what was formally called the World Church of the Creator.

2. That I was the State Leader of Wisconsin for that church.

3. That I was the successful litigant in Peterson v. Wilmur Communications Co. Inc., 205 F. Supp.1014, a case that recognized my religion, Creativity, as a bona fide religion for purposes of Title VII of the Civil Rights Act of 1964.

4. That I have known Reverend Matthew Hale for seven years and have had numerous conversations and E-mails with him during this time.

5. That never since I have known Reverend Matthew Hale has he ever advocated or encouraged the commission of a crime.

6. That he has never, specifically, advocated or encouraged an act of violence.

7. That Reverend Matthew Hale is absolutely committed to legal and peaceful change.

8. That when the Ben Smith shootings occurred, Reverend Matthew Hale told me specifically that Ben Smith's acts were not only a surprise, but a blow to the reputation of our church.

9. That Reverend Matthew Hale told me that the church's position on the shootings was that we condemn them, but not Ben Smith personally.

10. That as a minister in the church, I am extremely familiar with Nature's Eternal Religion and The White Man's Bible, two Bibles of our Creativity religion, and have studied the teachings contained within these books extensively.

11. That no where in these Bibles or any other Bibles of our faith is there any advocacy of violence if our Constitutional Rights are taken away.

12. That our teachings make clear that we only advocate violence in self-defense if violence is used against us to take away our Constitutional Rights.

13. That I was one of the recipients of an E-mail from Reverend Matthew Hale on 11/29/02 entitled "Absolutely Confidential", my E-mail address being "crevpeterson@hotmail.com"

14. That this E-mail contained an article written by Reverend Matthew Hale entitled "Rigged Court System Declares War on Church".

*B*

15. That while it's true that Reverend Matthew Hale wrote that the described court order put "our Church in a state of war with this federal judge" and later quoted from The White Man's Bible, I certainly did not take it as a "solicitation" to murder Judge Lefkow or anyone else.

16. That the article made clear, in my judgement, that the "war" was against our Church and that it was not against Judge Lefkow or anyone else.

17. That the passage from The White Man's Bible quoted in the article deals simply with self-defense from violence from the government should it commit violence against us to stop us from exercising our Constitutional Rights.

18. That Reverend Matthew Hale told me in November 2002 at a rally our Church held in Milwaukee, Wisconsin that he didn't trust Tony Evola and told me a few days before his arrest on January 8, 2003 that Tony Evola was probably indeed a spy of some kind, after we discussed the possibility of this in the summer of 2002 at a rally in East Peoria, Illinois.

19. That Reverend Matthew Hale routinely used the word "war" in a non-violent context.

20. That I have never interpreted any of Reverend Matthew Hale's speeches, talks, or writings as a call for violence.

21. That Reverend Matthew Hale routinely used militant language and has told me that he did this to get media attention for our Church and rally our adherents.

22. That I was slated as a witness at Reverend Matthew Hale's trial, would have testified to all of these matters if called, and will testify to them if called in the future.

Further, affiant sayeth not.

Signed and sworn on this 23 Day of July, 2004

State: Wisconsin
County: Milwaukee

exp 06 07 07

_____
Reverend Christopher Lee Peterson