# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James T. Moody | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 CR 11 | **DATE** | 11/10/2004 |
| **CASE TITLE** | US vs. Matthew Hale | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM AND ORDER:** This is a case involving an intelligent, educated defendant who tried to walk a very fine line, soliciting another person to commit a crime of violence but doing so in terms designed to make it appear that he was only discussing abstract philosophical concepts. For the reasons explained above, there was sufficient evidence for a reasonable jury to conclude, beyond a reasonable doubt, that those efforts at subterfuge failed and that the line was crossed. Hale's motion (Doc 207-1 & 207-2) for a judgment of acquittal is denied, except as to Count Five of the indictment, as to which count the motion is granted. Hale's motion (Doc 207-3) for a new trial is denied in all respects.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

SCT   courtroom deputy's initials

NOV 17 2004

date docketed

11/16/2004
date mailed notice

U.S. DISTRICT COURT
CLERK

2004 NOV 16  AM 11:49

FILED-DITE

Date/time received in central Clerk's Office

**Document Number**

249

SCT

mailing deputy initials

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA,    )
       Plaintiff,    )
       )
       v.    )    **No. 03 CR 11**
       )
MATTHEW HALE,    )
       Defendant.    )

*DOCKETED*
*NOV 1 7 2004*

## MEMORANDUM AND ORDER

On April 26, 2004, a jury found defendant Matthew Hale guilty of three counts of

obstruction of justice in violation of 18 U.S.C. § 1503, and one count of solicitation to

commit a crime of violence in violation of 18 U.S.C. § 373. On June 24, 2004, within a

sixty-day extension granted by the court, Hale filed a timely motion for a judgment of

acquittal pursuant to FED. R. CRIM. P. 29(c), or alternatively for a new trial pursuant to

FED. R. CRIM. P. 33. The motion is supported by a memorandum,[1] the government has

filed a responsive memorandum (docket # 223, hereinafter, "Government's Response")

and Hale has filed a reply memorandum (docket # 228, hereinafter "Defendant's

Reply").[2] For the reasons that follow, with the exception of Hale's motion for a

---

[1] The motion and supporting memorandum are an integrated document (docket
# 207), and will be referred to herein simply as "Defendant's Motion." The pages of
Defendant's Motion were not numbered. The court has assigned numbers to the pages
for ease of citation.

[2] In addition, Hale filed supplemental transcript excerpts supporting his motion.
(docket # 238). The court has taken that filing, and the government's response thereto
(docket # 243), into consideration. Hale also filed motions requesting an evidentiary
hearing (docket # 226) and oral argument (docket # 225). Because the court believes that
an "evidentiary" hearing is unwarranted, and neither hearing would be helpful, both
motions are **DENIED**.

judgment of acquittal on Count Five, the court will deny Defendant's Motion in all respects.

The court may grant a motion for a judgment of acquittal only if, when the evidence is considered in the light most favorable to the government, no reasonable jury could find guilt. *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). The standard for granting a new trial is more liberal, but less well-defined, allowing the court to weigh the evidence and act in the interests of justice. A new trial may be ordered if the "verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses." *Id.; United States v. Alanis*, 265 F.3d 576, 590 n. 8 (7th Cir. 2001).

*Motion for a Judgment of Acquittal*

As to each of the four counts on which he was convicted, Hale argues that the government did not introduce sufficient evidence from which a reasonable jury could find him guilty beyond a reasonable doubt. The Court of Appeals has frequently stated that a defendant making this argument faces an "uphill battle" and bears a "heavy burden." *United States v. Wallace*, 212 F.3d 1000, 1003 (7th Cir. 2000); *see also United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001); *United States v. Angle*, 234 F.3d 326, 339 (7th Cir. 2000). "The test is whether, when the evidence is viewed in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Gardner*, 238 F.3d at 879 (*citing Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

2

*Count One*

Count One of the indictment charged that Hale endeavored to obstruct justice in violation of 18 U.S.C. § 1503 by sending United States District Judge Joan H. Lefkow a letter containing a false statement pertaining to a lawsuit pending before her. In that suit, the World Church of the Creator (hereinafter, "World Church" or "Church") — an organization to which Hale belonged and at the pertinent times headed — was the defendant in a trademark infringement suit brought by a church with a similar name. Judge Lefkow had entered an order requiring the World Church and its members, officers, directors and so on to "deliver up for destruction (or, where feasible, removal or obliteration of any infringing mark from) all" materials bearing the various World Church marks that had been found to constitute infringements.

Count One of the indictment charged Hale with obstructing justice by sending a letter dated December 12, 2002, to Judge Lefkow which stated, as is pertinent here, "from my understanding of the Court's order, I have no material in my control or possession that falls afoul of it," when, at that time, Hale had at least 97 publications with the term "Church of the Creator" in his possession and control. The publications had been found in a search of the headquarters of the World Church, located in Hale's residence, conducted by the FBI on January 8, 2003.

Hale argues that because compliance with Judge Lefkow's order could have been achieved by simply obliterating, or masking out, the term "Church of the Creator" on the various documents, and because the government did not offer any evidence

3

showing that Hale did not intend to do so, the letter contained no falsehood: it simply reflected "opting for the most reasonable way to comply." Defendant's Motion at 5. While it is true that such action would have complied with the order, the fact remains that the letter contained a literal falsehood: at the time of writing, Hale had neither "delivered up" the materials for destruction or for removal or obliteration of the offending marks, nor had he taken steps to do so himself. The fact that he may have had an intent to do so at some unknown point in the future is irrelevant to the truth or falsity of the statement in the letter. It should also be noted that Judge Lefkow's order required the Church to file a report explaining how compliance would be achieved, and no report detailing Hale's supposed plan was filed. Vol. 4 at 62, 67-68.[3]

Moreover, witness James Burnett, who at the relevant time was a "Creator," the term used to describe a member of the World Church, and part of Hale's inner circle, testified that he had heard Hale discuss the trademark lawsuit and remark "[t]hat he would not hand over any books, that he would have them shipped out to another state." Vol. 5 at 20. Witness Jon Fox, another World Church insider, testified that just before Thanksgiving in 2002 Hale told Fox that Hale had received Judge Lefkow's order, it required the World Church to deliver its books up for destruction, and that he would not comply. Vol. 5 at 108-111. There was more evidence bearing on this issue,[4]

---

[3] All citations in the format of Vol. # at # are to the transcript of trial filed with the clerk of the court.

[4] For example, throughout a November 29, 2002, e-mail to World Church members, Hale reiterated that Judge Lefkow had ordered the books to be destroyed,

4

but as will be true throughout this order, the court, rather than exhaustively addressing it, stops here because this evidence alone is sufficient to allow a reasonable jury to find[5] that the statement in the letter was false.[6]

Next, Hale argues that, even if false, the government did not prove that Hale acted knowingly, as is required for him to be guilty, that is, that there is no proof that Hale knew the statement was false when he made it. According to Hale, the opposite is shown by the fact that the government's own witness, James Amend (the attorney representing the plaintiff in the trademark suit), testified that Hale could have complied with the order by obliterating or masking out the offending marks, and so Hale cannot

_____

e.g., "How the ashes of our Holy Books are supposed to be magically restored to their original state in the event of a victory before the Supreme Court, no one bothers to explain." Whether or not Hale understood that the books did not have to be destroyed, it appears that he took the public position that the books had to be destroyed, perhaps as a means of inflaming the passions of Church members against the government in general and Judge Lefkow in particular. See n. 7 below at p. 6.

[5] References in this order to the jury "finding," "concluding," "determining" and so on should be understood to mean by the appropriate standard, that is, beyond a reasonable doubt.

[6] In Defendant's Reply, Hale makes a new argument: that the government offered no evidence that he possessed the materials on the date he wrote the letter, so no rational jury could find beyond a reasonable doubt that the statement was false when made. Arguments raised for the first time in a reply brief are, as a general rule, not considered, and that seems especially appropriate where to do so would provide a back door to the time limits imposed by Fed. R. Crim. P. 29(c)(1) & 45(b)(2). *Cf. United States v. Holt*, 170 F.3d 698, 703 (7th Cir. 1999). In any event, a reasonable jury could infer that ordinary World Church materials in Hale's possession on January 8, 2004, had been in his control or possession only three weeks earlier. Moreover, at trial, the defense made a proffer of Hale's testimony on this issue, which was that some, but not all, of the materials, came into his possession after he wrote the letter to Judge Lefkow but before the search was conducted. Vol. 10 at 38.

5

be faulted for thinking that he could retain the materials in his possession, while assuring Judge Lefkow that he was in compliance, as long as he intended to take the proper steps in the future. Hale amplifies this argument in Defendant's Reply by noting that he told Judge Lefkow that from his "understanding" of the order he was in compliance, and "as a matter of common sense," that qualification means that he really didn't know whether or not he was in compliance, so "[c]ontained within the sentence itself is reasonable doubt and no rational jury could find beyond a reasonable doubt to the contrary." Defendant's Reply at 23.

Obviously, this argument is slight variation of the first, the difference being its focus on Hale's state of mind rather than the objective truth or falsity of the statement: because Hale *could* have believed the statement was true, no reasonable jury could find beyond a reasonable doubt that Hale knowingly told a falsehood. However, all of the evidence the jury heard painted a picture of Hale — whom the jury knew to be a law school graduate — as a person who chose his words carefully and cleverly. In addition, the jury heard Jon Fox testify that on January 7, 2003, the day before the materials were seized, Fox was helping Hale pack up documents that Hale wanted to safeguard from seizure. When Fox asked whether to pack up the materials in question, Hale told him not to because they "might as well leave a few things to be confiscated."[7] Vol. 5 at 143.

---

[7] This raises an obvious question: why would Hale tell Judge Lefkow that no infringing materials were in his possession, then intentionally leave some to be found? A reasonable jury could make two inferences. First, that Hale didn't want it to be obvious that many documents had been hidden from seizure. Second, that Hale, whom all the evidence in the case showed was a person who took advantage of every

Thus, a reasonable jury could have found that Hale, by qualifying his statement to Judge Lefkow on his "understanding" of her order, made a calculated attempt to be able to disclaim responsibility later, just as he now does. In fact, considering the letter as a whole, in the context of Hale's statements about the trademark litigation and the suggestion that he could have easily obliterated the infringing marks, the court believes that a reasonable jury could infer that Hale had no reason to even bother to mention to Judge Lefkow that he had no non-complying materials in his possession *other* than for the purpose of misleading her.[8] In short, viewing the evidence in the light most favorable to the government, a reasonable jury could find that Hale's statement to Judge Lefkow was made with knowledge of its falsity.

Hale's final argument on Count One is that the evidence was insufficient to show that he had the necessary corrupt intent; that is, even if the statement in the letter to Judge Lefkow was a "knowing misrepresentation, the government still offered precious

_____

opportunity to arouse the passions of World Church members, saw this as a perfect opportunity to do so in that he would be able to claim that the "Jewish Occupational Government" — a favorite World Church term — had seized the holy books of the World Church in order to destroy them.

[8] In Defendant's Reply, Hale makes another new argument (see n. 6 above at p. 5 as to the propriety of new arguments). Hale's argument is that because Judge Lefkow never read the letter and did not have it filed with the clerk, the letter had no more "reasonable tendency to influence, obstruct or impede the due administration of justice" than if he had mailed it to himself. Defendant's Reply at 26. Hale did not mail the letter to himself, however, he mailed it to Judge Lefkow, and the fact that she never read it (or by the time of trial could not recall if she had) is a happenstance. A reasonable jury could conclude that a letter mailed to a federal judge containing a falsehood would have a reasonable tendency to obstruct justice.

little evidence that could tend to show any reasonable person that Defendant acted with the purpose of obstructing justice." Defendant's Motion at 9. As noted above, the jury heard evidence that Hale had stated to World Church members that he had no intention of complying with the order and would ship books out of state rather than turning them over. A reasonable jury could conclude that Hale made the statement in the letter to Judge Lefkow with the necessary corrupt intent.

*Count Two*

Count Two of the indictment charged Hale with solicitation to commit a crime of violence in violation of 18 U.S.C. § 373, that is, that Hale solicited government informant Tony Evola to murder Judge Lefkow. Paraphrasing the elements in simple terms, in order to find Hale guilty of that charge, the jury was required to find beyond a reasonable doubt that Hale intended, under circumstances strongly corroborative of his intent, for Tony Evola to commit a felony involving the use or threatened use of force against Judge Lefkow, and that Hale solicited, commanded, induced or otherwise endeavored to persuade Evola to commit that felony.

First, Hale argues that the government offered insufficient evidence—in fact, no evidence—of circumstances strongly corroborative of his intent. On this element the parties requested, and the court gave, the jury an instruction (Court's Instruction No. 19A) patterned after Congress's specific examples of strongly corroborative

circumstances, as discussed in *United States v. Gabriel*, 810 F.2d 627, 635 (7th Cir. 1987).[9] The instruction concluded with the statement that the "surrounding circumstances in general must indicate that the solicitor is serious that the person solicited actually carry out the crime." The surrounding circumstances in this case easily make this showing.

First, Hale sent an e-mail to all World Church members informing them of the order entered by Judge Lefkow, stating that the order placed the Church in a state of war with her, and quoting a passage from the *White Man's Bible* (one of the Church's "holy books"); that this allowed members to take "the law into our own hands" and "meet force with force and open warfare exists." E-mail dated 11/29/02.[10] A few days later Hale sent an e-mail to Evola only, providing Judge Lefkow's name and office

---

[9] The circumstances include, *but are not limited to*: (1) offering or promising payment or some other benefit to the person solicited if he would commit the offense; (2) threatening harm or some other detriment to the person solicited if he would not commit the offense; (3) repeatedly soliciting the commission of the offense; (4) holding forth at length in soliciting the commission of the offense, or making express protestations of seriousness in soliciting the commission of the offense; (5) believing or being aware that the person solicited had previously committed similar offenses; and (6) acquiring weapons, tools or information suited for use by the person solicited in commission of the offense, or making other apparent preparations for the commission of the offense by the person solicited. S.Rep. No. 307, 97th Cong., 1st Sess. 183 (1982). Similar to its feelings regarding the giving of Court's Instruction # 19A, the court reluctantly lists the circumstances here, because the parties' emphasis on them tends to make them exclusive rather than illustrative. The circumstances listed are neither exclusive nor conclusive and serve only as guidance on the issue of intent; whether there are strongly corroborating circumstances is an issue of fact for the jury to decide. *Gabriel*, 810 F.2d at 635, & n. 5.

[10] For the various e-mail copies, tape recordings and video tapes admitted during the case-in-chief, the government used a numbering scheme based on the date of the item. Therefore, for simplicity the court identifies the exhibits by date throughout this order.

address (and of the attorneys representing the plaintiff in the trademark suit), and

asking Evola to obtain each person's home address. The e-mail then stated: "Any action

of any kind against those seeking to destroy our religious liberties is entirely up to each

and every Creator according to the dictates of his own conscience."[11] E-mail dated

12/04/02.

The following day Evola went to Hale's residence and told him that Evola had

received the "e-mail about the Jew judge . . . you wanting his address and the other

rats." Hale responded: "That information, yes, for educational purposes *and for whatever*

*reason you wish it to be*."[12] Recorded conversation of 12/05/02. Besides being a not-too-

subtle hint that Evola — the head of the "White Berets," the security force for the World

Church — should think about doing more than sending the Judge a greeting card, one of

the corroborating circumstances listed by Congress is acquiring information suited for

use by the person being solicited, and providing Judge Lefkow's name and office

address to Evola generally falls within that category.[13]

---

[11] Part of Hale's defense has been to maintain that Hale's quotation of the *White Man's Bible* and other Church doctrine is simply rhetoric not meant to be exhortation to action. A reasonable jury is certainly entitled to conclude, however, that these passages were not chosen at random and do shed light on Hale's intent.

[12] The italics are the court's emphasis and not meant to suggest that Hale emphasized this phrase when speaking.

[13] On this point, Hale argues that the surveillance tapes show that he had asked for, and provided, many other persons' addresses but never sought to have them murdered: "In fact, when Evola sought Defendant's imprimatur to murder Ken Dippold, Pat Langeballe and Dan Hasset, Defendant, despite knowing the addresses of these people, tells Evola in no uncertain terms that he is not interested in having anyone

Continuing with the conversation of 12/05/02, Evola stated that he had a way of "getting it" — which a jury could reasonably understand to mean the home address of the "Jew judge" — and asked, "when we get it, we gonna exterminate the rat?" Hale's response was "well, whatever you wanna do . . . I'm gonna fight within the law and but, ah, that information's been pro-, provided. If you wish to, ah, do anything yourself, you can, you know?" Evola answers "OK" and Hale states "So that makes it clear." Evola then says, "Consider it done" and Hale replies "Good." In conjunction with the earlier e-mails and other parts of the conversation, Hale's statement to Evola that if he "wish[ed] to do anything" himself, he could, was at least the fourth reminder to Evola that he could take action against Lefkow.

Even children understand the tactic of encouraging others to take action through passive exhortation: "Mom said we shouldn't get in the cookie jar. *I'm* not going to get in the cookie jar, but if *you* want to get in the cookie jar, that's up to you." A reasonable jury could find that Hale's repeated[14] reminders that Evola could take action if he wished were repeated solicitations for Evola to commit the offense, and repeated

---

killed." Defendant's Motion at 16. As the government points out, and as is noted below, Hale's failure to tell Evola "in no uncertain terms" that he is not interested in having Judge Lefkow killed is itself a circumstance corroborative of Hale's intent.

[14] The court has not reiterated all of them in this order. To provide only one more example, on December 17, 2002, Evola and Hale met in person and Evola told Hale that the plan to exterminate the rat was in motion. At least twice during that conversation Hale told Evola that, while Hale wasn't telling him to do anything, "whatever a person does is according to the dictates of their own conscience" and that "whatever a person wants to do, that's their own decision."

solicitation of the offense is another of the examples given by Congress of a strongly corroborating circumstance.

This is particularly true where, after Evola said "[c]onsider it done," Hale replied, "[g]ood." Instead of saying "you have misunderstood me," or "I was only joking," this expression of approval for Evola's plans could reasonably be interpreted as an express protestation of seriousness by Hale, another of the specific factors listed by Congress. Adding to the gravity of the remark, only a few moments later Hale told Evola, "if something happens to me, then, you know, make sure that, that the world knows about it in a very strong way, you know." Evola asked "any special way," and Hale replied "just use your imagination." Interpreting these remarks in light of other evidence introduced showing that Hale had praised[15] the actions of Ben Smith, a World Church member who had gone on a shooting spree targeting minorities several years earlier, the jury could view this as further evidence that Hale truly intended for Evola to engage in violence.

While the evidence just summarized is enough, by itself, to allow a reasonable jury to find that the "surrounding circumstances in general . . . indicate that the solicitor is serious that the person solicited actually carry out the crime," there was

_____

[15] Although, as Hale points out, he also made public statements to the effect that Smith should have acted peacefully, his private criticism tells a different story. For example, Burnett testified that Hale stated that he wished that Smith had killed more "race traitors," a World Church term for, among other things, a white person who marries a Jew or person belonging to another race. Vol. 4 at 198. It appears that Hale may have considered Judge Lefkow to be a race traitor, as his e-mail asking Evola to obtain her home address described her as a "PROBABLE JEW OR MARRIED TO JEW."

other evidence. Another factor listed by Congress as an example of a strongly corroborating circumstance is the belief or knowledge that the person being solicited had previously committed similar offenses. While there is no evidence Hale had such knowledge as to Evola, Hale on several occasions did express confidence in Evola's loyalty, willingness and ability to carry out actions to further the World Church agenda.

For example, in a recorded conversation on May 24, 2002, Hale told Evola "I know damn well that if I were to tell you right now to go out and shoot the bastard [referring to a perceived enemy of the World Church] you would in a heartbeat." On another occasion, after Evola had suggested an act of violence against Ken Dippold, also thought to be an enemy of the Church, Hale told him "after dreaming about your idea for hours . . . I must veto it." E-mail dated 1-12-01 Both of these statements evince Hale's belief that Evola was willing and capable of carrying out violent acts, which is not much different than if Hale believed that Evola had committed similar offenses in the past — one of the specific examples given by Congress — and is a circumstance strongly corroborative of Hale's intent. Moreover, as the government points out, the latter statement shows that Hale believed he could direct Evola not to carry out plans of violence. Thus, his failure to tell Evola not to carry out plans of violence against Judge Lefkow is another circumstance corroborative of his intent.

The above is a brief summary of only some of the aspects of the evidence providing circumstances that corroborate Hale's intent. The evidence as a whole was

more than sufficient for a reasonable jury to conclude that circumstances strongly corroborative of Hale's intent existed.

Next, Hale argues that there is insufficient evidence from which the jury could conclude that the "rat" Evola talked about exterminating was understood by Hale to be Judge Lefkow. As noted above, on his visit to Hale the day after Hale's e-mail request for Judge Lefkow's address, Evola stated that he had received the "e-mail about the Jew judge . . . you wanting his address and the other rats" and seconds later asked "when we get it [the address], we gonna exterminate the rat?" Although Hale did not correct Evola's reference to "his"[16] address, Evola sent Hale an e-mail a week later stating that he had called the "exterminator" about the "rat problem" he and Hale had talked about: "You have to know where rats hide and he think[s] he located her. He is working to get rid of the femala [sic] rat right now." E-mail dated 12/09/02. On December 17, 2002, Evola again met with Hale in person. During that recorded conversation, Evola used

---

[16] The court has understood Hale to be arguing that because Evola said "his," a reasonable jury could not find that Hale understood Evola to be referring to Judge Lefkow. Because Hale had sent Evola an e-mail only the day before identifying the Judge as "Joan" Lefkow, a jury could reasonably conclude that Hale simply assumed that Evola had misspoken in the (feigned) heat of the moment and let it go without correction. However, in subsequent filings (seeking electronic analysis of the tape) to be addressed in a separate order, Hale states that the court has misunderstood: the issue is whether, instead of "other," Evola said "his address and all his rats." If so, Hale believes, Evola never called Judge Lefkow a "rat" and so Hale could not have believed the conversation about exterminating a rat to be about Judge Lefkow. Because Evola told Hale he had received the e-mail "about the Jew judge . . . wanting his address" and then asked "when we get it, we gonna exterminate the rat," a reasonable jury could find that Judge Lefkow was being discussed even if Evola did say "wanting his address and all his rats."

the phrases "she gotta go down" and "[i]t's not like I'm gonna do it and drop our flag on top of her." Judge Lefkow was the only female in Evola's list of "rats," and these are only a few examples of the evidence which was sufficient to allow a reasonable jury to find that Hale understood Evola to be discussing plans to kill Judge Lefkow.

Hale also argues that the government did not offer sufficient — or any — evidence that Hale solicited Evola to murder Judge Lefkow; rather, as Hale sees it, Evola solicited Hale, "repeatedly . . . bringing the subject up after Defendant had clearly expressed his lack of interest in Evola's plot." Defendant's Motion at 19. On this point, the court refers to the analogy above drawn to children discussing a cookie jar. After making it clear that a state of war existed between the World Church and Judge Lefkow, allowing members to take the law into their own hands, Hale repeatedly reminded Evola that any action Evola wanted to take against Judge Lefkow was entirely up to his own conscience. When Evola first advised Hale of his plan to "exterminate the rat" and said that Hale could "consider it done," rather than expressing concern or reluctance, Hale replied "good." Recorded conversation of 12/05/02.

On December 17, 2002, when Evola told Hale that the plan to exterminate the rat was in motion, Hale — after stating that they were only talking theoretically, that he was "not party to such a thing," and "in fact, don't know of such a thing" — said that if what he "surmise[d], without saying that I know anything" were true, "the shit's gonna really hit the fan." After comparing himself to the fictional character Sergeant Schultz (source of the pop-culture phrase "I know nothing") and telling Evola that the

15

information Evola was imparting was putting Hale in an awkward position, Hale, declaring that he wasn't telling Evola to do anything, also told him that "whatever a person does is according to the dictates of their own conscience" and that "whatever a person wants to do, that's their own decision." There is no doubt that, starting with the first e-mail declaring "war" on Judge Lefkow, and then by repeatedly advising Evola that any action he wanted to take against her was up to Evola's own conscience, a sufficient evidentiary basis exists from which a reasonable jury could find that Hale solicited Evola.[17]

Finally, Hale argues that the evidence was not sufficient to prove that Hale was not entrapped. Where an entrapment defense is properly raised, the government has the burden of proving, beyond a reasonable doubt, either that before contact with law enforcement agents the defendant had a predisposition to commit the offense, or that the defendant was not induced or persuaded to commit the offense by law enforcement agents. An entrapment defense is "properly raised" when a defendant identifies

---

[17] In Defendant's Reply, Hale argues that during this conversation he specifically told Evola that "this is too serious" and that he "didn't want it," meaning the murder of Judge Lefkow. The portion of the conversation Hale references, coming just after he reminded Evola that it was "not exactly wise to tell me [Hale] anything," is as follows: "I'm not gonna have anything done. I'm just . . . saying that whatever a person wants to do and I, I have to be, I just can't, this is too serious. I just can't ah, yeah, incredible. Anyway, I don't want anything, you know. I'm not a party of anything. . . . not encouraging anything, just . . . if they do something, that's their own business." A reasonable jury could interpret the "too serious" remark to mean "too serious for us to discuss like this," or "too serious for me to explicitly approve of," and the remark "I don't want anything" to be an effort to create what the government calls "plausible deniability," allowing Hale to later claim that his words did not direct Evola to do anything, contrary to the substance of the communication between them.

16

evidence sufficient to allow a reasonable jury to find that: 1) the government induced the defendant to commit the crime, and 2) the defendant was not predisposed to commit the offense. *United States v. Blassingame,* 197 F.3d 271, 279 (7th Cir. 1999).

Although the court thinks now that it is a very close question whether an entrapment instruction was even warranted, the court gave the jury Court's Instruction No. 20, stating that in deciding whether the government had met its burden, the jury could consider: 1) Hale's background; 2) whether law enforcement agents had first suggested the criminal activity; 3) whether Hale showed reluctance to perform criminal activity; 4) whether law enforcement agents repeatedly induced or persuaded Hale to perform criminal activity, and; 5) whether law enforcement agents offered exceptional persuasion or merely solicited the commission of a crime. The court instructed the jury that no single factor is dispositive: "the central question is whether the defendant showed reluctance to engage in criminal activity that was overcome by inducement or persuasion."

Hale's motion for a judgment of acquittal must be denied unless *no* rational jury could decide beyond a reasonable doubt that he was not entrapped. *United States v. Theodosopoulos,* 48 F.3d 1438, 1444 (7th Cir. 1995). This requires the court to focus on the two issues a jury must determine when a defendant presents an entrapment defense: "(1) whether the government induced the defendant to commit the crime, and, if so, (2) whether the defendant was predisposed to commit the offense." *United States v. Higham,* 98 F.3d 285, 290 (7th Cir.1996). Hale moves directly to predisposition, arguing

that his case has "parallels . . . [that] are stunning" with *Jacobson v. United States*, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed. 2d 174 (1992). Relying on his earlier argument that Evola solicited him, Hale argues that there is "not [sic] question that the government attempted to induce . . . [him] into committing a crime. Defendant's Motion at 22.

Although in the usual case involving an entrapment issue the "principal question" is the presence or absence of the defendant's predisposition to commit the crime, *see, e.g., United States v. Fiedeke*, 384 F.3d 407, 410 (7th Cir. 2004), Hale's focus here on predisposition, and corresponding reliance on *Jacobson*, is somewhat misplaced. *Jacobson* is markedly different from Hale's case because in *Jacobson* the government conceded that it had induced the commission of the crime. *Jacobson*, 503 U.S. at 549 n. 2, 112 S.Ct. 1540-41 n.2. In the present case inducement is hotly contested, and, unlike the usual case where the government induces the commission of a crime by, for example, offering to purchase contraband, the central question here revolves around whether Evola solicited Hale or Hale solicited Evola. Because, as was already explained above, there was sufficient evidence for the jury to conclude that Hale solicited Evola, Hale's assertion that there is "no question" that the government induced him is incorrect, and so his argument that no reasonable jury could find that he was not entrapped doesn't leave the starting gate.[18]

---

[18] Put another way, were the court to find that there was insufficient evidence that Hale solicited Evola, then Hale simply would be not guilty of the solicitation charge, and it would be unnecessary to consider the entrapment defense. This makes the present case, unlike the ordinary case where an entrapment defense is presented, something of an all-or-nothing proposition. To reason that the evidence would allow a

18

But even if the present case, like the entrapment paradigm, should be decided on the issue of predisposition—raising the "central question" whether Hale showed reluctance that was overcome by government inducement—not only does the court fail to see insufficient evidence of predisposition, the court fails to see any evidence that would allow a jury to find reluctance or a lack of predisposition on Hale's part. Hale argues that the jury had the following to consider: Hale's history of having committed no acts of violent crime;[19] the fact that law enforcement agents first suggested the crime; Hale's reluctance, expressed during his conversations with Evola, to commit the crime;

---

jury to conclude that Hale solicited Evola, but only because Evola induced Hale to solicit him, presents the logical equivalent of a dog chasing its own tail. It seems unlikely that any reasonable jury would ever arrive at such a labyrinthine conclusion.

[19] As the government points out, Hale's personal commission of violent crime (or lack thereof) is a somewhat different issue than whether he might encourage someone else to commit a violent offense. In addition, while *United States v. Hollingsworth*, 27 F.3d 1196 (7th Cir. 1994), in several instances emphasizes the relevance of a lack of criminal history to the issue of predisposition, *e.g.*, "[s]o far as it appears, before becoming involved [with the government agent, the defendants] . . . had [n]ever engaged in financial wrongdoing or for that matter any other wrongdoing," *Id.* at 1201, there is no guaranty in a given case that the jury will be allowed to hear evidence of prior bad acts, because of the strictures of RULE 403 and RULE 404(b) of the FEDERAL RULES OF EVIDENCE. In this case, for example, Hale vigorously objected before and during trial to the jury hearing that Hale had had any contact with Ben Smith in the days immediately prior to Smith's shooting spree, and had praised Smith afterwards (the shootings were moral and beneficial for the World Church, but Hale expressed regret that Smith had not shot more race traitors). Vol. 4 at 187-94; 197-98. Although in *Jacobson* the Court commented that the defendant's predisposition to view sexually-oriented photos was "evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, [and] is of little probative value in establishing predisposition," 503 U.S. at 550, 112 S.Ct. at 1541, the evidence in this case allowed the jury to understand Hale's intent in announcing that a "state of war" existed with Judge Lefkow, and repeated statements that Evola—like any member of the Church, was free to take "[a]ny action of any kind . . . according to the dictates of his own conscience."

and the fact that government agents had "campaigned for years" to persuade him to commit a criminal act, starting long before Judge Lefkow issued the order in the trademark suit requiring the World Church to destroy or alter its books.

It is not too difficult to explain why Hale's characterization of the evidence fails to show that no reasonable jury could find predisposition. In *United States v. Hollingsworth*, 27 F.3d 1196 (7th Cir. 1994), the Court of Appeals explained that *Jacobson* "clarified the meaning of predisposition," showing that the term has "positional as well as dispositional force." *Hollingsworth*, 27 F.3d at 1200. The positional aspect means that the defendant

> must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so; only then does a sting or other arranged crime take a dangerous person out of circulation. A public official is in a position to take bribes; a drug addict to deal drugs; a gun dealer to engage in illegal gun sales. For these and other traditional targets of stings all that must be shown to establish predisposition and thus defeat the defense of entrapment is willingness to violate the law without extraordinary inducements; ability can be presumed.

*Id.* Amplifying further, the court explained that the "defense of entrapment reflects the view that the proper use of the criminal law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, rather than to purify thoughts and perfect character." *Id.* at 1203.

The court emphasized that *Jacobson* defined entrapment as "'the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would never

20

have run afoul of the law.'" *Id.* at 1199 (quoting *Jacobson,* 503 U.S. at 553, 112 S.Ct. at

1543). As the court saw it, that described defendant Jacobson, a Nebraska farmer with

limited access to child pornography, who received no solicitations for child

pornography other than from the government. *Hollingsworth,* 27 F.3d at 1199. The court

also saw that as aptly describing the principal defendant in *Hollingsworth,* named

Pickard, an Arkansas orthodontist with a history of failed business ventures, who was

lawfully trying to sell a Grenadan banking license and whom the government induced

to commit money-laundering:

> Had it not been for that contrived ray of hope [ — the
> government's inducement — ] Pickard would have been
> forced to abandon international financing in order to avoid
> financial ruin. He was a threat to himself and his family. He
> was never a threat to society. All this is even clearer with
> respect to Hollingsworth, who functioned in CIAL [the
> corporation involved] purely as a minor investor and factotum.
>     It would be different if CIAL had had an up-and-
> running bank, for then it would have had a realistic
> opportunity to engage in money laundering, in much the
> same way that a public official to whom a government
> undercover agent or informant might offer a bribe would
> have a real opportunity to sell his office, as in *United States v.
> Jenrette,* 744 F.2d 817, 822 (D.C. Cir. 1984). Pickard and
> Hollingsworth didn't have a bank or a public office or any
> other facility that made it even remotely likely that they
> would have engaged in criminal activity if the government
> had not set their minds to it.

*Id.* at 1202.

From the evidence in the present case, could a reasonable jury conclude only that

defendant Hale was a harmless individual who never would have committed a crime

had Evola not come along, or was there evidence allowing the jury to find that it was

only a matter of time until Hale offended and Evola hastened the timetable?[20] To state

the conclusion before painting the supporting picture, a reasonable jury could easily see

Hale as an active recruiter of individuals such as Evola (that is, the character Evola

pretended to be), who then cultivated his relationship with such individuals in order to

be able to later use them, as the government aptly characterized during its closing

argument, as "stick[s] of dynamite" to be lighted if and when Hale chose.

Unlike Jacobson, who (in the Court's view) was sitting in his Nebraska

farmhouse minding his own business until the government came along, Hale placed

himself in a unique position creating the opportunity to meet potential lawbreakers: he

was the prominent, media-savvy, leader of the World Church of the Creator, a white

supremacist organization subscribing to the doctrine contained in the *White Man's Bible.*

Despite Hale's attempts to characterize the World Church as a peaceful organization,

any reasonable person can interpret the organization's philosophy as advocating the

---

[20] "A person who is likely to commit a particular type of crime without being induced to do so by government agents, although he would not have committed it when he did but for that inducement, is a menace to society and a proper target of law enforcement. The likelihood that he has committed this type of crime in the past or will do so in the future is great, and by arranging for him to commit it now, in circumstances that enable the government to apprehend and convict him, the government punishes or prevents real criminal activity. The government's inducement affects the timing of the offense; it does not create the offense by exploiting the susceptibility of a weak-minded person. The defense of entrapment reflects the view that the proper use of the criminal law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, rather than to purify thoughts and perfect character." *Hollingsworth*, 27 F.3d at 1203.

overthrow[21] of the "Jewish occupational government" by any necessary means including terrorism. While Hale and other adherents to this philosophy have, under our system of government, a constitutional right to hold and advocate such beliefs, there is no doubt that some persons attracted to such beliefs will be inclined to act on them, and cross the line from protected belief to criminal conduct.

Evola presented himself to Hale as one such individual. While Hale tries to portray himself as a peaceful individual reluctant to endorse Evola's repeated proposals to take action against enemies of the World Church, who was finally worn down by Evola's persistent inducements, a reasonable jury could view the evidence as showing only that Hale was only biding his time, often indifferent to Evola's schemes — except in those cases where he thought it prudent to direct Evola not to take action — and only reluctant to do or say anything that might directly inculpate him.

For example, in January 2001 Evola badgered (as Hale would characterize it) Hale for information, such as a picture and an address, that could be used to take violent action against Ken Dippold. Hale told Evola: "I think in many ways it would be best that nothing happened." Recorded conversation of 1/11/01. As Hale explains his reasons for disagreeing with Evola, it becomes clear that his objection is motivated by expediency rather than a lack of predisposition that Evola carry out the plan:

> [M]orally speaking by all means I don't want to have a
> problem with any kind of a traitor, you know, being

---

[21] Hale often made statements such as "Our day will come." See, e.g., e-mail dated 1/12/01.

> punished, morally. But there's just a lot of problems, you
> know. . . . Number one, uhm, without going into too
> much detail because you just never know. But uh, we, you
> know, have a situation with someone who is part of the case
> against us, winds up with a problem, we're automatically
> going to be looked at and blamed.

Recorded conversation of 1/11/2001 at 4.[22] Hale then explains that a second problem is

that it could interfere with obtaining his law license in Iowa, were any suspicion to arise

that he was involved. Id. at 5-6. Evola then states that he could give Hale the date, so

that Hale could create an alibi ("[w]e could go and do something or you could go with

your father out to eat"). Hale responds:

> I know what you're saying and I have to always remain, you
> know, I, I just have to always remain above board and, and
> not doing this. I know, I know it's, and I don't like it. I don't
> like it at all. I don't like the idea that indeed this person is
> saying these things. But and, I'm not saying that's it's for
> really, you, like it's certainly not for moral reasons but for
> practical reasons[.]
> . . . . . . . . . . . . . . . . . .
> It's just that, I don't think that anything, you know, I don't
> think that anything, uhm, would be gained except for, you
> know, knowledge that indeed somebody that, you know, uh,
> betrayed us paid for it. I mean and that might be nice and
> everything but.

Id. at 6-9.

---

[22] For convenience, the court gives references to the transcript of this
conversation used as a demonstrative exhibit by the parties.

Evola then presses Hale, saying that all he needs is Dippold's address, and Hale responds "I already mailed it to you. . . . Just for your information only." Id. at 9. A moment later Hale follows with:[23]

> I have to be pure because I, you know, such a thing would really, you know, such a thing they would try to make hay out of and I suppose, you know. Once again, we're just speaking in theoretical terms just in case, you know, the walls have ears and all kinds of shit.
> . . . . . . . . . . . . . . . . . .
> And I, but I just want it clear. I've never given my authorization for this. . . . You know, I, I and I don't approve, you know, uhm . . .

Id. at 10, 12. Evola then asks Hale to describe Dippold's apartment. Hale starts to and then says: "But see I, I can't even really go into stuff like that otherwise it could be said that, yeah, I'm furthering this. I can't further this, you know. . . . I don't want to know about these things." Id. at 13-14.

After Evola reassures Hale that "this" is just between the two of them and nothing will "come back" to Hale, Hale states: "Right . . . but . . . once again, we're all speaking in theoretical terms and everything. If all this, you know, uh, were to transpire and everything, a hell of a lot of questions are going to be asked, and ah . . . I have to always be able to say that with complete honesty. . . . Uh, but in any case, uh, you know, I've, I've always encouraged people to follow the law and obey the law

---

[23] The ellipsis in the block quotation that follows indicates the court's omission of some unrelated conversation and interjections, but also of comments by Evola insisting that "[h]e has to go" and that all he needs is Dippold's address. The court does so for brevity and does not believe that by doing so Hale's remarks are portrayed in a misleading light. The court believes this true of all edited quotations herein.

and, uhm, you know, I'll just leave it at that. . . . . You know, um, that's pretty much

the deal on that." Id. at 14-16.

After Evola says "but reverend we, we really need to do this though," Hale

states:

> Let me explain one thing that, you know. It's my
> understanding and you'll understand, I hope. You know,
> you will probably hate to say this. It's my understanding
> that you're coming to me as your minister, as your priest so
> to speak . . . and you're confessing . . . and, you know,
> that's confidential. . . . [Y]ou can speak freely because if it
> ever came back that uh, that somehow, you know, it was
> known that you were here or whatever, well you talked to
> me about church things . . . but I don't have to reveal any
> of the content of your conversation because you're coming
> to me as your . . . I'm your minister. . . . But in any
> case, uhm, you know, we're just speaking about a, a Charles
> Dickens' novel anyway, aren't we?

Id. at 16-17.

A bit later Evola refers to "the matter that we were talking about [before.[24]]" Id.

at 18. Hale responds: "Well, I can't approve. I just want to say that I can't approve, you

know. . . . . I know you [want][25] that but if I were to say that, then technically I'd be

violating what I just, today, argued strenuously that I wouldn't do, you know[.]" Id. at

18. After Evola reiterates that he "doesn't want a rat to go free" and that "it has to be

done," Hale responds: "Well, I just have to make it clear. I can't and after today, I don't

---

[24] Although the transcript agreed to by the parties says "for that tape," the court
believes that Evola actually said, or at least meant, "before that tape," referring to the
fact that the two of them had just been making a copy of a cassette tape.

[25] The transcript says "what" but the court believes "want" is correct.

want to ever hear about it again, you know. . . . I mean, as far as I'm concerned, you

were talking about something theoretical[.]" Id. at 19. A bit later Hale says: "I guess I

can't, you know, you understand why I can't give approval. You understand that's

because that could be construed as a conspiracy and I, I cannot be a party to a

conspiracy." Id. at 24. Hale then says "even if it happens" he would be able to say "I

don't know anything about it." Id. at 25. Continuing, "I mean the guy, the guy was a

nutball and who the hell knows who else doesn't like him, you know. . . . [S]o, that's

what I have to, you know, after tonight, know nothing[.] Id. The conversation concludes

with Evola stating that it will be good when it's done, that he will take care of it, and

that it is strictly between the two of them. Hale replies: "Yeah, well, yeah." Id. at 26.

Despite Hale's statements throughout the above conversation that he and Evola

were only speaking theoretically and that he wasn't authorizing anything, the next day

he sent Evola an e-mail which stated:

> After thinking and dreaming about your idea for hours
> before awakening abruptly at three this morning. I must
> veto it.
>
> I know this is difficult. You are very persuasive and
> obviously I think very well of you for your idea. You have
> demonstrated repeatedly your allegiance to me and our
> great Cause and my love for you as my loyal Brother
> increases by the day. However, too many allegations could
> be made. Too many insinuations. Too many individuals
> would see it as grounds to cast doubt upon our word and
> my word in the legal realm. With the stakes so high, and
> with no tangible benefit in the various legal struggles we are
> engaged in by implementing your idea, I must instruct you
> not to proceed.

> Yes, I know a chance is taken with this. Maybe we will think
> otherwise of my decision in the future. However, you must
> let me be the ultimate judge of such an action as I have been
> entrusted by our Church to do.

E-mail dated 1/12/2001.

Eleven months later, Hale sent an e-mail asking Evola to "persuade" another

perceived enemy, Patrick Langballe, not to make certain derogatory statements about

Hale. Evola visited Hale seeking direction as to what Hale wanted done. Hale

responded that he had "basically kinda left it up to" Evola. Recorded conversation of

12/06/2001. Evola told Hale that if Hale wanted it, he could take care of it "like we

were gonna do to Dippold." Id. Hale then states that he had hoped that Evola, simply

by visiting Langballe in person, would be able to persuade him, and, after mentioning

the suspicion that his communications were being monitored, stated that he was

"hesitant . . . for a lot of reasons" to say anything more and that he had "deliberately

kept it vague." Id.

Other than the conversation immediately above, the court has focused almost

exclusively on the conversation between Evola and Hale occurring on January 11, 2001,

but so has Hale throughout this proceeding: during closing argument to the jury, the

defense asked the jury to look at the conversation concerning Dippold and described it

as one "of the strongest pieces of evidence with respect to innocence." Vol. 11 at 110.

Moreover, the conversation concerning Dippold is a fair example of the tenor of the

evidence as a whole. It is clear that a reasonable jury could view the evidence as

showing that Evola presented himself to Hale as a person ready, willing, and able to

carry out violence if Hale so wished, and that Hale seized that opportunity out of his own predisposition, not because he was manipulated by Evola.

And while it is true that Evola did attempt to persuade Hale that violent action should be taken, that persuasion was not "exceptional" persuasion: Evola's entreaties to Hale were not directed toward overcoming resistance to the idea of committing a crime, but rather revealed disagreement between Evola and Hale as to whether a particular crime would advance, or retard, Hale's (and the World Church's) objectives. Other than reluctance for Evola to take action which would be detrimental to his objectives, the only reluctance that Hale showed was that he not be associated with Evola's actions. It is also true that a reasonable jury could view the evidence as showing that at all times Hale saw himself in control of Evola, able to simply mention a name to Evola and have Evola take action, and that he could at any time direct Evola not to take any action.

When Hale initiated contact with Evola concerning Judge Lefkow, he knew, as the government characterized it, that he was lighting the fuse on a stick of dynamite that he had kept at the ready. When Evola then told Hale of his plans to "exterminate" Judge Lefkow, Hale, unlike his directive to Evola concerning Ken Dippold, told Evola that Evola should act in accordance with his own conscience. A reasonable jury could find beyond a reasonable doubt that Hale had the predisposition to use Evola in this manner, not that Evola turned a "harmless, . . . weak [and] foolish"[26] man into a

---

[26] *Hollingsworth*, 27 F.3d at 1202.

criminal. Thus, the court believes there was sufficient evidence for the jury to find beyond a reasonable doubt that Hale was not entrapped.

*Count Four*

Count Four of the indictment charged Hale with endeavoring to obstruct justice in violation of 18 U.S.C. § 1503 by means of the solicitation of the murder of Judge Lefkow. Hale's entire argument on this count is that it depends on his guilt on Count Two; that is, because he has demonstrated that he is entitled to a judgment of acquittal on Count Two, charging him with soliciting Tony Evola to murder Judge Lefkow, then he must also be granted a judgment of acquittal on Count Four. As the court has explained above, the evidence was sufficient to support the jury's verdict on Count Two, and Hale is not entitled to a judgment of acquittal on that count. As a result, Hale has given the court no reason to grant his motion for a judgment of acquittal on Count Four.

*Count Five*

Count Five of the indictment charged Hale with endeavoring to obstruct justice in violation of 18 U.S.C. § 1503 by means of instructing his father to testify falsely before the grand jury concerning a material matter. Specifically, the indictment charged that Hale's reaction to Ben Smith's death was material to the grand jury investigation into whether Hale encouraged or ordered the Smith shooting spree, and that Hale told his father to testify that Hale had to cut off an interview with CNN because he had started crying during the interview because of his emotional reaction to Smith's death,

30

knowing that to be untrue. Hale argues that the evidence was not sufficient to show that it was not true that he had started crying during the interview, and, if that fact is true, he did not act knowingly, or with corrupt intent, in telling his father to testify to that fact before the grand jury. Thus, no reasonable jury could find him guilty on Count Five.

The government attempted to prove the charge through the testimony of Tracy Scruggs, who was the field producer for the CNN crew that conducted and filmed the interview, and the videotapes of the interview. On the videotapes there is no indication that Hale became emotional or stopped the interview. Asked whether, to the best of her recollection, she ever saw Hale "break down in tears" or "ask for the interview to stop," Scruggs answered "no" to both questions. Vol. 10 at 8, 9. She thought she would remember Hale crying, if he had done so, because it's a "big deal" if you get an interviewee to cry on camera. Id. at 13.

However, as Hale argues, Scruggs also testified that while the film crew was putting away equipment, and Hale was still speaking with the CNN reporter, Jeff Flock, Hale asked to be excused for a moment and went into the house. Id. at 6-7. In Scruggs' view, because the crew was not filming at that point, the interview was completed and Hale and Flock were "just chatting." Id. at 20. As Hale argues, however, it is reasonable to assume—perhaps it is the only reasonable assumption—that from the perspective of the person speaking to the television reporter, the "interview" covers his or her entire

conversation with the reporter.[27] Scruggs also testified, during cross-examination, that nine months prior to the trial she had spoken with the prosecutor on the telephone and told him that she had observed Hale become "misty-eyed." Id. at 10. The jury also heard a stipulation that an FBI agent would testify that Evola told him that in May, 2000 (nearly a year after the time of the CNN interview), Evola gave Hale a T-shirt bearing an image of Ben Smith, and Hale began shedding tears while hugging the T-shirt. Vol. 10 at 69. Finally, the jury heard evidence that Hale, when prompting his father to recall that Hale cut off the interview and came into the house crying, and to tell the grand jury about the incident, knew that his conversation with his father was being listened to, and tape recorded. Vol. 9B at 177-78.

Summarizing, the jury heard uncontradicted evidence that Scruggs could not, at the time of trial, remember Hale crying or becoming "misty-eyed," but nine months earlier she had told the government that Hale became misty-eyed.[28] At trial she never stated that her memory nine months earlier must have been mistaken. On the other

---

[27] The word "interview" has much broader usage by lay people than being limited to on-camera questioning, e.g., going on a "job interview." As Hale points out, even the prosecutor referred to a telephone conversation he had had with Scruggs, discussed in the accompanying text, as an "interview." Vol. 10 at 21.

[28] The government argues that Scruggs "testified definitively" that she never saw Hale cry or become misty-eyed. This is a mischaracterization. Scruggs testified that, to the best of her recollection at that moment, she never saw Hale cry or become "misty-eyed." Although she testified that seeing the videotapes at trial refreshed her recollection about the day in question, she never testified that she must have made a mistake when she spoke to the government nine months earlier. Moreover, Hale becoming "misty-eyed" would be a peculiar detail of which for her to have a false recollection during her initial conversation with the government.

hand, at trial she did remember that Hale, while speaking to CNN reporter Flock, had excused himself and gone into the house for a short while, consistent with Hale's statement to his father. Nearly a year after the interview, Evola gave Hale a T-Shirt bearing Smith's image, and Evola reported to the FBI that Hale hugged the shirt and broke down in tears, lending some credence to the notion that Hale might have cried about Smith during the interview, conducted only a few days after Smith's shooting spree and death.

Assuming that, on the day of trial, Scruggs truly did not recall that Hale had ever cried or appeared misty-eyed, the jury was still given no reason to doubt that, on an earlier occasion, she recalled that he had become misty-eyed. Essentially, the jury had uncontradicted evidence that Hale did become misty-eyed, and there is no doubt that the evidence was uncontradicted that Hale excused himself and went into the house for a few minutes. Thus, even viewing the evidence in the light most favorable to the government, the court does not believe it sufficient to allow a reasonable jury to conclude *beyond a reasonable doubt* that Hale was directing his father to testify falsely before the grand jury, and therefore, Hale's motion for a judgment of acquittal on Count Five must be granted.[29]

---

[29] The court also notes that, while the indictment charged that Hale knew that "his reaction to Benjamin Smith's death was material to the Grand Jury Investigation," (Count Five, ¶ 4), the government offered absolutely no evidence on the issue of materiality at trial, presumably because of its view that materiality is not an element of a § 1503 charge. Vol. 10 at 32. At least two circuits agree with that view. *See, e.g., United States v. Wood*, 958 F.2d 963, 973-74 (10th Cir. 1992); *United States v. Ruggiero*, 934 F.2d 440, 446 (2d Cir. 1991). The court has found no controlling Seventh Circuit decision,

Hale argues that the interests of justice require a new trial because of three evidentiary issues as to which there was a "complete lack of probative value and . . . high level of prejudice." Defendant's Motion at 32. Those issues are, first, evidence concerning the Ben Smith shooting spree. Second, admission of, and comment on passages in the *White Man's Bible*. Third, evidence admitted through the testimony of James Amend concerning "judgment-proofing" and "in the process . . . [saying] that the Defendant's organization had previously been held civilly liable for a killing." Defendant's Motion at 32.

As to the second of these issues, concerning the *White Man's Bible*, little need be said. Defendant Hale, not the government, moved for admission of this document into evidence as Defendant's Ex. 15. Vol. 5 at 184. Hale cannot obtain a new trial on the basis of any prejudice caused by an exhibit that he himself put in evidence. The government's comments on portions of that document thereafter was fair use of the evidence.

As to Amend's testimony concerning judgment-proofing, the defense made efforts, during Amend's cross-examination, to portray the Seventh Circuit opinion which reversed Judge Lefkow's decision—favorable to the World Church—as an "extraordinary" opinion. Vol. 4 at 86-87. The defense also brought up the issue of the

---

however, and it is not clear that the Seventh Circuit would agree, as it has stated: "When obstruction [of justice] takes the form, as in this case, of perjury or other lying, . . . the materiality of the lie becomes a focus of inquiry because a lie that is immaterial to the justice process is not a potential interference with it." *United States v. Buckley*, 192 F.3d 708, 710 (7th Cir. 1999).

34

trademark defense of "prior use," and asked about a motion that had been filed to disqualify Amend's firm because one of his partners knew, at the time the suit was filed, that the World Church had made a prior use of the term "Church of the Creator," the specific term involved in the litigation. Vol. 4 at 82-85.

In response to that line of questioning, the government, during re-direct, asked whether the Seventh Circuit's opinion had used the term "judgment-proofing," having Amend explain that the Seventh Circuit reasoned that the organization known as the "Church of the Creator" had dissolved its corporate existence, as part of a judgment-proofing effort, and therefore Hale's organization, the World Church of the Creator, was not a successor to that organization which could claim a prior use of the term. Vol. 4 at 112-117. The defense did not object to the initial question regarding the term "judgment-proofing," and this line of questioning was a fair response to the defense argument. By itself, the evidence of "judgment-proofing" was not inherently prejudicial requiring a new trial.

Next, however, the government asked Amend if he knew what the earlier judgment against the Church of the Creator involved, and he answered that it resulted from the Church of the Creator "sponsoring" the murder of an individual in Florida. Vol. 4 at 113, 117. The defense objected and moved for a mistrial as the result of the government eliciting this detail. The government argued this detail was fair as part of its effort to show that the Seventh Circuit opinion was not "extraordinary," and the court denied the defense motion. Vol. 4 at 114. While the court now agrees that the

35

probative value of this evidence was marginal, and outweighed by the potential for prejudice, a new trial is not warranted. During re-cross-examination, the defense emphasized the fact that the murder, which led to the judgment, occurred several years earlier when the Church of the Creator was headed by Ben Klassen, well before Hale became the leader of the new church, the World Church of the Creator. Vol. 4 at 123-25. Any prejudice caused by this evidence was thus minimized and, in light of the evidence of Hale's guilt, the court will not order a new trial.

Last, there is the issue of evidence concerning the Ben Smith shooting spree. In his opening brief Hale argues that this evidence had a "complete lack of probative value" and because the "government argued Defendant's involvement in the Smith shootings as if he had been proven to have had an involvement," the resulting prejudice "necessitates a new trial." Defendant's Motion at 31-32. In its response the government answers:

> Defendant cites to no portion of the record that supports this assertion. Indeed, the government never argued that the defendant . . . instructed Ben Smith to engage in a shooting spree.

Government's Response at 20.[30]

---

[30] The court points this out because the government maintains that this court lacks jurisdiction to consider Hale's filing of September 23, 2004, identifying the relevant portion of the transcript, on the basis that it is untimely. However, because the government specifically argues that Hale's motion is unsupported by the record, and because Hale's filing merely points out the transcript passage supporting the argument made in his *timely* motion for a new trial, the court does not believe that it lacks jurisdiction. In any event, the transcript of what was said at trial cannot be ignored.

However, as a supplement to Defendant's Reply, Hale points out that during his closing argument, the prosecutor stated: "The government had evidence that the defendant had a member of his organization kill two people and shoot lots of others." Vol. 11 at 140.

Upon reading this statement the court was, frankly, shocked. First, the court was shocked because it did not recall anything like this being said at trial. The remark should have jumped out, as it is an apparent violation of repeated assurances by the government, important to the court's evidentiary rulings, that evidence concerning Smith would be confined to the purposes for which it was allowed,[31] and would not be used to suggest that Hale directed the Smith shooting spree (consistent with the claim in the Government's Response that it never argued that Hale instructed Ben Smith to engage in the spree). Second, the court is surprised that defense counsel did not immediately object and seek a mistrial on this basis. While not doing so in front of the

---

[31] In public comments following the Smith shooting spree, and statements made to the FBI, Hale never condemned Smith, but did state that the World Church was a peaceful organization and that he would have counseled Smith not to engage in the shootings if Smith had asked for counseling. In private comments to Evola and others church members Hale praised Smith's actions as beneficial to the Church. As has been explained in this memorandum and order, the court allowed this evidence in order to aid the jury in understanding Hale's conversations with Evola, and to support the element of circumstances "strongly corroborating" Hale's intent; i.e., that when Evola stated that he was going to "exterminate the rat," and Hale responded that whatever Evola wished to do was up to his "own conscience," Hale was serious, and understood that he and Evola were not joking. For the same reason, it had bearing on the issue of entrapment/predisposition, that is, whether Evola proposed a criminal design to Hale and thereby caused a crime, or whether Hale already saw violence as a means of achieving church objectives, and seized upon the opportunity Evola offered.

jury could have been a strategic move, so as not to emphasize the prosecutor's remark, the court doubts that is the case. Defense counsel could have raised the issue out of the jury's presence, but did not. Instead, it appears that defense counsel, like the court, did not even notice the remark.

There is a reason the court believes that the remark was overlooked, and if ever there were an example of why a transcript is no substitute for actually observing the trial, this is it. The word "had" takes many variations in meaning, depending on the context. In one context, it means that a person experienced something existing or happening, while in another, it can mean that a person caused something to exist or happen, both of which usages are illustrated in the following sentence: "On the way home from work, Bob *had* a flat tire, so he called a garage and *had* them come fix it."

Throughout the transcript are numerous examples of the prosecutor using, in some cases perhaps misusing, "had" simply to mean that something existed or happened. For example, only three sentences after the remark at issue the prosecutor stated: "The government knew that this man, the defendant, *had* an organization that *had* all the things that are in this *White Man's Bible*." Vol. 11 at 140 (emphasis added). Although any listener can understand this sentence, consider the second "had." While the prosecutor seems to have meant that the organization subscribed to the "things" in the *White Man's Bible*, the organization didn't cause them to be there, the author did.

*Thus, the court is convinced that it, defense counsel and the jury* all heard the sentence, "[t]he government had evidence that the defendant had a member of his

organization kill two people and shoot lots of others," simply as a reference to the fact

that the shootings occurred, not that Hale orchestrated the shootings. This

understanding of the remark is supported by reading the sentence in context:

> The government had evidence that the defendant had a
> member of his organization kill two people and shoot lots of
> others. And the defendant got on national television and
> said it wasn't a bad thing. The problem with it wasn't that
> there were two people dead, but that his law license might
> be denied.

Vol. 112 at 140. The overall thrust of the prosecutor's remarks is not that Hale caused

the shootings to happen, but instead that Hale's reaction and remarks afterward

showed his approval of what had happened, one of the very reasons that references to

the Smith shooting spree were allowed.

Despite the court's view of how the prosecutor's closing argument was

understood, it appears now that this is not what the prosecutor intended. In the

"Government's Response to Defendant's Transcript Excerpts Relating to Pending

Motion for a New Trial," filed on October 22, 2004 (docket # 243), the government

argues that this comment was a fair response to defense counsel's closing argument on

entrapment—that only five days after the Smith shootings the government was trying

to introduce Evola to Hale as a means of "setting him up," Vol. 11 at 102-03, 116—and

the fact that the government "had evidence" that Hale was involved (as opposed to

stating that Hale in fact was involved) was not improper because it was a fair comment on inferences that could be drawn from the evidence.[32]

This argument is both surprising and somewhat troubling, because it is a 180-degree shift from the government's first argument — that it "never argued" that Hale had directed Smith to do what he did — and suggests that the government intentionally reneged on its promise to the court and to defense counsel that it would not do so. What it appears actually happened is that the prosecutor misspoke, in the heat of the moment, and is trying to make his best argument now that the statement was not improper. An objection by defense counsel cut off the prosecutor mid-sentence as follows: "As to Mr. Evola, before Tony Evola ever had any conversations with the defendant, we knew a lot about him. Ben Smith killed two people, and he thought that was —." Vol. 11 at 140. After the interruption, the prosecutor picked up where he left off, continuing with the statement that the "government had evidence that the defendant had a member of his organization kill two people." Thus, the plain fact that Ben Smith had killed two people became the statement that the government "had evidence" that Hale had Smith kill two people.

---

[32] For example, during cross-exam of Evola, defense counsel brought out the fact that Evola had told the FBI that another individual who had been involved with the World Church, John Yonkers, told Evola that he had been asked by Hale "to do what Ben [Smith] did." Vol. 7B at 105. Defense counsel was not trying to show that Yonkers had said such a thing, but instead that Evola was a biased witness: that he made the statement up to get into the FBI's good graces and help them try to "get" Hale. Vol. 7B at 107-09.

Viewing the remark in isolation, the court believes it was improper, but as the government points out, "[p]rosecutorial remarks can provide a basis for a new trial only if the remarks were improper and so infected the entire trial with unfairness so as to render the conviction a denial of due process." *United States v. Sanchez-Galvez*, 33 F.3d 829, 834 (7th Cir. 1994). If a remark in isolation is improper, then the court must consider it in light of the entire record to see if there has been a trial so unfair that it amounts to a denial of due process, in light of five factors:

> 1) the nature and seriousness of the prosecutorial misconduct; 2) whether the conduct of the defense counsel invited the prosecutor's remarks; 3) whether the trial court's instructions to the jury were adequate; 4) whether the defense was able to counter the improper arguments through rebuttal; and 5) the weight of the evidence against the defendant.

*United States v. Miller*, 199 F.3d 416, 422 (7th Cir. 1999).

As to nature and seriousness, as explained above, the prosecutor made one isolated improper remark in the heat of his closing argument, and the court does not believe the jury even understood the remark the way it was intended. Thus, the seriousness of its impact, if any, was quite limited. To some extent, the remark was invited by defense counsel's argument that the government took steps to "set up" Hale by sending Evola to him only five days after the Smith shootings. Although defense counsel had no opportunity for rebuttal, and did not object and seek a corrective instruction when the remark was made, the court, throughout the trial and in both its opening and final instructions to the jury, informed the jury that the lawyers'

41

statements are not evidence. Finally, considering the discussion above as to why the evidence was sufficient to support Hale's convictions, the court does believes it extremely unlikely that the remark played any role in the jury's verdicts.[33]

## CONCLUSION

This is a case involving an intelligent, educated defendant who tried to walk a very fine line, soliciting another person to commit a crime of violence but doing so in terms designed to make it appear that he was only discussing abstract philosophical concepts. For the reasons explained above, there was sufficient evidence for a reasonable jury to conclude, beyond a reasonable doubt, that those efforts at subterfuge failed and that the line was crossed. Hale's motion for a judgment of acquittal is **DENIED**, except as to Count Five of the indictment, as to which count the motion is **GRANTED**. Hale's motion for a new trial is **DENIED** in all respects.

**SO ORDERED.**

ENTER: November **10**, 2004

_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT

---

[33] In fact, the jury found Hale not guilty on a solicitation count as to which there plainly was enough evidence to support a conviction, suggesting that he was not convicted blindly out of prejudice caused by an improper prosecutorial remark.