O3CA11
USA v Hale



**Haikal Correctional Consultants**
**436 Watkins Street**
**Philadelphia, PA 19148**
**215-467-4388**
**shakeerahlong@msn.com**

FILED

JUL 1 2004

UNITED STATES DISTRICT COURT

The Honorable Judge James T. Moody
Federal Plaza
Suite 5400
Hammond, IN 46320

July 1, 2004

Dear Judge Moody:

Matthew Hale's family has retained Haikal Consultants to advocate on his behalf to secure a designation close to his family once he is sentenced. On Monday April 26, 2004 Mr. Hale was found guilty of four of the five charges against him. Haikal Consultants is aware of Matthew Hale's racial and political views and although we have agreed to advocate on his behalf we want to make it clear that we do not uphold or agree with his views. Haikal Consultants also understands the serious nature of Mr. Hale's crimes and we are fully aware of the numerous security concerns that surround him.

Nonetheless, it is our goal to assist offenders and their families. Mr. Hale's family has been devastated by the publicity, the trial and now as they wait for their son to be sentenced they are concerned as to where he will serve his time. Mr. Hale has an especially close bond with his father who is (71) years old. His father understands the courts' obligation in sentencing his son now that he has been found guilty and he is also aware of the strict security in place regarding his son. His father has seen on television, read in newspapers and listened in court to all the negative things said about his son but regardless of what has been said, Matthew is still his son whom he loves deeply. Mr. Hale fears he will not live to see his son be released from prison and because of that fear he is concerned as to where his son will be incarcerated.

Prior to Mathew Hales' arrest and incarceration he lived with his father. He was his fathers' caretaker and friend. A bond between parent and child is an unconditional one and Mr. Hale is suffering the loss of his son due to his incarceration. He visits him when

possible (bi-monthly) and speaks to him on the telephone weekly. If Mathew is transferred to a facility far from his family he will certainly lose physical contact with them. His family is not able to financially afford to travel long distances to make regular visits and the cost of telephone calls could become a burden.

As the supporting article confirms, research has shown that continued family contact benefits both the offender and their family. Family contact assists offenders' adjustment and rehabilitation while incarcerated. When contact is cut off it is like a death and both the offender and family members go through a grieving process.

It is imperative, therefore, that Matthew's elderly parents be available to see him regularly and without undue hardship. Matthew's proximity is crucial here. We respectfully ask that the Court consider making a recommendation to the BOP that Mr. Hale be designated as close to his parents' hometown of E. Peoria, IL as possible. It is our understanding that the nearest Federal Prison exists in Pekin, IL.

Sincerely,

Shakeerah Hameen-Haikal
Senior Consultant


Cc: Matthew Hale
    Russell Hale
    Tim Murphy, Attorney
    FBOP Central Office
    North Central Regional Office
    Chicago CCM Office

<u>Family Contact And The Inmate</u>

By Kathryn L. Nevin, LSW

Both inmates and their families experience significant stress as a result of incarceration. It is not just the inmate who suffers. Family members and those close to the inmate find their lives suddenly and irrevocably changed by the new absence. They end up "doing time," as it were, in their own way, emotionally. The overall repercussions of incarceration in the family system can be far-reaching and devastating. Children lose the opportunity to grow up knowing their uncle, older brother or father; wives no longer have the companionship or provision they once had; the inmate's parents no longer have their child in their life. If the parents are aging, especially, they can no longer look forward to him looking after them. They may have already lost some of that care-taking when he went to prison. Other family members, such as wives and children, may have lost significant financial support as a result of the incarceration. Social relationships are based on reciprocity, but the prisoner is in no position to reciprocate in very significant kinds of ways.... Typically, the resources flow the other way, with relatives crediting money to the inmate's account each month.[1] This can present a new and significant burden to the family system.

A common and natural response to having a loved one incarcerated is for family members to display grief reactions. Indeed, losing the inmate to prison (especially if a long sentence is involved) represents a kind of death. It is the end of an era. Although the inmate is still alive, he has gone on to a whole sub-strata of existence and things will never be the same. Family gatherings, holidays, daily life – everything is made hollow by the constant absence of their loved one. Under the stress of grief, they find themselves more irritable than usual or weeping frequently. The ensuing depression brings about uncomfortable disturbances in sleep and eating habits. Regarding spouses, Schwartz & Weintraub (1974) report that the impact on a wife of a husband's incarceration is quite similar to loss of a spouse by death; except loss by incarceration can be worse in that it involves the same grief and fear, but additionally involves shame, anger and confusion.[1] Often the burden of social stigma surrounding incarceration accounts for the wife's latter emotions. This sense of stigma extends to all family members. They can often feel ostracized in society, as though they are viewed as criminals themselves.

Without proper support, grief and depression can become unmanageable and can catapult into an abnormal or protracted grief reaction. Along with professional or spiritual intervention, one main hope of combating this possibility consists of frequent visits with the inmate himself. The most striking feature of the literature about the benefits of visits for prisoners, their families and communities, is that there is little if any contrary argument and conflicting data to the general principle that the better the quality of visitation throughout a prisoner's incarceration, the better the effects on the prisoner,

---

[1] www.fcnetwork.org

[2] www.patrickcrusade.org

his or her post-release adjustment, the family of the prisoner and the community.[3] Frequent visits, of course, can only occur when the inmate resides close to the family. Proximity is crucial to the family's ability to visit. The family is often burdened by financial, health, job, and other constraints, and needs to be able to access the inmate in a reasonable way. Just knowing that their loved one is close and that visits can occur on a frequent and regular basis provides the family with a higher degree of emotional well-being.

The same is true for the inmate. In fact, the two variables that correlate most strongly with a prisoner's success in post-release adjustment are visitation and education.[4] Particularly when inmates are in "supermax" situations where solitary confinement is the norm, family contact is essential to psychological well-being. A number of case studies on the effects of prison life have also indicated that imprisonment can be brutal, demeaning, and generally psychologically a devastating experience for many individuals. Psychological symptoms described in these studies which are believed to be directly caused by imprisonment include psychosis, severe depression, inhibiting anxiety, and complete social withdrawal.[5] Indeed, Federal District Court Judge William Wayne Justice ruled that such supermax conditions are unconstitutional in Ruiz v. Johnson for this very reason.

In conclusion, even when a person has to be removed from society because of his actions, it is necessary for the total well-being of everyone involved – for the inmate and his family – to allow for frequent contact and visits. If incarceration must occur for the good of society, at least we can ensure that the inmate and his family are not destroyed in the process. Separating families by large distances does not need to occur in order for the incarceration to take place or the punishment to be imposed. Separating families only creates more pain and suffering in situations already rife with pain.

---

[3] www.patrickcrusade.org
[4] Ibid
[5] www.uplink.com.au/lawlibrary/Documents/Docs/Doc82.html