UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 CR 11 |
| | ) | |
| MATTHEW HALE, | ) | |
| Defendant. | ) | |

## SENTENCING MEMORANDUM

The following is intended to provide additional explanation of the court's resolution of the various objections and legal issues raised by defendant Matthew Hale regarding his sentencing, and of the court's method of determining, and reasons for deciding upon, the sentence imposed on defendant Hale in light of *United States v. Booker*, — U.S. —, 125 S. Ct. 738, — L. Ed. 2d —, 2005 WL 50108 (Jan. 12, 2005).

First, the court calculated the applicable advisory sentencing range under the United States Sentencing Guidelines ("Guidelines")[1] by making appropriate findings of fact and resolving objections to the revised Presentence Investigation Report ("PSI") prepared by the United States Probation Office. Then the court considered the advisory Guidelines sentencing range along with the other sentencing considerations set forth in 18 U.S.C. § 3553(a), in light of all the evidence in the case to make an informed exercise of its discretion and arrive at an appropriate sentence for defendant Hale.

---

[1] The Guidelines in effect on the dates of the offense conduct in this case, generally speaking, November-December 2002, were compared to those in effect on the date of sentencing, so that if any differences were found the lesser penalty would be used.

What follows is a brief summary of the court's factual determinations, of the calculation of defendant Hale's advisory Guidelines range, and a discussion of the court's analysis, and resolution, of the various legal and factual arguments made by defendant Hale. The main thrust of Hale's position is that he has a constitutional entitlement to a sentence within the Guidelines range that is based solely on factual findings made by the jury beyond a reasonable doubt: the court can make no factual findings and no increases to his base offense level under the Guidelines as allowed by the "remedial" portion of the Court's decision in *Booker*, because to do so would violate due process. In addition, Hale argues that the adjustment in Guidelines § 3A1.4 ("Terrorism") does not apply in this case because he has not been convicted of a crime of terrorism enumerated in 18 U.S.C. § 2332b(g)(5)(B).

*I. Summary of the facts of the case*

A summary of the facts of the case, as revealed by the evidence at trial and the revised Presentence Investigation Report, is as follows. The TE-TA-MA Truth Foundation ("the Truth Foundation"), owner of the registered federal trademark "Church of the Creator," was engaged in civil litigation with the "World Church of the Creator" ("WCOTC"), an organization headed by defendant Hale under the title/office "Pontifex Maximus," over its use of the term "Church of the Creator." On November 19, 2002, United States District Judge Joan H. Lefkow issued an order permanently enjoining the WCOTC and its members from using the term Church of the Creator (hereinafter, the "11/19/02 order"). Hale has admitted, as recently as in his filings

2

preceding today's hearing, that he believed he could obtain maximum publicity for his cause by characterizing this order as a "book–burning" order.

On November 29, 2002, Hale sent an e-mail message (hereinafter, the "11/29/02 e-mail") to various WCOTC members stating that the "sick, dranconian [sic] order . . . in effect places our Church in a state of war with this federal judge and any acting on authority from her kangaroo court." The e-mail then quoted the words of the founder of the WCOTC, as set out in the "White Man's Bible," one of the WCOTC's "Holy Books," that:

> Should the Jewish Occupational government use force to violate our Constitutional rights to freely practice our religion; to peacefully assemble; to peacefully organize; to distribute our White Man's Bible; to use the mails and any other prerogative in promoting and expanding our legal religious organization and the full practice of our religion, then we have every right to declare them as open criminals violating the Constitution and the highest law of the land. They then obviously are the criminals, and we can then treat them like the criminal dogs they are and take the law into our own hands. . . . We must then meet force with force and open warfare exists. It will then be open season on all Jews.

Hale then stated in the e-mail: "Clearly, any court ordered confiscation and destruction of our Bibles on pain of imprisonment or death violates these tenets of our religion as well as the Constitution of the United States."

A few days later, on December 4, 2002, Jon Fox, whom Hale had made the leader of the WCOTC for Illinois, met with Hale at the WCOTC headquarters (a room in Hale's parents' residence). Hale began to discuss the trademark suit brought against the

3

WCOTC by the Truth Foundation, and his dissatisfaction and anger with, and possible responses to, Judge Lefkow's order. Fox suggested that they take a walk outside to continue the conversation. While they were discussing the matter further, Fox recalled that a Federal Express truck drove up and the driver attempted to give Hale a package that was from the law firm representing the Truth Foundation. Hale refused the package. After the truck drove away, Hale, who had become more angry, asked Fox if he would kill Judge Lefkow or if he knew someone who would.[2]

Early that evening, Hale sent an e-mail to "Brother Tony" seeking the home address of "Judge Joan H. Lefkow, PROBABLE JEW OR MARRIED TO JEW" and of attorneys involved in the case. The message then stated "[a]ny action of any kind against those seeking to destroy our religious liberties is entirely up to each and every Creator [World Church adherent] according to the dictates of his own conscience." The recipient of this e-mail, "Brother Tony" was Tony Evola, the head of "The White

---

[2] Hale's defense attorneys did an excellent job at trial of showing the jury reasons to find Fox's credibility suspect, and the jury found Hale not guilty of a charge of soliciting Fox to commit a crime of violence in violation of 18 U.S.C. § 373. However, the government obtained delivery records from Federal Express that showed that Hale had rejected a package on December 4, 2002, just as Fox described. Along with other evidence in the case, the dovetailing of the delivery records with Fox's recollection causes the court to find, by a preponderance of the evidence, that Hale did make the requests as Fox testified.

Berets," the WCOTC security detail, but who, unbeknownst to Hale,[3] was a cooperating individual who was recording his conversations with Hale for the FBI.

The next day, December 5, 2002, Evola paid a call on Hale in person. Evola stated that he had received the e-mail about "the Jew judge" and Hale "wanting his address and the other rats'" to which Hale responded "[t]hat information, yes, for educational purposes and for whatever reason you wish it to be." Evola then asked "when we get it, we gonna exterminate the rat?" Hale responded "[w]ell whatever you want to do[.] . . . [M]y position's always been that I, you know, I'm gonna fight within the law and, but ah, that information's been pro-, provided. If you wish to, ah, do anything yourself, you can, you know? . . . So that makes it clear." Evola then responded "[c]onsider it done" and Hale replied "[g]ood."[4]

Later that evening Hale sent another e-mail addressed to Evola and a larger group of recipients who, generally speaking, constituted the WCOTC "inner circle."[5] That e-mail gave the office addresses for Judge Lefkow and the attorneys involved in the trademark litigation case, stating that it was information "concerning the

---

[3] Hale disputes this, arguing that the evidence shows that he in fact suspected that Evola was an informant. From listening to Hale's statements in the tape-recorded conversations, along with other evidence in the case, the court finds that Hale did not suspect that Evola was an informant and instead placed a great deal of trust and confidence in Evola.

[4] The quotations in this paragraph and throughout this order deviate slightly from the transcripts furnished to the jury for convenience. The court has written the quotations to reflect how it heard and understood the tape recordings.

[5] Fox testified that the recipients were WCOTC state leaders and administrators.

conspirators out to destroy our religious liberties," and that "[w]e are in the process of getting their home addresses as well." The e-mail also stated that "[i]n case my e-mails are being monitored, let me make it clear that I provide this for educational purposes only," in effect, a verbal wink.

On December 9, 2002, the TE-TA-MA Truth Foundation filed a motion asking for a rule to show cause why the WCOTC and anyone acting for it should not be held in contempt for violating Judge Lefkow's 11/19/02 order. Hale wrote a letter to Judge Lefkow on December 12, 2002, in which he stated, falsely, that "from my understanding of the Court's order, I have no material in my control or possession that falls afoul of it." On December 13, 2002, Judge Lefkow issued an order requiring Hale to appear on January 8, 2003, to show cause why he should not be held in contempt for violating the 11/19/02 order.

On December 17, 2002, Evola again went to see Hale in person. During the conversation between the two that day, Evola told Hale that it was "in motion about exterminating the rat" to which Hale, after chuckling, replied "[h]ere's the thing. I can't be a party to such a thing . . . ." After more conversation in this vein, during which Hale insisted that they were only speaking on a theoretical basis, Hale stated "if everything you're saying, I mean, if what I surmise, without saying that I know anything, if what I surmise . . . were the case, then ah, the shit's gonna really hit the fan, you know? . . . . . So I gotta be prepared . . . psychologically and I have to be innocent, which of course . . . I am[.]" Evola then asked if he could come stay with Hale "when this stuff

6

does come to happen" to which Hale responded that if he "were to say yes to that, I would technically, technically and maybe be considered some kind of accessory in something I do not want to be an accessory in." Hale then compared himself to Sargent Schultz in Hogan's Heroes saying "I know nothing . . . nothing." He reiterated to Evola that he was not encouraging him to do anything, but that "whatever a person does is according to the dictates of their own conscience."

On January 8, 2003, when Hale appeared as ordered by Judge Lefkow for the contempt hearing, he was arrested. A series of indictments were returned culminating with a third superseding indictment on October 29, 2003, containing five counts. Count One charged Hale with obstruction of justice in violation of 18 U.S.C. § 1503, based on Hale's December 12, 2002, letter to Judge Lefkow. Count Two charged Hale with solicitation of a crime of violence in violation of 18 U.S.C. § 373, based on his solicitation of Tony Evola to assault and murder Judge Lefkow. Count Three charged Hale with solicitation of a crime of violence in violation of 18 U.S.C. § 373, based on his solicitation of Jon Fox to assault and murder Judge Lefkow. Count Four charged Hale with obstruction of justice in violation of 18 U.S.C. § 1503, based on his soliciting and encouraging the assault and murder of Judge Lefkow. Count Five charged Hale with obstruction of justice in violation of 18 U.S.C. § 1503, by instructing his father to lie to the grand jury that continued to investigate Hale following his arrest. On April 26, 2004, a jury found Hale not guilty of the charge made in Count Three of the indictment, and

guilty of the remaining four charges. On November 10, 2004, the court granted Hale's motion for a judgment of acquittal on Count Five.

*II. Outline of calculation of advisory Guidelines term-of-imprisonment range*

Defendant Hale appeared before the court for sentencing on April 6, 2005. After resolving the defendant's objections and the parties' requests to correct the revised PSI, the court calculated the advisory Guidelines range. The following explanation of the advisory Guidelines range sets out the court's conclusions: the court's explanation of its reasons for applying various adjustments and overruling Hale's objections to those adjustments is explained in later sections of this memorandum

For Count One the court finds the applicable section of the Guidelines to be § 2J1.2(a), establishing a base offense level of 12. The court applies no adjustments, resulting in an adjusted offense level that remains at 12.

For Count Two, the court finds the applicable section of the Guidelines to be § 2A1.5(a), establishing a base offense level of 28. Pursuant to Guidelines § 3A1.2(a)(1)(A), a three-level upward adjustment is made because the crime was motivated by Judge Lefkow's status as a government officer. Pursuant to Guidelines § 3C1.1, a two-level upward adjustment is made for obstruction of justice, because Hale, while awaiting trial for the offense of conviction, attempted to persuade Jon Fox to testify falsely that he (Hale) had previously told Fox that he suspected that Tony Evola was a government informant. Pursuant to Guidelines § 3A1.4, an upward adjustment of twelve levels is applied, and Hale's criminal history category is increased to a Category

VI, because the offense of conviction is a felony that involved, or was intended to promote, a federal crime of terrorism. The sum of these adjustments results in an adjusted offense level of 45 for Count Two.

For Count Four, the court finds the applicable section of the Guidelines to be § 2J1.2(a), establishing a base offense level of 12. Pursuant to Guidelines § 2J1.2(b)(1), the offense level is adjusted upward by eight levels, because the offense of conviction involved threatening to cause physical injury to a person in order to obstruct the administration of justice, in this case, the assault and murder of Judge Lefkow. Pursuant to Guidelines § 3A1.2(a)(1)(A), a three-level upward adjustment is made because the crime was motivated by Judge Lefkow's status as a government officer. The sum of these adjustments results in an adjusted offense level of 23 for Count Four.

Pursuant to Guidelines § 3D1.2(b), Counts Two and Four are grouped because they involve the same victim, Judge Lefkow, and a common criminal objective, her assault and murder in retaliation for her having entered an order requiring the WCOTC to stop using the "Church of the Creator" mark. Pursuant to Guidelines § 3D1.3(a), the offense level for that group ("group one") is 45, that is, the adjusted offense level from Count Two, which is the highest offense level of the counts in group one. The conviction on Count One is treated as a separate group ("group two"), but because the offense level for group two is the same as the adjusted offense level for Count One (offense level 12), and is nine or more levels less serious than the offense level for group one, there are no further increases to the offense level, Guidelines § 3D1.4(c), and the

9

combined offense level for the purposes of Guidelines § 3D1.4, and determining the total punishment pursuant to Guidelines § 3D1.5, is 45. The presence of group two may be a reason to consider sentencing at the higher end of the applicable Guidelines sentencing range. Guidelines § 3D1.4(c). There is no adjustment to any of the offense levels pursuant to Guidelines § 3E1.1 because defendant Hale put the government to its burden fo proof at trial and continues to maintain that he is factually innocent of the crimes of conviction.

For a combined offense level of 45 and a criminal history Category VI, the total punishment, that is, the advisory Guidelines range from the sentencing table in Guidelines Chapter 5, Part A, is imprisonment for life. Because the statutorily-authorized maximum sentence for each count of conviction, even when made to run consecutively, is less than the minimum of the advisory Guidelines range, the statutory maximum becomes the advisory Guidelines sentence, Guidelines §§ 5G1.2(b), 5G1.1(a), and the sentences imposed on the counts are made to run consecutively to achieve the total punishment. Guidelines § 5G1.2(d). Thus, the court imposes a sentence of 10 years on Count One, 20 years on Count Two, and 10 years on Count 4, each sentence to run consecutively, for a total term of imprisonment of 40 years.

*III. Sentencing Factors found in 18 U.S.C. 3553(a)*

Section 3553(a) of Title 18 of the United States Code instructs sentencing judges to consider the nature and circumstances of the offense, and the history and characteristics of the defendant, and to "impose a sentence sufficient, but not greater

10

than necessary, to comply with the purposes" of sentencing that are set out in

§ 3553(a)(2). The court explained, in open court, its consideration of all of these factors

and its reasons for believing that the gravity of the offense and defendant Hale's

personal characteristics make the statutory maximum sentence of 40 years, which is

equivalent to the minimum total punishment advised by the Guidelines, a sentence

which is not greater than necessary to achieve sentencing purposes set out in

§ 3553(a)(2).

*IV. Hale's legal objections to court fact-finding at sentencing*

     *A. Due process objection to the court following Booker's remedial holding*

     In *Booker,* a majority of the Court held in an opinion written by Justice Stevens

("the constitutional opinion") that the Guidelines, as promulgated by the Sentencing

Reform Act of 1984, 18 U.S.C. § 3551 *et seq.* ("the SRA"), violated a defendant's right to a

jury trial under the Sixth Amendment. This was so because the Guidelines required the

judge to engage in fact-finding in arriving at a defendant's sentence, and then based

upon the facts found *mandated* the imposition of a greater sentence, within a narrow

range, than the sentence *mandated* based solely on the facts found by the jury beyond a

reasonable doubt.[6] *Booker* made clear that the Court's earlier holdings in *Blakely v.*

*Washington,* 542 U.S. —, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), and *Apprendi v. New*

---

     [6] [E]veryone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the SRA the provisions that make the Guidelines binding on district judges[.]" *Booker,* 125 S. Ct. at 738.

*Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), applied to the Guidelines.

As a remedy, in a second opinion authored by Justice Breyer ("the remedial opinion"), a different majority of the Court severed and excised two parts of the SRA: 18 U.S.C. § 3553(b)(1), which made a sentence within the Guidelines-calculated range mandatory, and 18 U.S.C. §3742(e), which mandated a *de novo* standard of review on appeal from sentencing decisions. The Court observed that "[s]o modified, the Federal Sentencing Act . . . makes the Guidelines effectively advisory," requiring the sentencing court to consider the Guidelines but allowing it to tailor the sentence in light of the other statutory factors set out in 18 U.S.C. § 3553(a). *Booker*, 125 S. Ct. at 757.

In the constitutional opinion, the Court summarized the reasoning for its earlier decision in *Blakely:* "Our precedents, we explained, make clear 'that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.'*" *Booker*, 125 S. Ct. at 749 (quoting *Blakely*, 124 S. Ct. at 2537, emphasis in *Blakely*).

Because the Court decided *Apprendi* in 2000, Hale contends that the existing law on the date of his offense conduct in 2002 was that any fact that might ultimately be used to increase the sentencing range of his punishment was a fact on which he was entitled to a jury finding beyond a reasonable doubt. Then, relying on *Bouie v. Columbia*, 378 U.S. 347, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964), Hale argues that for the court to follow the remedial opinion in Booker, thereby treating the Guidelines as merely

12

advisory, and increasing Hale's sentence above that mandated by the Guidelines based on the facts found by the jury in this case, would violate his right to due process of law.[7]

As Hale quite aptly explains, in *Bouie* the Court, relying on its *ex post facto* jurisprudence, found that there can be a deprivation of the due process right to fair warning of the meaning of criminal statutes when there is "an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie*, 373 U.S. at 352, 84 S. Ct. at 1702. Hale asserts, and there is little doubt that he is wrong, that the remedial opinion in Booker was unforeseeable. Thus, his argument—oversimplified to state it in a nutshell—is that the remedy of treating the Guidelines as advisory, if applied to him, violates his due process right to fair warning that he faced any penalty greater than whatever the mandatory Guidelines sentence based on the jury's findings might have been:

> Since exceeding the guidelines range was not permissible under the guidelines prior to <u>Booker</u>, due process provides that exceeding the guidelines range is not permissible now, and as for enhancements and upward departures, these are—per the <u>Booker</u> merits majority—barred without a jury finding beyond a reasonable doubt of the facts that form their predicate.

Defendant's New Position Paper as to Sentencing Factors at p. 9.

---

[7] This argument is made in Hale's "New Position Paper as to Sentencing Factors in Light of <u>United States v. Booker</u>," superseding the argument made in his original "Position Paper as to Sentencing Factors," filed before the Court's decision in *Booker*, in which Hale argued that this court could make no upward adjustments to his sentence that were not based on facts found by the jury beyond a reasonable doubt.

*Bouie's* holding was clarified in *Rogers v. Tennessee*, 532 U.S. 451, 458-59, 121 S. Ct. 1693, 1698, 149 L. Ed. 2d 697 (2001). The Court explained that much of its "expansive" language in *Bouie* was *dicta*, and that the due process clause does not import all of the specific prohibitions of the *ex post facto* clause of art. I, § 10, cl. 1 of the United States Constitution, which, by its terms, is not itself applicable to the courts. *See Marks v. United States*, 430 U.S. 188, 191, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977). Instead, *Bouie* is based on "core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct." *Id.*, 532 U.S. at 459, 121 S. Ct. at 1698-99.

Relying mainly on the explanation in *Rogers*, two courts have already considered, and rejected, the substance of Hale's due process argument, *United States v. Duncan*, — F.3d —, 2005 WL 428414 (11th Cir. Feb. 24, 2005), and *United States v. Gray*, — F. Supp. 2d —, 2005 WL 613645 (S.D. W. Va. 2005). The court finds the reasoning and analysis in those cases persuasive and adopts it here. As the court in *Duncan* explained:

> At the time Duncan committed his offense, 1999-2002, the U. S. Code informed Duncan that if a jury convicted him of possessing at least 5 kilograms of cocaine powder, he was subject to a sentence of life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A)(ii)(I). The Guidelines at the time also informed Duncan that a judge would engage in fact-finding to determine his sentence and could impose up to a sentence of life imprisonment. 18 U.S.C. § 3551 *et seq.* Duncan, therefore, had ample warning at the time he committed his crime that life imprisonment was a potential consequence of his actions. Applying the principles announced in *Rogers*,

14

> Duncan's due process rights cannot be said to have been
> violated.

*Duncan,* — F.3d at —, 2005 WL 428414 at * 8 (footnote omitted). The court also noted

that "at the time of Duncan's criminal conduct, the recognized state of the law looked to

the U.S. Code as establishing maximum sentences — in Duncan's case, a life sentence.

Although mandatory Guidelines were in place, the law of this Circuit then recognized

the U.S. Code as the source of the maximum sentence." *Id.* at *9.

The court in *Gray* adopted *Duncan*'s reasoning, noting:

> [T]he defendants in the instant case had fair warning of the
> potential consequences of their conduct by virtue of the
> statutory maximums set by the United States Code. These
> code sections have long been referenced by the Sentencing
> Guidelines, judges, and presentence reports. Thus, the
> surprise that the defendants may have experienced when
> learning that the Guidelines were no longer a mandatory
> system is not analogous to the surprise experienced by the
> defendants in *Bouie* and *Marks*, who learned that their
> conduct, innocent when it was done, had become a crime
> after the fact.

*Gray,* — F. Supp. 2d at —, 2005 WL 613645 at * 13.

The same is true for Hale in the present case. At the time he committed his

offense, the law of this circuit was that "a particular sentence does not even implicate

*Apprendi* unless it exceeds a default statutory maximum[.[8]]" *United States v. Knox,* 301

F.3d 616, 620 (7th Cir. 2002) (*citing United States v. Jones,* 245 F.3d 645, 649 (7th Cir.2001).

---

[8] The term "statutory maximum" as used here was a reference to the maximum
for the offense set out in the United States Code, not a reference to the maximum
penalty established by the Guidelines without additional factfinding, as the term meant
after the explanation of *Blakely* in *United States v. Booker,* 375 F.3d 508, 510 (7th Cir. 2004).

15

Thus, Hale had fair warning that his offenses exposed him to the maximum penalty set out in the United States Code.

The only observation that this court can add to the reasoning of *Duncan* and *Gray* is this: suppose Hale, at the time of his offense conduct, understood that existing precedent was wrong, and that the true state of existing law, based on *Apprendi*, was that any Guidelines-based upward adjustments to the length of his sentence would have to be based on facts found by a jury beyond a reasonable doubt. Even if that had been Hale's understanding, it would have been completely unreasonable for him to expect to receive a sentence within the minimum Guidelines range based on an unadjusted base offense level. This is because, from the panoply of facts and circumstances existing at the time of his conduct, Hale had no way of knowing what facts the government might choose to allege and prove to the jury beyond a reasonable doubt. The only thing that Hale could know with certainty on the date of his offense conduct was that he might receive the maximum penalty for his offenses as set out in the United States Code. Thus, the court holds that applying the remedial holding of *Booker* to Hale, and determining a sentence that is based on judicial fact-finding with the Guidelines serving a statutorily-mandated advisory function, does not violate Hale's due process rights.

### B. Objection to preponderance standard of proof

Hale argues that any facts on which the court does rely to increase his sentence must be submitted to a jury and proven beyond a reasonable doubt:

16

> While traditionally judicial fact finding has been based upon
> a preponderance of the evidence standard, Booker arguably
> stands for the proposition that this standard is now changed,
> especially where a court is applying guideline enhancements
> to increase a defendant's sentence above what it otherwise
> would be.

New Position Paper as to Sentencing Factors at p. 10.

The court disagrees, and believes that *Booker* has resolved any constitutional question regarding the appropriate burden of proof for facts on which the court relies for sentencing purposes in favor of a preponderance standard. Under the now advisory, non-mandatory role that the Guidelines play, a person a jury finds guilty of a crime beyond a reasonable doubt is exposed to the maximum punishment allowed by the United States Code penalty provision for the offense, rather than the maximum allowed under the Guidelines. That makes it constitutional to sentence the defendant anywhere within that statutory range based on facts proven only by a preponderance of the evidence. *Harris v. United States*, 536 U.S. 545, 558, 122 S. Ct. 2406, 153 L. Ed. 2d 524 (2002) ("Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments.")

*V. Hale's specific objections to the Guidelines adjustments applied by the court*

  *A. Count Two adjustments*

    *1. Guidelines § 3A1.2(a)(1)(A)*

17

First, Hale objects to the three-level upward adjustment made to Count Two pursuant to Guidelines § 3A1.2(a)(1)(A) because the crime was motivated by Judge Lefkow's status as a government officer. Hale argues that the government's theory of the case is that he was motivated to solicit Judge Lefkow's murder because of the 11/19/02 order she entered, not because of her status as a United States district judge: "Judge Lefkow had presided over the case for two years and there is simply no evidence at all that I suddenly wanted her dead because of that <u>status</u>." Defendant's Position Paper as to Sentencing Factors at p. 7.

Hale's argument on this point is the classic distinction without a difference. Judge Lefkow could not have entered the order that she did were it not for the fact that she was a federal judge. The 11/29/02 e-mail that Hale sent to WCOTC members describing Judge Lefkow's 11/19/02 order contained the text of an article he intended to publish in the WCOTC's newsletter, entitled "Rigged Court System Declares War on Church," and stated that the order "in effect" put the WCOTC in "a state of war with this federal judge and any acting on authority from her kangaroo court." Thus, it was not the order in a vacuum that motivated Hale, it was the fact that the order was issued by a federal judge exercising the jurisdiction and power that jurisdiction gave her. The court has no trouble concluding that the adjustment pursuant to Guidelines § 3A1.2(a)(1)(A) applies.[9]

---

[9] The court also notes that Application Note 3 to Guidelines § 3A1.2(a)(1)(A) explains that "motivated by such status" means motivated by the fact that the victim was a government officer or employee, and describes, as the only example of

### 2. Guidelines § 3C1.1

Hale next objects to the two-level upward adjustment pursuant to Guidelines
§ 3C1.1 for obstruction of justice, based on Hale's attempts to persuade Jon Fox to testify
falsely that Hale had previously told Fox that he suspected that Tony Evola was a
government informant. He argues that the facts do not support the adjustment because
he told Fox only to tell the media that he had never trusted Evola. In addition, Fox was
not a credible witness and so his testimony that Hale had never made such statements
should not be believed.[10]

It is true that Hale wrote to Fox that Fox should tell the media that Hale never
trusted Evola, but it is not true that he told Fox only to tell that to the media. Telling Fox
to tell that to the media was merely one part of Hale's attempt to orchestrate Fox's
testimony. First, in a letter dated January 17, 2002,[11] Hale told Fox "[y]ou remember
well that I expressed my doubts about him [Evola] to you," and then told Fox to tell
Hale's defense attorneys that he had "suspected that Tony was an informant." Then, in
a letter dated January 31, 2002, Hale told Fox to contact the media as often as possible
when anything happened in the case, and:

---

circumstances where that would not be true, a personal dispute between co-employees
of a government agency. That example is nothing like the circumstances of this case.

[10] Hale also points to a statement he made to the FBI when he was arrested that
he had suspected Evola was an informant, and an affidavit provided by a WCOTC
Reverend that Hale had in the past expressed suspicion about Evola to him.

[11] For the year, Hale's letters bear dates based on a calendar system used by the
WCOTC. The court references them by their conventional dates.

> [T]ell the media that I suspected all along that he [Evola] was
> a spy and that's one of the things that makes this "case" so
> absurd. Tell them the <u>fact</u> that I told you the day before my
> arrest that T. [Tony Evola] was a spy. This will help my
> situation. "phony Tony."

Then, in a third letter dated April 1, 2002, Hale told Fox that "[y]ou yourself are a key

witness on the issue of the spy—how I suspected him as that—. . . . I told the FBI all

about these facts when they kidnapped me so there's no harm in telling them again."

It is clear that Hale was engaging in a campaign to encourage Fox to tell the

authorities that Hale had suspected all along that Evola was an informant. Because the

court finds Fox's testimony at trial that Hale had never expressed any such doubts

about Evola to him to be credible, the court finds the two-level upward adjustment

pursuant to Guidelines § 3C1.1 for obstruction of justice to be applicable.[12]

### 3. Guidelines § 3A1.4

Hale objects to an upward adjustment (and increase to his criminal history

category) pursuant to Guidelines § 3A1.4, a section with the heading "Terrorism," for

several reasons, which the court condenses under the two headings below. The

provisions of § 3A1.4 that are pertinent to the discussion which follows are subsection

(a), which provides (in part): "If the offense is a felony that involved, or was intended to

promote, a federal crime of terrorism, increase by **12** levels," and Application Note 1,

---

[12] In addition, there was ample evidence from Hale's correspondence with, and
statements to, Evola showing that he trusted Evola. Hale's arguments that this only
shows that he did not want to "hurt his [Evola's] feelings" or that he himself feared
Evola is an unbelievable characterization of the evidence.

which states that "[f]or the purposes of this guideline, 'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." In turn, 18 U.S.C. § 2332b(g)(5) provides that a federal crime of terrorism is one of several enumerated statutes (listed in § 2332b(g)(5)(B)) that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).

*a.) Whether offense of conviction must be enumerated in § 2332b(g)(5)(B)*

Hale argues that Guidelines § 3A1.4 applies only when the offense of conviction is one of the offenses enumerated in § 2332b(g)(5)(B), which 18 U.S.C. § 373, the offense of conviction on Count Two, is not. This argument flies in the face of the plain language of § 3A1.4, which does *not* instruct to apply the adjustment if the offense is a felony that *is* a federal crime of terrorism; instead, it directs the court to make the adjustment if the "offense is a felony that involved, or was intended to promote, a federal crime of terrorism," which is a much broader scope. Thus, under Hale's interpretation, conspiring to blow up the federal building in Oklahoma City would not support the enhancement (18 U.S.C. § 371 is not enumerated in § 2332b(g)(5)(B)), but actually doing so would. The absurdity of this dichotomy strongly suggests that Hale's interpretation is wrong.

Hale's argument is supported, however, by the decision in *United States v. Arnaout*, 282 F. Supp. 2d 838 (N.D. Ill. 2003)—which Hale states is "the law of this

district"[13]—and by the dissenting opinion in *United States v. Graham,* 275 F.3d 490 (6th Cir. 2001). These decisions[14] are based on the reasoning that in enacting Guidelines § 3A1.4, the Sentencing Commission ignored a specific directive from Congress—which the Commission lacks the authority to do, *United States v. LaBonte,* 520 U.S. 751, 757, 117 S. Ct. 1673, 137 L. Ed. 2d 1001 (1997)—that the terrorism adjustment should be applied only when the offense of conviction is one of the offenses listed in § 2332b(g)(5)(B).

This directive was gleaned from a statement found in the legislative history to § 730 of the Antiterrorism and Effective Death Penalty Act of 1996 § 730, Pub.L. 104-132, 110 Stat. 1303 (hereinafter, "AEDPA"). Section 730 of the AEDPA directed the Sentencing Commission to amend § 3A1.4, which at that time applied only to international terrorism, in order to make it apply to all federal crimes of terrorism, that is, to include domestic terrorism as well. As noted in *Arnaout,* "[t]he amendment

---

[13] This is not correct, as decisions by other district judges are "entitled to no more weight than their intrinsic persuasiveness merits." *Colby v. J.C. Penney Co., Inc.,* 811 F.2d 1119, 1124 (7th Cir. 1987). Even were that not true, in *Arnaout* the conspiracy offense of conviction was "not predicated on any terrorist conduct enumerated in" § 2332b(g)(5)(B), 282 F. Supp. 2d at 845, unlike the present case, where Hale was convicted of soliciting a violation of 18 U.S.C. § 1114, which is one of the enumerated offenses. *Arnaout* read narrowly is, therefore, not applicable to the present circumstances.

[14] In this discussion the court focuses on *Arnaout.* The reasoning in it, and in the dissenting opinion in *Graham,* is virtually identical.

22

responded to a congressional directive that the existing international terrorism

guideline be defined more broadly[."][15]

Prior to the amendment, § 3A1.4 had stated: "If the offense is a felony that

involved, or was intended to promote, international terrorism, increase by **12** levels[.]"

Section 730 of the AEDPA, captioned "DIRECTIONS TO SENTENCING

COMMISSION," provided:

> The United States Sentencing Commission shall forthwith, in
> accordance with the procedures set forth in section 21(a) of
> the Sentencing Act of 1987, as though the authority under
> that section had not expired, amend the sentencing
> guidelines so that the chapter 3 adjustment relating to
> international terrorism only applies to Federal crimes of
> terrorism, as defined in section 2332b(g) of title 18, United
> States Code.

AEDPA § 730.

It is obvious this directive, meant to expand the application of the terrorism

adjustment, used the word "only" as a modifier of "international terrorism." Better

drafting would have placed a comma after "only" so that the sentence read: ". . . amend

the sentencing Guidelines so that the chapter 3 adjustment relating to international

---

[15] The court has not selectively omitted the last portion of this sentence to
advance its own view. The sentence in its entirety states: "The amendment responded to
a congressional directive that the existing international terrorism guideline be defined
more broadly to include **only** federal crimes of terrorism." (Emphasis in original). It is
difficult to understand how a guideline would ever be broadened by limiting its
application to include "only" some part of something else. This self-contradictory
statement comes early in the *Arnaout* discussion and shows how the court was led
astray by a poorly-drafted legislative history which, as the court explains herein,
misstates which clause of AEDPA § 730 the word "only" modifies.

terrorism only, applies to Federal crimes of terrorism as defined in section 2332b(g)[.]"

Even better, the sentence could have been written as: " . . . amend the sentencing

Guidelines so that the chapter 3 adjustment relating only to international terrorism

applies to Federal crimes of terrorism as defined in section 2332b(g)[.]" It also bears

observing, at this point, that nothing in the directive suggested that Congress intended

the Sentencing Commission to do anything else, such as, for example, limiting the

adjustment so that, rather than applying when the offense of conviction "involved, or

was intended to promote" a crime of terrorism, it would be applied only when the

offense of conviction was itself a crime of terrorism defined in section 2332b(g).

     The less than ideal punctuation and placement of the word "only" in § 730 led to

an absolute mangling of Congress' intent when the legislative history that purported to

explain § 730 was written, most likely by a harried and/or misinformed Congressional

staff-person:

> This section gives the U.S. Sentencing Commission
> amendment authority to expand the scope of its Chapter 3
> enhancement for "international terrorism offenses" under
> the U.S. Sentencing Guidelines, to apply only to federal
> crimes of terrorism as defined in section 2332b(g). In
> amendments to the Sentencing Guidelines that became
> effective November 1, 1996, a new provision that
> substantially increases jail time for offenses committed in
> connection with a crime of international terrorism. This
> section of the bill will make that new provision applicable
> only to those specifically listed federal crimes of terrorism,
> upon conviction of those crimes with the necessary
> motivational element to be established at the sentencing
> phase of the prosecution, without having to wait until
> November 1996 for the change to become law.

24

Conference Report on S. 735, 142 Cong. Rec. H. 3305-01, § 730.

The fact speaks for itself that the drafter of the paragraph above thought that this was a complete sentence: "In amendments to the Sentencing Guidelines that became effective November 1, 1996, a new provision that substantially increases jail time for offenses committed in connection with a crime of international terrorism." This sentence fragment is indicative of the amount of time and care that went into writing this portion of the conference report. Thus, the drafter made the additional mistake of assuming that "only" as used in AEDPA § 730 modified "federal crimes of terrorism," leading to inclusion of the self-contradictory statement that "[t]his section gives the U.S. Sentencing Commission amendment authority to *expand* the scope of its Chapter 3 enhancement for 'international terrorism offenses' under the U.S. Sentencing Guidelines, *to apply only to* federal crimes of terrorism as defined in section 2332b(g)." (Emphasis added.) Finally, when the drafter when on to write that the "new provision" (which probably should have instead been "expanded provision") would be "applicable only to those specifically listed federal crimes of terrorism, *upon conviction of those crimes* with the necessary motivational element to be established at the sentencing phase of the prosecution" (emphasis added), the court doubts that he or she even understood that this phrasing placed a new limitation into the provision, which limitation appears nowhere in the directive to the Sentencing Commission that Congress actually enacted as law.

To its credit, the Sentencing Commission was not misled by this incompetently-written provision in the conference report, and did exactly what Congress directed it to do in AEDPA § 730: it amended Guidelines § 3A1.4 so that, instead of applying only to international terrorism, it applied to all federal crimes of terrorism, by deleting the word "international" and substituting in its place "a federal crime of." Guidelines Appendix C, Vol. I, Amendment 539. Courts should "determine what Congress meant *by what it enacted*, not what Senators and Representatives said, thought, wished or hoped." *N.A.A.C.P. v. American Family Mutual Insurance Co.*, 978 F.2d 287, 294 (7th Cir. 1992). Thus, this court sees no reason to believe that Congress instructed the Sentencing Commission to amend § 3A1.4 to limit its application to convictions of the offenses listed in § 2332b(g)(5)(B), and to conclude that the Sentencing Commission improperly ignored any such instruction. This court will follow the plain language of § 3A1.4, and finds that the terrorism adjustment can be applied when the offense of conviction "involved, or was intended to promote" one of the offenses listed in § 2332b(g)(5)(B).[16]

### b.) Whether § 3A1.4 adjustment is factually appropriate

Hale next argues that even if § 3A1.4 applies legally, it does not apply factually. In addition to being an offense listed in § 2332b(g)(5)(B), for an offense to be a "federal crime of terrorism" it also must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

---

[16] The court therefore reaches a conclusion which is not in conflict with the law of the two circuits that have addressed this issue. *United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004); *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001).

18 U.S.C. § 2332b(g)(5)(A). Hale argues that there was "no evidence" at trial that his crime was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," because the evidence showed that Judge Lefkow had (initially) ruled in favor of the WCOTC, and that Hale had already trademarked another name for the WCOTC to use.

While the latter two points may be true, the argument belies the evidence. The immediate chain of events that lead to Hale's arrest and indictment began with Judge Lefkow's 11/19/02 order, which Hale described in his 11/29/02 e-mail to WCOTC members as placing the WCOTC in "a state of war with this federal judge and any acting on authority from her kangaroo court." Clearly there is sufficient evidence to support a finding by a preponderance of the evidence that Hale's actions were calculated to retaliate against government conduct.

In addition, as the presentence investigation report points out, there was a jury finding beyond a reasonable doubt of facts sufficient to support the adjustment on the basis that Hale's actions were "calculated to influence or affect the conduct of government by intimidation or coercion." To find Hale guilty of the charge contained in Count Four of the indictment,[17] the court instructed the jury (in Court's Final Jury

---

[17] Hale argues that because the jury findings made on Count Four are cited in the presentence investigation report as supporting the adjustment, the adjustment has wrongfully been applied to Count Two rather than Count Four. The factual conduct involved in the two counts is substantially the same, and the evidence on the two counts substantially overlapped. In determining an appropriate sentence, the court does not have to cabin its view to a single count, but can consider all of the evidence in the case; in fact, where counts are grouped, as Counts Two and Four are here, the

Instruction No. 25) that it had to find beyond a reasonable doubt that Hale endeavored to influence, intimidate or impede Judge Lefkow by soliciting her murder, and that his acts were done with the purpose of wrongfully impeding the due administration of justice. Because of the jury findings on these two issues, and the court's own finding that there is sufficient evidence to show that Hale acted to retaliate against government conduct, the § 3A1.4 terrorism adjustment is factually appropriate in this case.

### c.) Whether § 3A1.4 adjustment is disproportionate

Hale argues that applying the § 3A1.4 adjustment, which results in the Guidelines range being life,[18] is *prima facie* unreasonable, disproportionate to his offense conduct and true criminal history, and violative of the command in 18 U.S.C. § 3553(a) that the sentence imposed be "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth therein. The court explained in open court its reasons for finding that the advisory Guidelines sentence after the adjustment—40

---

Guidelines require the court to consider all acts that are part of the same course of conduct. Guidelines § 1B1.3(a)(2). Moreover, Hale fails to appreciate that the same adjustment can be applied to multiple counts. Guidelines § 1B1.1(d). Thus, the court could also apply the adjustment to Count 4. Doing so would ultimately make no difference in the sentence because of the grouping of Count Two and Four pursuant to Guidelines § 3D1.2(b).

[18] This is as Hale states it, "life" being the range in the sentencing table in Guidelines Chapter 5, Part A, for his adjusted offense level and criminal history category after the adjustment is applied. As is explained above, however, the statutory maximum of 40 years becomes the advisory Guidelines range. Guidelines §§ 5G1.2(b), 5G1.1(a).

years—is a sentence which is reasonable and not greater than is necessary to adequately meet the purposes of sentencing.

### B. Count Four adjustments

#### 1. Guidelines § 3A1.2(a)(1)(A)

Hale objects to the three-level upward adjustment made to Count Four pursuant to Guidelines § 3A1.2(a)(1)(A) because the crime was motivated by Judge Lefkow's status as a government officer, by incorporating his argument on this issue made on Count Two. For the reasons given above regarding Count Two in section (A)(1) of this memorandum, the adjustment is appropriate.

#### 2. Guidelines § 2J1.2(b)(1)

Hale objects to the eight-level upward adjustment pursuant to Guidelines § 2J1.2(b)(1), because the offense of conviction involved threatening to cause physical injury to a person in order to obstruct the administration of justice, in this case, the assault and murder of Judge Lefkow. Guidelines § 2J1.2(b)(1) states:

> If the offense involved causing or threatening to cause physical injury to a person, . . . in order to obstruct the administration of justice, increase by 8 levels.

To find Hale guilty on Count 4, the jury found that he had solicited Judge Lefkow's murder in order to impede the due administration of justice.

Hale nevertheless argues that the adjustment is inappropriate because Black's Law Dictionary defines a threat as a "communicated intent to inflict physical or other harm on any person or property," and:

29

> There was no jury finding that I <u>communicated</u> such an
> intent. When a person "threatens" another with physical
> harm, that person is attempting to put the other in
> apprehension of harm.  .  .  .
>           .  .  . I submit that a solicitation and a "threat" are
> very different concepts as a matter of law and linguistics. A
> threat is a <u>communication</u>, not an act, at least for the
> purposes of this guideline. Otherwise, every crime of
> violence could be subjectively labeled a "threat."

Defendant's Position Paper as to Sentencing Factors at pp. 6-7.

The court notes that the Black's definition cited by Hale simply says a "communicated intent," it does not say that the threat must be communicated to the object of the threat, and this is consistent with the common meaning of the term that any declaration of an intent to inflict harm is a threat. For example, the meaning of the statement "he is threatening to shoot anyone he finds trespassing on his property" is clear, even though there is no threat being communicated to unknown future trespassers. The very few cases that have considered this issue have concluded that a threat need not be communicated to the victim for § 2J1.2(b)(1) to apply. *See United States v. Grap*, 368 F.3d 824, 832 (8th Cir. 2004) ("We decline to read into the guideline a requirement that the threat must have been communicated to the person intended to be threatened. The plain meaning of the guideline's language suggests no such limitation."); *United States v. Sand*, 989 F.2d 501, 1993 WL 72479 at * 4 (6th Cir. 1993) (unpublished decision); *United States v. Moody*, 977 F.2d 1420, 1425 (11th Cir. 1992); *United States v. Sims*, 952 F.2d 1014, 1017 (8th Cir. 1991).

In his Reply to Government's Response to Defendant's Various Sentencing Filings, filed on March 29, 2005, defendant Hale states that his argument is not that the threat had to be communicated to Judge Lefkow (despite his earlier argument, quoted above, that a threat involves one person "attempting to put the other in apprehension of harm"). Instead, he maintains that Guidelines § 2J1.2(b)(1) requires some communication, but in the present case the threat at issue "is not a communication, but an act." Reply to Government's Response to Defendant's Various Sentencing Filings at p. 4. The court fails to appreciate the distinction. Hale solicited Tony Evola to assault and murder Judge Lefkow. He communicated to Evola his intention that Judge Lefkow be harmed. Thus, his "offense involved . . . threatening to cause physical injury to a person," exactly as the adjustment requires.

The court finds that under the plain meaning of the language used in Guidelines § 2J1.2(b)(1), Hale's offense *involved* threatening to cause physical injury to a person. The eight-level upward adjustment is therefore appropriate.

ENTERED this 6th day of April, 2005

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT